PARTIDO POPULAR DEMOCRÁTICO, apelante, *v.* PEDRO ROSSELLÓ GONZÁLEZ ET ALS., apelados; LCDO. MAX PÉREZ PRESTON, por sí y como candidato a Alcalde del Partido Nuevo Progresista, y OTROS, apelantes, *v.* JOSÉ E. APONTE, por sí y como candidato a Alcalde por el Partido Popular Democrático, y OTROS, apelados; PARTIDO POPULAR DEMOCRÁTICO ET ALS., demandantes, *v.* PARTIDO NUEVO PROGRESISTA ET ALS., demandados.

*Números:* AP-95-7
AP-95-9
CT-95-10

*Resueltos:* 22 de diciembre de 1995

644

*Pedro E. Ortiz Álvarez, Rina Biaggi García* y *Marcos Ramírez Lavandero,* abogados del Partido Popular Democrático, apelante; *Carlos Lugo Fiol, Procurador General,* y *Francisco J. González Muñiz, Procurador General Auxiliar,* abogados de El Pueblo.

El Juez Presidente Señor Andréu García emitió la opinión del Tribunal.

Para propósitos decisorios, consolidamos los tres (3) ca-

sos de epígrafe.([1]) En todos se plantea la interrogante de si existe una violación al axioma constitucional de igualdad económica de los partidos y a la Sec. 9 del Art. VI de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, sobre el uso de fondos públicos, cuando el Estado o un municipio utiliza tales fondos fuera del período de veda electoral para pagar anuncios que tienen el propósito de beneficiar al partido en el poder o a los candidatos del partido en el poder —o a ambos— tanto a nivel estatal como a nivel municipal. En todos los casos se solicita un *injunction*, preliminar y permanente para prohibir la divulgación de los anuncios o los mensajes impugnados, así como el resarcimiento o la restitución de dichos fondos al erario.

I

*Trasfondo procesal de los casos*

A. *P.P.D. v. Rosselló, Caso Civil Núm. AP-95-7*

El 20 de abril de 1995 el Partido Popular Democrático presentó la demanda en el caso de epígrafe contra el Hon. Pedro Rosselló González, Gobernador de Puerto Rico; la Hon. Carmen Feliciano de Melecio, Secretaria de Salud, y el Estado Libre Asociado de Puerto Rico "por conducto del Departamento de Salud". En la demanda se alegó, en síntesis, que el 18 de abril de 1995 fueron transmitidos por la televisión en Puerto Rico ciertos anuncios en los cuales se atacaba directamente el Plan de Salud del Alcalde del Municipio de San Juan, Hon. Héctor Luis Acevedo, y al Alcalde propiamente. Sostuvo que en los referidos anuncios aparecía como productor y auspiciador de éstos el Departamento de Salud. Adujo, además, que en el periódico *El Nuevo Día*, edición de 19 de abril de 1995, fue publicado un

---

([1]) Previamente habíamos consolidados estos casos, pero sólo para propósitos de la vista oral celebrada el 8 de diciembre de 1995.

anuncio impreso, parecido al anuncio televisado, con el mismo mensaje y objetivo.

En la demanda se alegó que los referidos anuncios carecen de fin o propósito público alguno y que son de carácter político-partidista. Según la parte demandante, los referidos anuncios van claramente dirigidos a desacreditar, entorpecer e impedir la divulgación del Plan de Salud del Municipio de San Juan y su aprobación. Mediante estos anuncios, alegadamente, se ataca al candidato a gobernador de Puerto Rico por el Partido Popular Democrático y se exalta la imagen del actual incumbente y candidato a Gobernador por el Partido Nuevo Progresista (en adelante P.N.P.). A tenor con estas alegaciones, sostienen los demandantes que la utilización de fondos públicos para estos fines constituye una práctica nociva al interés público que afecta de forma detrimental el derecho de otros electores afiliados al partido demandante, al favorecer impermisiblemente los fines del partido del actual incumbente.

La parte demandante alegó que las violaciones constitucionales señaladas le causan daños irreparables sin que exista otro remedio en ley que le permita proteger sus derechos. A tenor con ello, solicitó los remedios siguientes:

> 1. Sentencia declarando la inconstitucionalidad del uso de fondos públicos para el diseño, producción y divulgación de los referidos anuncios;
> 2. Orden de injunction permanente prohibiéndole a los demandados utilizar los recursos del Estado para fines privados político-partidistas y para que detengan la campaña publicitaria de los anuncios en los medios de difusión pública del país; y
> 3. Orden a los codemandados para que restituyan al erario todo el dinero gastado en diseño, producción y divulgación de los anuncios objeto de la demanda.

En conformidad con la Regla 57 de Procedimiento Civil, 32 L.P.R.A. Ap. III, la parte demandante también solicitó un *injunction* preliminar para que se ordenara a los demandados abstenerse de continuar utilizando fondos públicos para los anuncios descritos en la demanda o cuales-

quiera otros similares que respondan exclusivamente a fines político-partidistas.

De los escritos presentados por la parte demandada, a través del señor Procurador General de Puerto Rico, surge que se sometieron a la jurisdicción del Tribunal de Primera Instancia (Sala Superior de San Juan, Hon. Carmen R. Vélez Borrás), tanto el señor Gobernador de Puerto Rico como la señora Secretaria de Salud y el Estado Libre Asociado de Puerto Rico.

El Tribunal de Primera Instancia denegó la solicitud de entredicho provisional. Durante la vista celebrada el 5 de mayo de 1995, las partes solicitaron, y el tribunal accedió, que las controversias fuesen sometidas a base de una estipulación de hechos y los alegatos. La parte demandada presentó, además, una moción para solicitar la desestimación de la demanda.[2]

Conforme determinó el tribunal a base de las estipulaciones de las partes, el 18 de abril de 1995 se transmitió por algunos canales de televisión un anuncio auspiciado y producido por el Departamento de Salud de Puerto Rico. El referido anuncio consistía en una comparación entre el número de tarjetas de salud que el Gobierno de Puerto Rico había distribuido en toda la Isla en comparación con las que el Municipio de San Juan había distribuido en dicha ciudad. Este mismo anuncio fue publicado durante los días 19 y 26 de abril de 1995 en el periódico *El Nuevo Día*. El texto del referido anuncio es el siguiente:

¿Después de 7 años, cuántas tarjetas de salud ha distribuido el alcalde Acevedo en San Juan?

0

¿Después de 2 años, cuántas tarjetas de salud ha distribuido el Gobierno de Puerto Rico en el resto de la Isla?

315,000

---

[2] En ésta señaló, en síntesis, que la parte demandante carecía de legitimación activa y, en la alternativa, que la controversia se había tornado académica.

En sólo dos años, más de 315,000 puertorriqueños están disfrutando de la reforma de salud y de la Tarjeta de Seguro de Salud del Gobierno de P.R. La misma que el Alcalde Acevedo rechazó para el municipio de San Juan, en momentos en que el sistema de salud de este municipio atraviesa su peor crisis.

Ahora después de 7 años prometiendo un plan de salud para San Juan, el Alcalde anuncia una tarjeta que no existe. Por otro lado, cientos de miles de puertorriqueños están disfrutando del poder de la salud con la tarjeta probada del Gobierno de Puerto Rico.

Por el bienestar de la salud de nuestro pueblo es importante que conozcas la verdad.

Surge de la sentencia recurrida que el Departamento de Salud auspició y se hizo cargo del pago de los gastos de producción y de publicación del referido anuncio en los distintos medios de comunicación. Éste respondió a unos anuncios previamente publicados por el Municipio de San Juan. La validez constitucional de dichas publicaciones no fue cuestionada y, por lo tanto, no está ante nuestra consideración.

El foro de instancia determinó que la presente controversia plantea legítimos reclamos de derechos fundamentales a nuestro quehacer democrático. De una parte, consideró que el Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, consagra que el propósito de utilizar fondos públicos debe ser el propiciar el bienestar de la ciudadanía en general y que el postulado de igualdad o paridad económica entre los partidos políticos, consagrado en nuestra Constitución, prohíbe el uso de fondos públicos para la promoción de determinada postura política. De otra parte, consideró que el hecho de que el partido de gobierno utilice los medios publicitarios para proyectar el mensaje que desea transmitir a la ciudadanía, no necesariamente configura una violación al postulado de igualdad consagrado en la Constitución ni vulnera la referida prohibición del Art. VI, Sec. 9 de la Constitución del E.L.A., *supra*.

Amparándose en la facultad indelegable del Gobierno de informar al país y en el derecho de la ciudadanía a recibir información del Estado, el cual es un componente esencial de la libertad de expresión y de asociación reconocido por nuestra Constitución, e interpretando la prohibición contenida en el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, concluyó que los anuncios en cuestión no constituían una violación al derecho reclamado por el Partido Popular Democrático. Señaló, además, que el legislador no estimó apropiado extender la veda de anuncios *"político-partidistas"* a períodos relativamente apartados en tiempo de las contiendas electorales. Estimó el tribunal que no se justificaba ampliar judicialmente el remedio dispuesto en dicha ley, por lo que no podía extender la prohibición del Art. VI, Sec. 9 de la Constitución del E.L.A., *supra*, más allá del período electoral.

Conforme a los pronunciamientos antes resumidos, el 8 de junio de 1995 el tribunal dictó una sentencia mediante la cual declaró sin lugar la demanda. Por su inconformidad con dicha sentencia, apela ante nos la parte demandante señalando en apoyo a su escrito que "[e]rró el Tribunal de Primera Instancia al decidir que se pueden costear con fondos públicos los anuncios en controversia por no encontrarnos en el período electoral según contemplado en al Artículo 8.001 de la Ley Electoral de Puerto Rico". Mediante Resolución de 10 de noviembre de 1995, dimos curso a dicha apelación.

Por la naturaleza de la controversia que amerita la más pronta adjudicación, concedimos un término simultáneo de veinte (20) días a todas las partes para presentar sus respectivos alegatos. En éstos indicamos que las partes debían discutir, además de los planteamientos constitucionales, el aspecto de legitimación activa del apelante, a la luz de toda nuestra normativa, así como los aspectos de acade-

micidad y cuestión política. Señalamos una vista de argumentación oral para el 8 de diciembre de 1995.[3]

B. *Pérez Preston v. Aponte, Caso Civil Núm. AP-95-9*

El 23 de mayo de 1995, el Lic. Max Pérez Preston, por sí y como candidato a Alcalde de Carolina por el Partido Nuevo Progresista y Presidente del Comité Municipal de dicho partido, junto al Senador Roger Iglesias, los Representantes Iván Figueroa Figueroa y Epifanio Jiménez, Jr., y los Srs. José J. Espinosa Hernández, Miguel A. Díaz Cintrón y David Rodríguez Rivera, como electores y residentes del Municipio de Carolina, presentaron una demanda contra el Hon. José E. Aponte, por sí, como Alcalde del Municipio de Carolina y como candidato a Alcalde por el Partido Popular Democrático, contra la Directora de Finanzas del Municipio y contra el Secretario del Comité Municipal del Partido Popular Democrático. En síntesis, se alegó que el Alcalde demandado había desplegado por todo el referido municipio una campaña publicitaria masiva en la que destaca como logo el número 10 y la frase "UNA DÉCADA DE SUPERACIÓN", resaltando los años 1985–1995. Adujo que el despliegue del logo se ha hecho mediante el uso de pegatinas (*bumper stickers*), rótulos y anuncios que aparecen en postes; sobre los vehículos de la guardia municipal, de transportación pública, de los Departamentos de Conservación y Ornato, de Deportes y de Conservación Ambiental; publicados en el periódico regional "Todo" de Carolina, en los periódicos de circulación general (*El Vocero de Puerto Rico* y *El Nuevo Día*) y en el periódico mensual "La Voz del Gigante"; en el centro de la cancha de baloncesto del Coliseo Guillermo Angulo; en todos o en varios de los

---

[3] El Juez Asociado Señor Corrada Del Río señaló que declinaría ejercer la jurisdicción apelativa de este Foro por entender que el recurso no plantea una cuestión constitucional sustancial, por lo que lo remitiría al Tribunal de Circuito de Apelaciones.

vehículos oficiales del Municipio, donde se sustituyó el emblema o escudo oficial del Municipio por el logo de los diez (10) años y en el timbre del papel oficial del Municipio. Sostuvo, a su vez, que los empleados del municipio han estado usando camisetas con el referido logo durante horas laborables, en el desempeño de sus funciones públicas.

Se adujo en la demanda que el uso de este logo tiene el propósito de destacar y realzar con fondos públicos una administración municipal determinada, o sea, la del Alcalde demandado, y que de manera solapada y subliminal se pretende realzar la figura de éste como candidato para la reelección como Alcalde por el Partido Popular Democrático. Esto contraviene, según los demandantes, la Sec. 9 del Art. VI de la Constitución del E.L.A., *supra, permitiendo al actual incumbente municipal una ventaja económica sustancial sobre su opositor, al cual se le priva de tener la misma oportunidad económica*, desvirtuando el postulado constitucional de igualdad económica de los partidos para el debate público de los partidos y sus candidatos.

El Senador Iglesias, el Representante Figueroa y el Representante Jiménez reclamaron la violación *patente* al derecho de igualdad económica, ya que a pesar de haber asignado unas cantidades sustanciales de dinero de sus fondos legislativos al Municipio, el Alcalde utiliza estos fondos para realzar su figura como candidato sin reconocer a éstos sus aportaciones en la referida campaña.

Por su parte, los señores Espinosa Hernández, Díaz Cintrón y Rodríguez Rivera alegan ser electores residentes de Carolina que reclaman como daño el uso de los fondos del Municipio para una campaña que beneficia al candidato a Alcalde con el cual ellos no simpatizan, lo que a su vez constituye un uso de fondos públicos para fines político-partidistas.

En la demanda se solicitaron los remedios siguientes:

1. Que se declare inconstitucional e ilegal la campaña publicitaria masiva del Municipio de Carolina;

2. Entredicho provisional e injunction preliminar ordenándole a los demandados que se abstengan de hacer uso de fondos públicos para sufragar directa e indirectamente la campaña publicitaria del Alcalde demandado;

3. Orden de devolución y restitución de los fondos públicos que directa o indirectamente se han utilizado ilegalmente;

4. Que se le ordene a los demandados que satisfagan a los demandantes una suma igual a la gastada en forma ilegal para que éstos obtengan la paridad o igualdad económica en el debate político-partidista.

5. Orden de remoción de la insignia o emblema alusivo a los 10 años de incumbencia del Alcalde demandado y que se coloque nuevamente el emblema oficial del Municipio en su lugar.

Luego de contestada la demanda, el Tribunal de Primera Instancia (Sala Superior de Carolina, Hon. Julio Soto Ríos, Juez) celebró una vista en la que se discutió una moción de desestimación presentada por la parte demandada. Posteriormente, ambas partes presentaron varios escritos y memorandos de derecho. Entre los referidos escritos se sometió un informe suscrito por los abogados de ambas partes, mediante el cual los siguientes hechos aparecen estipulados:

1. El Municipio de Carolina ha hecho una campaña que destaca la última década de superación.

2. El anuncio se ha presentado en distintas formas, incluyendo las expuestas en el acápite 2.

3. En algunos vehículos municipales se ha colocado el anuncio aludido.

4. En algunos papeles que se usan para circular información dentro y fuera del Municipio se usa el lema aludido.

5. Algunos empleados han usado una camiseta con el lema aludido.

6. El Municipio ha pagado parte de los gastos de difusión

7. El anuncio cuenta con la aprobación del Alcalde.

8. La Directora de Finanzas autorizó el pago de las facturas.

9. Al Alcalde peticionado no le interesó contestar las expresiones políticas del licenciado Pérez Preston.

10. El Logo con el número 10 fue colocado en el centro de la Cancha de Baloncesto del Coliseo Guillermo Angulo.

Durante la vista argumentativa, el tribunal consideró que la representación legal de los demandantes había enmendado su petición al alegar que el logo de los diez (10) años de superación "no lleva ningún mensaje ... no destaca ningún logro ... no se señala ninguna obra ... es un mensaje vano donde lo único que se presenta son diez años de Administración".

El 29 de junio de 1995, el tribunal dictó una sentencia mediante la cual desestimó la demanda. De ésta surge que el tribunal no les reconoció legitimación activa a los legisladores ni a los tres (3) ciudadanos demandantes. Con respecto al licenciado Pérez Preston, concluyó que aunque se le reconociera la legitimación activa para incoar la acción, no existía una controversia real entre éste y el Alcalde demandado, ya que "[l]a caracterización de la campaña como una vana y sin mensaje alguno no p[odía] racionalmente ser fuente de daños". El tribunal se cuestionó, además, si un candidato interno de un partido a la Alcaldía podía reclamar daños con miras a una eventual candidatura en propiedad. Ante ello, consideró que el caso no era justiciable y procedió a desestimarlo.

Inconforme, la parte demandante apeló ante nos, señalando varios errores.(⁴) Inicialmente denegamos el recurso por no plantear una cuestión constitucional sustancial y lo remitimos al Tribunal de Circuito de Apelaciones.(⁵) En re-

---

(⁴) En el escrito (AP-95-9) se señalaron los errores que resumimos a continuación: (1) Resolver que las expresiones de la representación legal de los demandantes apelantes tuvo el efecto de enmendar las alegaciones de la petición; (2) no reconocer legitimación activa a los demandantes apelantes; (3) determinar que la campaña publicitaria impugnada no crea un daño claro, palpable, real, inmediato y preciso a los demandantes apelantes; (4) desestimar la causa de acción y no declarar con lugar la demanda con la prueba estipulada por las partes, y (5) concluir que no hay una controversia justiciable "en esta etapa" y no resolver la petición en los méritos.

(⁵) En esta Resolución de 3 de noviembre de 1995, el Juez Presidente Señor Andréu García y los Jueces Asociados Señores Negrón García y Rebollo López disintieron.

consideración, acogimos el recurso y lo consolidamos para propósitos de la vista oral con el Recurso Núm. AP-95-7.

### C. *P.P.D. v. P.N.P., Caso Civil Núm. CT-95-10*

El 14 de noviembre de 1995, el Partido Popular Democrático, el Senador Miguel Hernández Agosto y el Representante Severo Colberg Toro presentaron una demanda contra el Partido Nuevo Progresista, el Honorable Gobernador de Puerto Rico y varios funcionarios del Estado Libre Asociado de Puerto Rico, en su carácter personal y oficial.[6] En la demanda se alegó que los demandados habían incurrido en gastos de más de cincuenta y nueve millones de dólares ($59,000,000) para exaltar con fondos públicos la imagen política del Dr. Pedro Rosselló y para adelantar la causa electoral del P.N.P. en los comicios generales que se avecinan. Se alegó que de forma metódica y planificada, todos y cada uno de los demandados hacen referencia, en los anuncios pagados con fondos públicos, a los lemas y colores del P.N.P. y a la imagen política de su candidato a gobernador. A su vez, se alegó que todos y cada uno de los anuncios sufragados con fondos públicos carecen de fin o propósito público alguno y que éstos van dirigidos a realzar y promover la imagen política del P.N.P. y del code-

---

[6] Los funcionarios demandados, tanto en su carácter personal como oficial, son los siguientes: Hon. Pedro Rosselló González; Dra. Carmen Feliciano de Melecio (Secretaria del Departamento de Salud); Sr. Carlos I. Pesquera (Secretario del Departamento de Transportación y Obras Públicas); Sr. Sergio L. González (Director Ejecutivo de la Autoridad de Carreteras); Sr. Víctor Fajardo (Secretario del Departamento de Educación); Lic. Pedro Rosario Urdaz (Comisionado de la Oficina del Comisionado de Asuntos Municipales); Sr. Jorge Aponte (Director de la Oficina de Gerencia y Presupuesto); Sr. Agustín García (Presidente de la Puerto Rico Telephone Co.); Sra. Magaly Oms de Maldonado (Directora Ejecutiva de la Administración de Seguros de Salud); Sr. Luis Fortuño (Secretario del Departamento de Desarrollo Económico y Comercio); Sr. César Almodóvar (Secretario del Departamento del Trabajo y Recursos Humanos); Sra. Carmen Rodríguez (Secretaria del Departamento de la Familia), y Luis Maldonado Rodríguez (Representante por el Precinto Núm. 13).

mandado doctor Rosselló González, para lograr su reelección y permanencia en el poder.(⁷)

En la demanda se alegó que la referida campaña publicitaria costeada con fondos públicos constituye una violación al Art. VI, Sec. 9 de la Constitución del E.L.A., *supra*, "que afecta detrimentalmente el derecho de los demás electores, particularmente los afiliados al Partido demandante; y favorece y sirve, impermisiblemente, los fines de reelección del incumbente demandado".

Específicamente, contra el representante Luis Maldonado Rodríguez, se alegó que exhibe en su automóvil oficial una pegatina de carácter político-partidista, en violación a la práctica censurada en *Marrero v. Mun. de Morovis*, 115 D.P.R. 643 (1984).

Como remedio a las violaciones señaladas en la demanda se solicitó lo siguiente:

1. Sentencia declarando inconstitucional el uso de fondos públicos para el diseño, producción y divulgación de los anuncios objeto de esta acción;

2. orden de injunction permanente prohibiéndole a los demandados utilizar recursos del Estado para fines político partidistas y para que detengan la campaña publicitaria de los referidos anuncios en los medios de difusión pública del país;

3. orden de reembolso al erario público de todo lo gastado en

---

(⁷) En apoyo a su posición, los demandantes solicitaron que el tribunal tome conocimiento judicial de lo siguiente:

1. Que el color símbolo del codemandado P.N.P. es el azul.

2. Que los colores símbolo de la campaña de la codemandada Zaida Hernández Torres son el azul y el amarillo.

3. Que el lema de la campaña del codemandado P.N.P. y del Dr. Pedro Rosselló es el de promesas o "compromisos cumplidos" y "compromiso de cambio".

4. Que el codemandado P.N.P., en su comité central, ha pintado en letras blancas y azules el lema "Prometimos y Cumplimos-Pedro Rosselló".

5. Que la inmensa mayoría de los anuncios publicados con fondos públicos incorporan el lema "Compromiso Cumplido".

6. Que algunos de los anuncios incorporan los colores amarillo, blanco, rojo, verde y azul de la pegatina de campaña "Compromiso de Cambio" de los codemandados P.N.P. y Dr. Pedro Rosselló.

7. Que la inmensa mayoría de los anuncios utilizan el color azul.

diseño, producción y divulgación de los anuncios por los deman-
dados en su carácter personal y al Partido Nuevo Progresista;

4. injunction contra el codemandado Luis Maldonado Rodrí-
guez para que remueva de su vehículo oficial la propaganda
política que exhibe en este;

5. cualquier otro remedio que en derecho proceda.

El Tribunal de Primera Instancia (Sala Superior de San
Juan, Hon. Arnaldo López Rodríguez, Juez), luego de cele-
brada una vista con antelación a la solicitud de *injunction*,
dictó una resolución mediante la cual reconoció legitima-
ción activa al Partido Popular Democrático "para deman-
dar al Estado Libre Asociado de Puerto Rico, sus agencias
y funcionarios, a los fines de impugnar una actuación de
empleados públicos por éstos estar incurriendo en desem-
bolsos millonarios pertenecientes al erario para fines de
publicidad de naturaleza político-partidistas, en violación
a la prohibición constitucional del uso de fondos públicos,
lo que [alegadamente] lesiona sus intereses como partido
político". De igual forma, el tribunal determinó que, de ser
veraces las alegaciones de la demanda, el daño infligido al
partido es uno real, directo y concreto, independiente-
mente de que no haya comenzado el período de veda
electoral. Señaló la continuación de la vista en su fondo
para el 30 de noviembre de 1995.(8)

El Estado acudió en revisión de la referida resolución al
Tribunal de Circuito de Apelaciones, señalando que erró el
Tribunal de Primera Instancia: (1) al decretar que los fun-
cionarios públicos que fueron emplazados en su carácter
oficial no tenían que ser emplazados en su capacidad per-
sonal por presumir que conocieron del litigio al ser emplea-
dos en su carácter oficial(9) y (2) al decretar que el deman-

---

(8) El tribunal dispuso, además, en su resolución que todos aquellos funcionarios
públicos que fueron debidamente emplazados en su capacidad oficial y que se some-
tieron a la jurisdicción del tribunal con dicho emplazamiento, no tenían que ser
nuevamente emplazados.

(9) Cabe señalar que, según surge de la Resolución de 6 de diciembre de 1995 del
foro de instancia titulada Orden de *Injunction* Preliminar, todos los jefes de agencias
en su capacidad personal se sometieron a la jurisdicción del tribunal y estuvieron

dante, Partido Popular Democrático, tenía legitimación activa para incoar la presente acción judicial. El mismo día de la vista en relación al *injunction* preliminar, un panel especial del Tribunal de Circuito de Apelaciones (integrado por los Jueces Hon. Miguel Giménez Muñoz, Hon. Héctor Urgell Cuebas y Hon. Ángel González Román) dictó una orden para paralizar los procedimientos en instancia.

Inconformes, los demandantes acudieron ante nos mediante el recurso de *certiorari* y/o solicitud de certificación y una moción en auxilio de jurisdicción. El 1ro de diciembre de 1995 acogimos la solicitud de certificación tanto respecto al incidente que se encontraba ante el Tribunal de Circuito de Apelaciones como del caso pendiente ante el Tribunal de Primera Instancia, y a tenor con lo dispuesto en las Reglas 26(b) y 54 del Reglamento de este Tribunal, 4 L.P.R.A. Ap. XXI, ordenamos al Tribunal de Primera Instancia que celebrara el lunes 4 de diciembre la vista evidenciaria relacionada con el *injunction* preliminar, hiciera las determinaciones de hechos pertinentes y las sometiera a este Tribunal el miércoles 6 de diciembre antes del mediodía. A su vez, concedimos a las partes hasta el jueves 7 de diciembre para presentar sus alegatos, ordenamos su comparecencia a la vista oral previamente pautada para el viernes 8 de diciembre y, para propósitos de dicha vista, consolidamos este caso con los demás casos del epígrafe.

Para la vista evidenciaria referente al *injunction* preliminar, el tribunal contó con la prueba estipulada, todos los anuncios impugnados y la prueba pericial consistente en el testimonio del Profesor de Comunicaciones de la Universidad de Puerto Rico, Dr. Rubén Gaztambide Géigel, y del experto en estrategia publicitaria, Sr. Josué Merced Reyes, los cuales fueron contrainterrogados por la parte demandada. El único testigo presentado por la parte de-

---

debidamente representados durante la vista, por lo que este error se convirtió en académico.

mandada fue el Hon. Manuel Díaz Saldaña, Secretario de Hacienda.

A tenor con dicha prueba, el tribunal determinó que los demandados, de común acuerdo y en forma coordinada con el Partido Nuevo Progresista, han llevado a cabo con fondos públicos una campaña publicitaria masiva, a través de todos los medios de comunicación de la Isla, diseñada para destacar los logros del P.N.P. y del Dr. Pedro Rosselló. Según concluyó el tribunal, en todos los anuncios existen elementos comunes: lemas, colores y símbolos. Al juzgador de los hechos no le mereció credibilidad que el uso de la frase "compromiso cumplido" por las agencias del Gobierno sea una coincidencia. Por ello, concluyó el tribunal que aunque algunos de los anuncios informaban a la comunidad sobre los distintos servicios y programas gubernamentales, todos contienen propaganda político-partidista. A su vez, determinó que algunos sólo presentan parte de la información con el propósito de crear una imagen positiva del partido en el poder al incorporar la frase "compromiso cumplido", refiriéndose a las promesas de campaña del Dr. Pedro Rosselló. El tribunal destacó también la utilización de los símbolos del P.N.P. en los referidos anuncios, tales como las distintas tonalidades del color azul y las palmas.[10]

A pesar de que solamente se le ordenó hacer las determinaciones de hechos y sometérnoslas, el Tribunal de Primera Instancia interpretó erróneamente nuestro mandato, así como el efecto del auto de certificación expedido, habiéndose excedido en su jurisdicción al declarar inconstitucional el uso de fondos públicos para sufragar los referidos gastos de publicidad y emitir un *injunction* preliminar para ordenar a los demandados el cese inmediato de la campaña publicitaria del Gobierno en la forma y manera

---

[10] El tribunal concluyó que había algunos anuncios que carecían de mensajes político-partidistas. Estos anuncios corresponden a los *Exhibit* 54 al 57 de la parte demandante. Refiérase a la pág. 23 de la Orden de *Injunction* Preliminar.

en que está diseñada, o sea, con el emblema del P.N.P. y con la frase "compromiso cumplido".[11] Excluyó de su orden aquellos anuncios autorizados por ley y los de emergencia. El tribunal de instancia también se excedió al emitir un *injunction* permanente contra el representante codemandado Luis Maldonado Rodríguez, para que éste procediese inmediatamente a remover la propaganda político-partidista que exhibe en su vehículo oficial.[12] Por haber sido realizadas sin jurisdicción, no discutiremos estas actuaciones del foro de instancia.[13]

Cumplidos todos los trámites de rigor y con el beneficio de los alegatos sometidos por todas las partes y las ponencias de sus representantes legales durante la vista oral celebrada el 8 de diciembre de 1995, los recursos quedaron sometidos.

Pasemos ahora a discutir las cuestiones de derecho que se nos presentan en estos casos.

## II

Conforme a nuestra jurisprudencia respecto a las controversias que surgen al amparo de derechos reconocidos por la Constitución del Estado Libre Asociado de Puerto Rico, examinamos en primer lugar el cumplimiento en este caso con el requisito de justiciabilidad en cuanto a sus aspectos de legitimación activa, academicidad y cuestión política.

---

[11] El Juez Asociado Señor Negrón García disintió del trámite ordenado al Tribunal de Primera Instancia mediante nuestra Resolución de 1ro de diciembre de 1995. El Juez Asociado Señor Hernández Denton no intervino en tal resolución; tampoco suscribe estas expresiones por no estar de acuerdo con ellas.

[12] Surge de la Orden de *Injunction* que este Representante, a pesar de haber sido debidamente emplazado, no compareció a la vista celebrada por el tribunal, por lo que le fue anotada la rebeldía. El pleito fue desestimado contra la Puerto Rico Telephone Co. y su Presidente, el Sr. Agustín García. Refiérase a las págs. 15 y 37 de la Orden de *Injunction.*

[13] Véase esc. 11.

## A. *Legitimación activa*

■ Reiteradamente hemos explicado que, conforme a la doctrina de legitimación activa, el promovente de la acción debe cumplir con los requisitos siguientes: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no uno abstracto o hipotético; (3) que la causa de acción surge bajo el palio de la Constitución o de una ley, y (4) que existe una conexión entre el daño sufrido y la causa de acción ejercitada. *Asoc. Maestros P.R. v. Srio. Educación*, 137 D.P.R. 528 (1994); *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992); *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 414 (1982); *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387, 392 (1980).

■ Recientemente, en el citado caso *Asoc. Maestros v. Srio. Educación*, supra, pág. 446, señalamos que las organizaciones podían demandar a nombre propio o a nombre de sus miembros o integrantes. Cuando se demanda a nombre de los miembros de la organización, se debe demostrar que "(1) los miembros deben tener legitimación activa para demandar a nombre propio; (2) los intereses que se pretenden proteger están relacionados con los objetivos de la organización, y (3) la reclamación y el remedio solicitado no requieren la participación individual de los socios en el pleito". *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559, 566 (1989).

■ En el caso particular de los partidos políticos, en ocasión reciente, reafirmando nuestros pronunciamientos anteriores, les reconocimos legitimación activa para instar una acción cuando se trata de proteger el principio o axioma inmerso en nuestra Constitución de la igualdad electoral en su vertiente de igualdad económica. Refiérase a *P.P.D. v. Gobernador II*, 136 D.P.R. 916 (1994). "La igual-

dad es ingrediente medular del ideal de justicia que constantemente late en la Constitución. *Por su naturaleza dinámica es susceptible de manifestarse en diversas dimensiones.*" (Énfasis suplido.) *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 633 (1984).

■ En nuestra jurisdicción hemos reconocido que son susceptibles de impugnación constitucional las actuaciones que hacen onerosa o afectan negativa y sustancialmente el potencial de los partidos contrarios minoritarios o nuevos, así como cuando se crean situaciones que los colocan en una posición de inferioridad. Refiérase a *P.R.P. v. E.L.A.*, supra, pág. 638.

■ El axioma constitucional de igualdad electoral ha sido objeto de protección no sólo en nuestra jurisprudencia, sino por el propio legislador en el diseño del esquema electoral de nuestro país. De ahí que los partidos políticos reciben un trato igual en la asignación anual de fondos públicos para su funcionamiento. Refiérase al Art. 3.023 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3116, recientemente enmendado.([14])

_____

([14]) El Art. 3.023 de la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977, según enmendado por la Ley Núm. 169 de 11 de agosto de 1995 (16 L.P.R.A. sec. 3116), dispone lo siguiente:

"En años que no sean de elecciones generales cada partido político principal o partido por petición que haya cumplido o satisfecho el procedimiento establecido en la sección que antecede, podrá girar anualmente contra el Fondo Electoral por una cantidad que no se excederá de trescientos mil (300,000) dólares. En años de elecciones generales, los partidos políticos podrán girar contra los remanentes que hayan sobrado en años anteriores, pero el derecho de acumular tales remanentes solo operará desde el año en que el partido se haya acogido a los beneficios aquí dispuestos.

. . . . . . . .

"En año de elecciones generales cada partido político en unión a su candidato a Gobernador con derecho a los beneficios del Fondo Electoral tendrá derecho, con cargo al mismo, a una cantidad que no excederá de la suma de seiscientos mil (600,000) dólares."

Cabe señalar que mediante esta ley también se enmendaron los Arts. 3.032 y 3.027 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3124 y 3119, para aumentar el crédito adicional para los partidos políticos y el crédito para la transportación de electores. Con la aprobación de la Ley Núm. 168 de 11 de agosto de 1995 (16 L.P.R.A. sec. 3110) se enmendó, a su vez, el Art. 3.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3110, para aumentar el límite legal del gasto en año eleccionario para la compra de espacio y tiempo en los medios de difusión a dos millones

■ Con la aprobación de la Ley Núm. 169 de 11 de agosto de 1995 (16 L.P.R.A. secs. 3116, 3117 y 3119) se enmendaron, entre otros, el referido Art. 3.023 de la Ley Electoral de Puerto Rico a los fines de aumentar la participación de los partidos en el Fondo Electoral. En su exposición de motivos esta ley explica claramente el propósito del Fondo Electoral, al disponer que:

*Dichos fondos se distribuyen conforme a los costos funcionales de los partidos, tanto en años electorales como en los no electorales.* El fondo electoral permite a los partidos políticos, debidamente inscritos, financiar sus operaciones ordinarias. ...

*La presente medida permite la subsistencia de los partidos al costear parte de sus actividades electorales salvaguardándolos de una dependencia económica externa al interés gubernamental y social que debe guiar la existencia de los partidos.* (Énfasis suplido.) Exposición de Motivos de la Ley Núm. 169, *supra*, 1995 Leyes de Puerto Rico 874–875.

■ Considerando nuestro esquema electoral, resulta innegable que a través de éste se considere la existencia continua de los partidos políticos y su participación en la discusión de los asuntos de interés público no sólo durante el año eleccionario, sino durante *todo el cuatrienio.* Ello resulta compatible con el papel desempeñado por los partidos políticos en la moderna sociedad puertorriqueña. Los partidos políticos "[c]onstituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país". *P.R.P. v. E.L.A.*, supra, pág. 638. En *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 610 (1978), resumimos el ámbito de participación y el rol de los partidos políticos en la sociedad contemporánea de la forma siguiente:

Los partidos políticos son elemento básico de toda democracia. C.J. Friedrich, *Constitutional Government and Democracy*, 4a ed., 1968, pág. 430 y ss. Son las vías mediante las cuales se canalizan pacíficamente las distintas tendencias polí-

---

doscientos cincuenta mil (2,250,000) dólares.

ticas y económicas de la sociedad en un momento dado. *Fuster v. Busó*, 102 D.P.R. 327, 347 (1974) y autoridades allí citadas. R. Young, *American Law and Politics*, ed. 1967, pág. 67; V.O. Key, *Politics, Parties, and Pressure Groups*, 5a ed., 1964, pág. 200. Los partidos políticos realizan funciones cuasigubernamentales, tales como formular programas de administración y proponer candidatos a puestos políticos. El desempeño de estas funciones es indispensable para el sistema político. Note, *Primary Elections: The Real Party in Interest*, 27 Rutgers L. Rev. 298, 303 (1974).

■ De otra parte, cuando se trata de legisladores, en *Noriega v. Hernández Colón*, supra, reiteramos la norma pautada en *Hernández Torres v. Gobernador*, supra, y en *Hernández Torres v. Hernández Colón et al.*, supra, que dispone lo siguiente:

> ... [U]n legislador tiene acción legitimada para defender un interés individual tradicional, vinculado con el proceso legislativo o como representante oficialmente nombrado por el cuerpo para impugnar una actuación ejecutiva. ... También tiene acción legitimada para vindicar un interés personal en el ejercicio pleno de sus prerrogativas legislativas.[15]

■ En el caso de los electores, el Art. 2.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3051, expresamente dispone que "se concede por este Subtítulo a los electores la capacidad para iniciar o promover cualesquiera acciones legales al amparo de esta Declaración de Derechos y Prerrogativas ... ante el Tribunal de Primera Instancia que corresponda". Aplicando esta disposición de la Ley Electoral de Puerto Rico, en *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445, 448–449 (1993), le reconocimos legitimación activa al señor Sánchez Vilella y al Lic. Noel Colón Martínez como electores para impugnar la Ley Núm. 22 de 4 de julio de 1993 que autorizaba la celebración de un plebiscito con las fórmulas tradicionales de *status*, y explicamos que el citado Art. 2.001 "le concede la capacidad para promover toda acción legal para salvaguardar su de-

---

[15] *Hernández Torres v. Gobernador*, 129 D.P.R. 824, 837 (1992).

recho al voto universal, igual, directo y secreto. Este derecho es de estirpe constitucional, expresamente consagrado en el Art. II, Sec. 2 de nuestra Constitución", el cual dispone lo siguiente:

> Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. Const. E.L.A., *supra*, Art. II, Sec. 2, ed. 1982, pág. 261.

El Art. II, Sec. 2 de la Constitución del Estado Libre Asociado, *supra*, consagra el principio básico de que el poder político emana del consentimiento y de la voluntad popular, imponiendo al Gobierno una responsabilidad dual: la de abstenerse, por un lado, de interferir con el ejercicio del sufragio universal, igual, directo y secreto, y por otro, la de proteger al ciudadano contra *toda coacción* en el ejercicio de tal prerrogativa electoral. Véase *Sánchez y Colón v. E.L.A. I*, supra.

█ En nuestro sistema de vida democrático se ha reconocido que "[e]l sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el elector individual". *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 407 (1980). De ahí que el elector es acreedor a que su voto sea protegido por el Estado de distintas formas y con distinto rigor en una multiplicidad de situaciones. Amplia jurisprudencia así lo reconoce, tanto en Puerto Rico como en Estados Unidos. *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 615 (1988). Véase, también, E. Chemerinsky, *Protecting the Democratic Process: Voter Standing to Challenge Abuses of Incumbency*, 49 Ohio St. L.J. 773 (1988).[16]

---

[16] En el citado artículo se explica que no existe una doctrina uniforme en cuanto al reconocimiento de la legitimación activa a los electores. Sin embargo, nos resulta particularmente pertinente el siguiente razonamiento utilizado por el profesor Chemerinsky en su artículo: "If government resources are used to support the incumbent's reelection bid, either directly or by paying the salary of government employees who spend working time performing campaign tasks, then opponents of the incumbent are forced to subsidize the candidate they oppose. When the incum-

 Para el análisis de la legitimación activa en estos casos, resulta importante comprender la estrecha relación entre la Sec. 9 del Art. VI de la Constitución del E.L.A., *supra*, y el axioma de igualdad electoral en su vertiente de igualdad económica. En la medida en que se subvencione una campaña político-partidista con fondos públicos, se le permite una ventaja a un partido (o candidato político) sobre otros, lo que atenta contra el axioma de igualdad electoral y socava los pilares del esquema electoral en nuestro País, el cual garantiza la igualdad económica entre los partidos sin limitarlo al período eleccionario. Esto afecta detrimentalmente, además, el derecho de los electores a ejercer su voto libre de cualquier coacción, toda vez que como componentes esenciales de los partidos son colocados en la misma desventaja económica que su partido frente al que subvencionó parte de su campaña política con los fondos de todo el Pueblo de Puerto Rico, incluso los de esos electores pertenecientes a cualquier partido de oposición del Gobierno actual.

Conscientes de la relación entre los referidos preceptos constitucionales, en *P.P.D. v. Gobernador II*, supra, reconocimos legitimación activa al partido demandante e interpretamos que, por imperativo del axioma de igualdad electoral, así como por la protección del derecho constitucional a la libre selección —traducido en el derecho al sufragio— el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, era compatible y debía aplicarse a la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994. Allí, en aras de mantener un proceso democrático, rehusamos permitirle una ventaja indebida al partido de Gobierno, mediante la utilización de fondos públicos para promover su postura, y extendimos la veda electoral al referéndum.

---

bent uses public funds in aid of a reelection effort, all in society are paying for the campaign. There is a clear infringement of the first amendment rights of voters who support challengers." E. Chemerinsky, *Protecting the Democratic Process: Voter Standing to Challenge Abuses of Incumbency*, 49 Ohio St. L.J. 773, 789 (1988).

En los Casos Civil Núm. AP-95-7 (*P.P.D. v. Rosselló*) y Civil Núm. CT-95-10 (*P.P.D. v. P.N.P.*), el Tribunal de Primera Instancia aplicó correctamente la normativa antes resumida y reconoció legitimación activa al partido demandante. En ambas demandas se alegó específicamente que el Partido Popular Democrático (P.P.D.) es uno de los partidos políticos principales de la Isla, reconocido bajo la Ley Electoral de Puerto Rico, y que agrupa cientos de miles de electores en el País, además de que tiene plena capacidad para demandar e impugnar las actuaciones gubernamentales que lesionen sus intereses. En las demandas, también se alegó que las actuaciones de los respectivos demandados constituyen violaciones de carácter constitucional, las cuales le causan daños irreparables al partido, y que no existe un remedio ordinario en ley que le permita proteger sus derechos. Alegaron que la actuación de los demandados viola el Art. VI, Sec. 9 de la Constitución del E.L.A., *supra*, sobre la limitación al uso de los fondos públicos.

A los fines de identificar el daño reclamado en estos casos, resulta de particular relevancia lo resuelto por este Tribunal en *Marrero v. Mun. de Morovis*, supra. En este caso varios ciudadanos impugnaron la actuación del Alcalde de Morovis al colocar en el automóvil, propiedad del Estado, oficialmente asignádole, tres insignias políticas correspondientes al Partido Popular Democrático. En síntesis, se alegó que dicha actuación constituía un uso ilegal e impermisible de fondos públicos, en violación al Art. VI, Sec. 9 de la Constitución del E.L.A., *supra*. Para justificar su actuación, el Alcalde demandado invocó las disposiciones del Art. 3.011 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3108c, que autorizaba al Gobernador, los legisladores, los jefes de agencias y los alcaldes a usar los vehículos de motor asignados para hacer campaña política. Al confirmar la sentencia del tribunal de instancia que decretó la inconstitucionalidad del Art. 3.011, *supra*, identifi-

.camos el daño en este tipo de situación de la forma siguiente:

> La disposición de ley que autoriza el uso de vehículos oficiales a ciertos funcionarios para campaña partidista crea una clasificación legislativa que favorece únicamente a los funcionarios incumbentes. Toca íntimamente el ámbito político operacional y afecta los derechos de todos los electores y candidatos, sean o no miembros del partido que los eligió.

> ¿Cómo justificar ese desembolso frente a candidatos no incumbentes? *Advertimos que mediante el uso partidista ilimitado de tales vehículos se logra directamente una ventaja económica.* De hecho, cuando aritméticamente se proyecta esa utilización en toda la extensión territorial del país, vías estatales y municipales por los alcaldes y legisladores incumbentes, todos los indicadores son que el desembolso de fondos públicos es sustancial. *Como cuestión de realidad es innegable que represente un subsidio adicional para "gastos de viaje", ya previstos y autorizados bajo el fondo electoral.* Ese beneficio aumenta. Después de todo, para el gobierno un galón de gasolina está exento del pago de arbitrios. No así para otros aspirantes.

> En este contexto, no existe vínculo racional justificativo de trato desigual para distinguir entre incumbentes y aspirantes. Todos ellos tienen la misma necesidad de viajar y proveerse transportación para comunicar sus ideas, plataformas, programas y alternativas políticas a todos los electores del país. ¿Es que quienes no detentan el poder público no incurren en estos gastos? No es posible sostener tal proposición. ...

> El concepto de igualdad económica conlleva que se aplique con todo rigor la noción de equivalencia aritmética. De prevalecer el Art. 3.011 estaríamos perpetuando una disimilitud monetaria que derrotaría el propósito constitucional. *Concederíamos precisamente unos subsidios gubernamentales superiores y cuantiosos a unos candidatos, dando ventaja sobre otros. Esa disparidad económica y trato desigual es constitucionalmente impermisible.* Véase *P.S.P.* v. *Srio. de Hacienda*, 110 D.P.R. 313 (1980). (Énfasis suplido.) *Marrero v. Mun. de Morovis*, supra, págs. 648–649.

Tales expresiones aplican por igual a los partidos políticos y a los candidatos a puestos electivos.

Nada más se necesita, en casos como los que nos ocupan, para demostrar la existencia de un daño real, inmediato, claro y palpable, requerido por el principio de legiti-

mación activa. El daño reclamado en los tres (3) casos ante nuestra consideración se traduce concretamente en el subsidio adicional que representa la subvención de anuncios político-partidistas con fondos públicos para beneficio exclusivo del partido que ostenta la riendas del Gobierno, sea éste central o municipal, o del candidato incumbente. Ese subsidio de anuncios político-partidistas constituye no sólo un uso indebido de fondos públicos, sino que coloca a los demandantes en los tres (3) casos ante nos en una situación de desigualdad económica con respecto al partido o al candidato que de esa forma se beneficia utilizando fondos públicos.

De otra parte, el remedio interdictal solicitado guarda una estrecha relación con el interés y objetivo de los demandantes de proteger su derecho a la igualdad económica: detener la ventaja y situación de desigualdad económica creada, además de restablecer el equilibrio de la igualdad económica de los partidos.([17])

Aplicando los anteriores principios a los tres (3) casos ante nuestra consideración, resolvemos que poseen legitimación activa para solicitar el remedio interdictal tanto el Partido Popular Democrático en los Casos Civiles Núms. AP-95-7 y CT-95-10, como el Lcdo. Max Pérez Preston en su carácter de candidato a Alcalde por el Partido Nuevo Progresista en el Municipio de Carolina y los dos (2) electores de dicho Municipio que junto a tal candidato comparecen como demandantes en el Caso Civil Núm. AP-95-9. De este modo evitamos que se menoscabe la capacidad del partido y candidato demandantes de competir en igualdad de condiciones en el proceso electoral. De igual forma se garantiza a los electores demandantes su derecho a un

---

([17]) El Tribunal Supremo federal incluso ha conferido legitimación activa a un demandante en una reclamación basada en daños futuros, cuando éstos no son especulativos o imaginarios. A esos efectos ha expresado: "One does not have to await the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923), citado con aprobación en *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1981). Refiérase, además, a *Clements v. Fashing*, 457 U.S. 957 (1981).

voto igual al de los electores que favorecen al Alcalde incumbente. No obstante lo anterior, ninguno de estos demandantes posee legitimación activa para reclamar de los funcionarios demandados el remedio de la restitución de los fondos públicos, toda vez que no existe una conexión entre este remedio y el daño sufrido por los demandantes.

Contrario a lo que ocurre con el remedio interdictal, el remedio de la restitución de fondos al erario no guarda relación con la desigualdad económica reclamada, ya que el beneficiario directo de dicho remedio es el Estado o el Municipio, según sea el caso. Dicha restitución no tiene el efecto de reparar la desigualdad económica entre los partidos, ya que los fondos no serían ingresados al fondo electoral del partido demandante. Este tipo de acción correspondería ejercerla, en última instancia, a los representantes del Estado y no a los demandantes de los casos de epígrafe.

En cuanto a los legisladores demandantes, tanto en el caso *Pérez Preston v. Aponte*, Caso Civil Núm. AP-95-9, como en el caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, éstos carecen de legitimación activa, por no haber alegado o demostrado un daño real, inmediato, claro y palpable, ni pretender vindicar las prerrogativas de sus cargos electivos, conforme a nuestra jurisprudencia.

## B. *Academicidad*

■ En diversas ocasiones hemos considerado la doctrina de academicidad. Un caso académico es " 'uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes de que éste haya sido reclamado, o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente ...". *E.L.A. v. Aguayo*, 80 D.P.R. 552, 584 (1958). Véase *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993).

■ Una controversia puede convertirse en académica cuando los cambios fácticos o judiciales acaecidos durante

el trámite judicial tornan en ficticia su solución, convirtiéndose así en una opinión consultiva sobre asuntos abstractos de derecho. *Pueblo en interés menor M.A.G.O.*, 138 D.P.R. 20 (1995); *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Noriega v. Hernández Colón*, supra; entre otros.

En *Asoc. de Periodistas v. González*, 127 D.P.R. 704, 717–718 (1991), explicamos que "[a]l considerar el concepto de 'academicidad' hay que concentrarse en la relación existente entre los eventos pasados que dieron inicio al pleito y la adversidad presente. Este análisis es vital para determinar la existencia de los requisitos constitucionales ('caso o controversia') o jurisprudenciales de justiciabilidad. Un caso se convierte en académico cuando con el paso del tiempo su condición de controversia viva y presente se pierde".[18] (Escolio omitido.)

Se han elaborado, sin embargo, una serie de excepciones a la doctrina de academicidad que permiten la consideración de un caso que de otro modo resultaría académico en cuanto a su resultado o efecto inmediato. Por ejemplo, "cuando el caso ante el tribunal presenta una cuestión recurrente o susceptible de volver a ocurrir (*capable of repetition*), *Roe v. Wade*, 410 U.S. 113 (1973); *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969); *So. Pac. Terminal Co. v. Int. Comm. Comm.*, 219 U.S. 498, 515 (1911); o cuando aspectos de la controversia se tornan académicos pero persisten consecuencias colaterales de ésta que tienen vigencia y actualidad. Véanse: R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, 1986, págs. 122–126; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988; *El Vocero v. Junta de Planifica-*

---

[18] Citando a L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 82–83, y a Nota, *The Mootness Doctrine in the Supreme Court*, 88 Harv. L. Rev. 373, 376 (1974).

*ción*, supra, págs. 124–126". *C.E.E. v. Depto. de Estado*, supra, pág. 936.

En *C.E.E. v. Depto. de Estado*, supra, pág. 936, resolvimos que "es evidente que la conflictiva cuestión de derecho que dio lugar a la disputa entre las partes de este caso es *susceptible de volver a ocurrir*". (Énfasis suplido.) Señalamos que "con marcada frecuencia las agencias y los departamentos gubernamentales se ven en la necesidad de anunciar al país los eventos públicos que habrán de celebrar aun en años electorales y la postura de la Comisión, si no se dilucida de manera determinante, es *potencialmente una fuente de continuos conflictos*". (Énfasis suplido.) Íd., págs. 936–937. Allí también consideramos que por tratarse de anuncios, al igual que en los presentes casos, "si la controversia ante nos ahora no se resuelve finalmente [por este Tribunal], la parte que promueve la limitación a los anuncios en cuestión ... tendrá que volver a los tribunales en el futuro con su planteamiento, litigándolo siempre a última hora, debido a que es un asunto que por su naturaleza tiende a surgir imprevistamente, haciendo muy difícil que sea revisado judicialmente de manera definitiva". Íd., pág. 937.

Aplicando los principios de la doctrina de academicidad, debemos concluir que por la naturaleza de la controversia de estos casos, o sea, el uso de fondos públicos para sufragar anuncios de índole político-partidista, ésta es susceptible de repetirse, aun cuando en el caso *P.P.D. v. Rosselló*, Caso Civil Núm. AP-95-7, el anuncio ya no se publica. Así lo reconoce el señor Procurador General en su alegato. Igual razonamiento es aplicable al caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10.

De otra parte, dado que en el caso *Pérez Preston v. Aponte*, Caso Civil Núm. AP-95-9, la acción fue desestimada en forma sumaria por el tribunal, a este momento se continúa la publicación del logo impugnado, por lo que la

controversia que dio origen continúa viva en toda su extensión.

Por las razones antes indicadas, concluimos que ninguno de los tres (3) casos se ha tornado académico.

## C. *Cuestión política*

■■■ Como regla general, la doctrina de cuestión política impide la revisión judicial de asuntos cuya resolución corresponde a las otras ramas políticas del Gobierno o al electorado. *P.P.D. v. Gobernador II*, supra; *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497 (1994). A esos fines, en *Silva v. Hernández Agosto*, 118 D.P.R. 45, 55 (1986), reiterando nuestros pronunciamientos anteriores, expresamos lo siguiente:

> En todas las ocasiones anteriores ante reclamos de cuestión política hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional. *Marbury* v. *Madison*, 1 Cranch 137 (1803); *Santa Aponte* v. *Srio. del Senado*, [105 D.P.R. 750 (1977)]. La interpretación inicial que de la Constitución haga otra rama merece deferencia, pero debe prevalecer la norma de que la determinación final corresponde a los tribunales. *United States* v. *Nixon*, [418 U.S. 683 (1974)]. Nuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos.

■■■■ Ante un reclamo de inconstitucionalidad de una actuación gubernamental, es la Rama Judicial la llamada a determinar la validez de ésta. Véase *Noriega v. Hernández Colón*, supra, pág. 426, cuando reiteramos que "[n]i los cuerpos u organismos legislativos ni los funcionarios ejecutivos pueden convertirse en jueces de sus propios actos. Son los tribunales los llamados a ser los intérpretes finales de la Constitución y de las leyes que rigen nuestro País".

Según interpretamos en el citado caso *P.P.D. v. Gobernador II*, supra, pág. 923, "al haber invocado el derecho

constitucional de la igualdad electoral, resulta claro que no se plantea una cuestión política. Se trata del postulado rector que impregna la Carta de Derechos de la Constitución de que, en una sociedad democrática, todos los electores y partidos políticos 'gozarán de iguales derechos'. 4 Diario de Sesiones de la Convención Constituyente 2627 (1952)".

La controversia que plantean estos tres (3) casos es si puede el gobierno de turno utilizar los fondos del erario para subvencionar anuncios que tienen el efecto de influenciar la opinión pública a favor del partido político en el poder. Se alega específicamente la violación de dos (2) preceptos constitucionales, los cuales requieren de una interpretación judicial. El hecho de que estén implicados intereses político-partidistas no derrota la justiciabilidad de las reclamaciones ni convierte el caso en académico. Este no es un asunto que pueda ser resuelto en las urnas, especialmente cuando se considera que beneficia al gobierno de turno, y su importancia trasciende la afiliación de las partes en la controversia. Es por ello que ninguno de los tres (3) casos ante nuestra consideración plantea una cuestión política que impida nuestra adjudicación en los méritos de la controversia.

## III

### La facultad o deber de información del Gobierno

El Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico dispone lo siguiente:

Nosotros, el pueblo de Puerto Rico, a fin de organizarnos políticamente sobre una base plenamente democrática, promover el bienestar general y asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos, puesta nuestra confianza en Dios Todopoderoso, ordenamos y establecemos esta Constitución para el Estado Libre Asociado que en el ejercicio de nuestro derecho natural ahora creamos dentro de nuestra unión con los Estados Unidos de América. Preámbulo, Const. E.L.A., *supra*, pág. 251.

Del citado precepto surge claramente como objetivo de la organización política y social de nuestro País la promoción del bienestar general de la ciudadanía. En las distintas leyes que organizan el Gobierno en nuestro país se encuentran disposiciones generales que facultan a los funcionarios a informar a la ciudadanía sobre asuntos relativos a las funciones que realizan las diversas agencias del país.[19]

█ Hemos reconocido que la expresión del Gobierno de naturaleza educativa e informativa es indispensable para que el pueblo pueda juzgar su labor y exigir remedios a los agravios gubernamentales. Refiérase a *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 381 (1984); *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153, 158 (1986). Nuestra jurisprudencia refleja la tendencia seguida en favor de la divulgación de información pública, al punto de impartirle una dimensión amplia y robusta a la libertad de expresión consagrada en nuestra Carta de Derechos. Refiérase a *Noriega v. Gobernador*, 130 D.P.R. 919 (1992); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988); *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987); *Soto v. Srio. de Justicia*, 112 D.P.R. 477, 485 (1982); *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264 (1960); *Sierra v. Tribunal Superior*, 81 D.P.R. 554 (1959); entre otros.

---

[19] Por ejemplo, sin pretender ser exhaustivo, a la Secretaria de Salud, como Jefe del Departamento de Salud, tiene a su cargo todos los asuntos que por ley se le encomienden relacionados con la salud, sanidad y beneficiencia pública. Refiérase al Art. 1 de la Ley Núm. 81 de 14 de marzo de 1912, según enmendada, 3 L.P.R.A. sec. 171. Las amplias facultades y deberes de la Secretaria incluyen la de "establecer o reorganizar, consolidar o suprimir, aquellas divisiones, negociados, servicios, oficinas, para la mejor marcha del Departamento", y "siempre que no esté en conflicto con disposiciones legislativas ...". 3 L.P.R.A. sec. 173.

La Secretaria de Salud tiene además el deber de tomar medidas en caso de emergencias que amenacen la salud de la población; mantiene y tiene a su cargo los servicios de estadísticas vitales y "todos aquellos otros servicios necesarios, para la protección, cuidado, mejoramiento y conservación de la salud pública que por ley se le asignen". 3 L.P.R.A. sec. 177. Refiérase, también, a 3 L.P.R.A. sec. 175. Específicamente con respecto a los asuntos que afectan la salud pública, a la Secretaria de Salud se le encomienda la publicación de información, así como el dar aviso público y publicar para conocimiento general los reglamentos que la ley le autoriza a promulgar. Refiérase a 31 L.P.R.A. secs. 176–179.

En *Santiago v. Bobb y El Mundo, Inc.*, supra, pág. 159, citando a *Soto v. Srio. de Justicia*, supra, señalamos lo siguiente:

"... existe una estrecha correspondencia entre el derecho a la libre expresión y la libertad de información. La premisa es sencilla. Sin conocimiento de hechos no se puede juzgar; tampoco se pueden exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada cuatro (4) años." En ese desiderátum, la prensa constituye "un vehículo de información y opinión [para] informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o desean compilarla". (Cita y énfasis omitidos.)

Recientemente tuvimos la oportunidad de expresarnos sobre la relación existente entre el derecho constitucional a la libertad de expresión y el deber de información del Gobierno. A esos efectos, en *P.P.D. v. Gobernador II*, supra, pág. 923, claramente señalamos que "[l]os derechos contenidos en la Carta de Derechos le asisten *a los individuos frente al Estado. Esos derechos no pueden extenderse a las expresiones del Gobierno porque los derechos están formulados en términos de lo que el Gobierno no puede hacer con relación a la expresión de las personas y no a la inversa. De ahí que el Gobierno no tiene un derecho constitucional a la libre expresión protegido*". (Énfasis suplido y en el original.) Explicamos, además, lo siguiente:

El problema ante nos envuelve el axioma básico de que el proceso decisional puertorriqueño responde en su realidad al postulado de igualdad inmerso en nuestra Constitución, el cual persigue lograr paridad económica entre los partidos políticos para la divulgación de ideas y mensajes en nuestro país. *De ello resulta que existe un amplio poder en la limitación de la propaganda gubernamental.* (Énfasis suplido.) Íd., págs. 923–924.

Aclarado nuevamente que el Gobierno no puede, bajo el palio del derecho constitucional de los ciudadanos a la libertad de expresión y libertad de información, reclamar

para sí un derecho a la libertad de expresión, procede que examinemos las limitaciones a la facultad o deber de información del Gobierno.

## IV

*Restricciones a la facultad o deber de información del Gobierno*

■ Una de las restricciones a la divulgación de información por parte del Estado lo constituye la Ley Electoral de Puerto Rico. En específico, el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, el cual dispone lo siguiente:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
>
> Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones.

■ Según explicamos en *C.E.E. v. Depto. de Estado*, supra, págs. 938–939, el citado artículo proviene en todos sus aspectos esenciales del derogado Art. 3.014 del antiguo Código Electoral de Puerto Rico, Ley Núm. 1 de 13 de febrero de 1974 (16 L.P.R.A. ant. sec. 2094). Del Diario de Sesiones de la Asamblea Legislativa de 4 de febrero de 1974 y del lenguaje claro del propio Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, "surge inequívocamente la intención legislativa de excluir definitivamente del proceso político la influencia solapada que el partido en el poder

puede tener mediante el uso de los anuncios gubernamentales". *C.E.E. v. Depto. de Estado*, supra, pág. 939. Citando a *Romero Barceló v. Hernández Agosto*, supra, pág. 393, explicamos que la citada disposición reflejaba " 'el interés en descontinuar durante el período eleccionario la práctica de las agencias gubernamentales de hacer campaña política mediante la publicación de anuncios sobre sus logros y planes' ". *C.E.E. v. Depto. de Estado*, supra, pág. 939. En consecuencia, resolvimos que en año electoral todo anuncio gubernamental, excepto los expresamente excluidos por ley, debían ser sometidos a la previa autorización de la Comisión Estatal de Elecciones.

Posteriormente, en *P.P.D. v. Gobernador II*, supra, pág. 924, considerando el principio de igualdad económica de nuestra Constitución, extendimos la prohibición contenida en el referido artículo de la Ley Electoral de Puerto Rico a la Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994, Ley Núm. 49 de 2 de agosto de 1994. Principalmente, queríamos "evitar que el Estado, mediante anuncios gubernamentales, pueda tener una influencia en la libre expresión de los ciudadanos en la votación, con el poder económico que éste tiene mediante la utilización de fondos públicos". *P.P.D. v. Gobernador II*, supra, págs. 926–927.

La restricción impuesta al Estado mediante la antes explicada Ley Electoral de Puerto Rico, *por sus propios términos*, es inaplicable a la situación que nos ocupa, o sea, la publicación o divulgación de anuncios fuera del año electoral. *Independientemente de dicha prohibición estatutaria*, en estos tres (3) casos se plantea como controversia medular el axioma constitucional de igualdad económica de los partidos políticos o los candidatos a puestos electivos y su convergencia con la prohibición de la utilización de fondos públicos para fines privados, por lo que procede que

veamos entonces la relación existente entre ambos preceptos constitucionales.

## V

*La revisión judicial*

 La Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, *supra*, dispone lo siguiente:

Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley.

 Anteriormente, en ocasión de trazar el origen de esta sección en nuestra Constitución, aunque la hemos considerado autóctona, *P.S.P. v. E.L.A.*, supra, pág. 596,[20] y que su texto "[e]staba previsto, en su esencia, por el sistema Foraker de 1900 y la Ley Jones de 1917", hemos concluido que "[l]a Constitución de 1952 completa, sin duda, esta evolución". *P.I.P. v. C.E.E.*, supra, pág. 606. La utilización del concepto "fin público" en el texto de la citada disposición y su aplicación a casos como el presente, en el cual la erogación de fondos se hizo al amparo de la facultad o el deber del Gobierno de informar a la ciudadanía, requiere

---

[20] A esos efectos señalamos que "la Sec. 9 del Art. VI arranca de la Proposición Núm. 182 presentada a la Asamblea Constituyente por seis miembros de la Comisión de la Rama Legislativa y otro delegado. El Art. 18 de la referida propuesta disponía:

" '... Los fondos públicos solo podrán destinarse a fines públicos y los desembolsos se harán por autoridad de ley.'

"La Comisión de la Rama Legislativa incorporó esta idea a su Informe de 7 de diciembre de 1951, cuyo Art. 22 proveía, en modo aún más tajante:

" '... Los fondos públicos solo serán destinados a fines públicos y para el mantenimiento y sostenimiento de las instituciones del Gobierno, y no se considerarán instituciones del Gobierno ni fines públicos aquellos que no estén bajo la autoridad e intervención del Gobierno. Todo desembolso de fondos públicos se hará por autoridad de ley.' [Cita omitida.]

"La Comisión de la Carta de Derechos recomendaba también que se tratase este asunto, pero se convino que ésta era materia a examinarse principalmente por la Comisión de la Rama Legislativa. [Cita omitida.] La propuesta general que se debate resulta ser en tal forma la de esta última Comisión." *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 597 (1978).

del ejercicio de nuestra función revisora. Ahora bien, desde *P.I.P. v. C.E.E.*, supra, limitamos el alcance que en el citado caso *P.S.P. v. E.L.A.* le dimos a nuestra facultad interpretativa de la citada cláusula constitucional, y aclaramos que su ejercicio no era distinto al desempeño normal de la función revisora que nos corresponde ejercer bajo el sistema de separación de poderes. De ahí que

> [l]a determinación inicial que tomen los poderes públicos —Legislativo y Ejecutivo— sobre lo que es fin público es revisable por el Poder Judicial. Sin embargo, en el desempeño normal de nuestras funciones revisoras bajo el sistema de separación de poderes, los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional y aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos.[21]

En los debates de la Convención Constituyente prevaleció —según el Delegado señor Gutiérrez Franqui— la noción de que se debía "dejar [la] materia de definiciones, en cuanto a lo que es 'fines públicos e instituciones públicas' al poder judicial, de acuerdo con la expresión y declaración legislativa, inicialmente, al aprobarse una ley *y luego por la interpretación que el poder judicial haga de esta constitución ...*". (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 903 (1961).

■ Nuestra Constitución, cuerpo de normas supremas que se impone a la legislación ordinaria, otorga a la Rama Judicial amplios poderes para examinar las actuaciones alegadamente inconstitucionales del Poder Legislativo o Ejecutivo al amparo de la relación dinámica de la separación de poderes. Véanse: *P.I.P. v. C.E.E.*, supra, pág. 612; *Silva v. Hernández Agosto*, supra; *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); entre otros. Vea-

---

[21] Citando *Caguas Bus Line v. Sierra, Comisionado*, 73 D.P.R. 743, 750 (1952); *Irizarry v. Pueblo*, 75 D.P.R. 786, 793–794 (1954); *Berrocal v. Tribl. de Distrito*, 76 D.P.R. 38, 65 (1954); *Passalacqua v. Mun. de San Juan*, 116 D.P.R. 618, 623 (1985).

mos entonces la interpretación del concepto "fin público" en nuestra jurisdicción y su aplicabilidad a la controversia que nos ocupa.

## VI

*Fin público*

El concepto o la noción de finalidad pública "juega un papel importante en nuestro ordenamiento jurídico. A diferencia de los particulares quienes, siempre que sea lícito, pueden actuar para los fines más variados, la búsqueda de un fin de interés público es la condición positiva de toda actuación estatal. El interés público no es simplemente la suma de los intereses particulares. Tampoco es en esencia distinto al interés de las personas o los grupos que componen el país. Resulta en la mayoría de las ocasiones del acomodo entre los diversos intereses particulares". (Énfasis suprimido.) *P.I.P. v. C.E.E.*, supra, págs. 606–607.

Anteriormente hemos explicado que las frases "fondos públicos" y "dineros públicos" tienen el mismo significado y se han utilizado indistintamente en las leyes y en la jurisprudencia para expresar lo mismo. Véase *Pueblo v. Pérez*, 47 D.P.R. 765, 779 (1934).

El concepto "fin público" no es estático, sino que está ligado al bienestar general y que tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica, a los problemas peculiares que éstas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja. Su significado ha cobrado un marco dimensional de naturaleza liberal, *generalmente prevaleciendo el criterio de que los objetivos que estén contenidos en el referido fin público deben redundar en beneficio de la salud, seguridad, moral y bienestar general de todos los ciudadanos.* Refiérase a *P.R. Telephone Co. v. Tribl. Contribuciones*, 81 D.P.R. 982, 997 (1960).

En los debates de la Convención Constituyente, por voz del Delegado Sr. Leopoldo Figueroa, quedó expuesto el marco conceptual e interpretativo de la prohibición de utilizar fondos públicos para fines privados. A esos efectos, "los fondos públicos ... proceden de recaudaciones públicas, que proceden de tributos que se imponen a todas las clases, que proceden de rentas que obtiene el tesoro de todos los hombres y mujeres de todos [los] credos, de todas filiaciones, ... no es sana política, que esos fondos públicos sean manejados por instituciones privadas en las cuales no tenga intervención el gobierno". Diario de Sesiones, *supra*, págs. 913–914. Los fondos públicos provienen de todos los contribuyentes del país y del más amplio espectro político, por lo que no son privativos de quienes políticamente ostentan las riendas del país durante determinado cuatrienio.[22]

De otra parte, en *McCormick v. Marrero, Juez*, 64 D.P.R. 260 (1944), señalamos como criterios para determinar lo que es un fin público, los siguientes: que considere un beneficio público (o sea, promover el bienestar e interés público de la comunidad) o que estén destinados a una actividad de carácter público o semipúblico.

Por otro lado, si la actividad que ha de ser costeada con fondos públicos promueve los intereses y objetivos de la entidad gubernamental, en consonancia con la política pública establecida sobre el particular, es evidente el fin público y el carácter legítimo de dicha erogación. Una vez se determina que existe un fin público en relación con la erogación de fondos por una entidad gubernamental, el hecho de que surja un beneficio incidental en favor de personas particulares no desvirtúa el fin público a que va dirigida la actividad gubernamental.[23]

---

[22] Refiérase al voto disidente del Juez Asociado Señor Negrón García en *Noriega v. Hernández Colón*, 126 D.P.R. 42 (1990).

[23] Refiérase a las Ops. Sec. Just. Núms. 1987-23 de 1ro de junio de 1987 y 1965-2 de 26 de enero de 1965.

■ De nuestra jurisprudencia surgen otros criterios que orientan la determinación de un fin público. En *Marrero v. Mun. de Morovis*, supra, claramente resolvimos que no pueden utilizarse los fondos o recursos públicos por determinado partido político para sus fines particulares. Adoptando los fundamentos del tribunal de instancia, explicamos lo siguiente:

En la medida en que los fondos públicos se utilicen para propaganda político-partidista *se está afectando detrimentalmente el derecho de los demás electores*. En todo caso la finalidad pública envuelta en este caso y que este Tribunal debe proteger y fortalecer coincide con el interés de los demandantes. Esta es que todos los ciudadanos en Puerto Rico sientan la seguridad de que sus funcionarios públicos, irrespectiva[mente] de sus preferencias políticas particulares, le sirvan a la ciudadanía en general y no a determinado grupo de electores en particular.[24]

■ La norma enunciada antes es que, bajo la restricción constitucional al uso de los fondos públicos, no se permite el uso político-partidista de dichos fondos ni que de otro modo un partido político o candidato obtenga una ventaja económica a expensas del erario. Desde *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741 (1976), al validar las medidas legislativas encaminadas a disminuir las diferencias económicas entre los partidos y los candidatos que evitan contribuciones cuantiosas e irrestrictas, señalamos unos principios que orientan la evaluación de la controversia que nos ocupa. Hoy, dos (2) décadas después, aún conservan su vigencia nuestros pronunciamientos:

Nuestro sistema de gobierno democrático se nutre del proceso político para elegir aquellos que representan al pueblo, reconociendo el derecho de los ciudadanos a organizarse en grupos de opinión con carácter de partidos políticos y proponer candidatos de su predilección.

Ante los adelantos técnicos de comunicación rápida, directa y masiva, el libre intercambio y la fluidez de ideas y la discusión en torno a los asuntos públicos y las cualificaciones de los can-

---

[24] *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 645 (1984).

didatos, dependen en gran medida de la capacidad económica de éstos y los partidos políticos. El mensaje personal de antaño en las lides electorales puertorriqueñas es hoy la excepción, descansándose cada vez más en los medios electrónicos de difusión moderna. Ante este fenómeno, y el costo que ello exige, las contribuciones del ciudadano a sus respectivos partidos políticos son vitales para el desenvolvimiento y desarrollo del proceso democrático.

. . . . . . . .

Aun cuando no existe una correlación entre los resultados electorales y la capacidad económica de un partido político o candidato —ya que en adición entran en juego un sinnúmero de factores tales como naturaleza de las controversias, organización, liderazgo, destreza, prestigio, control y extensión de información y publicidad— las contribuciones económicas y por ende, la solvencia de los partidos políticos afectan positiva o negativamente y en gran medida los factores mencionados y por ende el desenlace final.[25]

En el pasado no hemos tolerado situaciones que crean una desventaja o desigualdad económica entre los partidos, aun tratándose de erogaciones hechas válidamente al amparo de legislación. Refiérase a *P.R.P. v. E.L.A.*, supra, pág. 640, en el cual le reconocimos el derecho al Partido de Renovación Puertorriqueña a nombrar representantes en las Juntas de Inscripción Permanentes con todos los derechos y prerrogativas, *incluso la económica*, de los partidos políticos principales. De ahí que, aun tratándose de situaciones jurídicas en las que se reconoce el fin público, el mero hecho de atentar contra el postulado de igualdad económica de los partidos ha conllevado nuestro enérgico repudio a la situación particular. Como expresamos en *P.R.P. v. E.L.A.*, supra, pág. 640:

La desigualdad bajo la ley se manifiesta más nítidamente en

---

[25] Refiérase, además, a la opinión concurrente del Juez Asociado Señor Negrón García, a la cual se unieron los Jueces Asociados Señores Dávila e Irizarry Yunqué en *P.S.P. v. Srio. de Hacienda*, 110 D.P.R. 313, 322 (1980) (Sentencia). En ese caso se confirmó en apelación una sentencia del tribunal de instancia, mediante la cual se declaró inconstitucional el Art. 3.017 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3111, por impedir que el crédito adicional a los partidos políticos fijado en dicho artículo pueda ser distribuido en partes iguales entre todos los partidos políticos que participarían en las elecciones generales de 4 de noviembre de 1980.

el aspecto económico. ... La negativa a reconocer los [funcionarios] del P.R.P. implica que dicha colectividad tiene que descansar en electores voluntarios para descargar sus funciones o absorber sus gastos, recargando así su presupuesto operacional. ... El impacto fiscal ha recaído sobre los electores del P.R.P., a distinción de los demás partidos que han sufragado el mismo mediante aportación gubernamental.

■ Recordemos que " '[l]a verdadera esencia de un gobierno libre consiste en considerar los puestos públicos como un fideicomiso, encomendado para el bien del país y no para beneficio de determinado individuo o partido' ". *Ex rel. Pérez v. Manescau*, 33 D.P.R. 739, 742 (1924). Implícito en estas expresiones se encuentra lo referente a los fondos públicos encomendados a los funcionarios de nuestro país.

## VII

*Determinación judicial de fin público; criterios y factores*

■ Los criterios que se derivan de nuestra jurisprudencia para determinar si existe o no un fin público —cuando mediante una ley o una actuación gubernamental se realiza una erogación de fondos públicos— son aplicables a la controversia que nos ocupa. Por un lado, cuando el Gobierno, en el ejercicio de su facultad o deber de informar a la ciudadanía, utiliza o incorpora símbolos, emblemas, colores, fotografías[26] o lemas de naturaleza político-partidista, estamos impedidos constitucionalmente de reconocerle fin público alguno a dicha expresión gubernamental. Tampoco podemos reconocer validez constitucional a cualquier expresión gubernamental difundida mediante el uso de fondos públicos cuando ésta claramente constituye un subterfugio para conferir una ventaja a un candidato o a un partido político, o para adelantar sus in-

---

[26] La Ley Núm. 52 de 6 de agosto de 1994 (3 L.P.R.A. sec. 946) dispone que "[e]n los casos de anuncios relacionados con trámites administrativos, como subastas, avisos y edictos, *se prohíbe el uso de las fotografías de los jefes de agencias y funcionarios ...*". (Énfasis suplido.)

tereses político-partidistas. *Cf. Marrero v. Mun. de Morovis*, supra.

■ De otra parte, ausente en la expresión gubernamental cualquier símbolo, emblema, color, fotografía, lema de naturaleza político-partidista, o el propósito de conferir una indebida ventaja a un candidato o partido político, la determinación de si la utilización de fondos públicos responde a un fin público requiere determinar su propósito y evaluar su contenido para adjudicar si cumple con alguno de los criterios siguientes:

1. Redunda en beneficio de la salud, la seguridad, la moral y el bienestar general de todos los ciudadanos.

2. Está destinado a una actividad de carácter público o semipúblico.

3. Promueve los intereses y objetivos de la entidad gubernamental, en consonancia con sus deberes y funciones o la política pública establecida.

4. Promueve programas, servicios, oportunidades y derechos, o adelanta causas sociales, cívicas, culturales, económicas o deportivas.

5. Promueve el establecimiento, modificación o cambio de una política gubernamental.

■ Reconocemos que la publicación de expresiones gubernamentales mediante el uso de fondos públicos para la consecución de cualquiera de los objetivos enunciados anteriormente, en algunas ocasiones, puede tener el efecto incidental de producir cierto grado de ventaja al partido político en el poder o a un candidato de dicho partido. Pero cuando la evidencia demuestra, por el contrario, que dicha expresión es utilizada como un vehículo para adelantar cualquier fin individual de dicho partido o candidato, anulando de tal forma la consecución de un objetivo legítimo, tal expresión no puede prevalecer por constituir una ventaja económica a dicho partido o candidato por sobre los partidos políticos o candidatos de oposición.

██ Por el hecho de que la Legislatura no haya extendido expresamente la prohibición contenida en el Art. 8.001, *supra*, a los años en que no se celebran elecciones generales, no podemos validar el uso de fondos públicos para anuncios político-partidistas durante tales años. La restricción a este tipo de actuación se encuentra en la Sec. 9 del Art. VI de nuestra Constitución, *supra*, la cual no requiere de una ley específica para su aplicación y en el axioma constitucional de igualdad electoral.

Con estos criterios rectores procede que evaluemos la controversia ante nuestra consideración.

## VIII

### A. *P.P.D. v. Rosselló, Caso Civil Núm. AP-95-7*

Según hemos señalado, la controversia en este caso fue sometida a base de los hechos estipulados y los alegatos, por lo cual estamos en posición de resolver. El anuncio impugnado era el de la tarjeta de salud en el cual se contrastaba la cantidad de tarjetas repartidas por el Estado con el hecho de que el Alcalde Acevedo no había repartido tarjeta alguna.

Sin necesidad de llevar a cabo un análisis de cada uno de los criterios que conformarían un fin público, concluimos que este anuncio de su faz constituye un ataque directo al Alcalde Acevedo, quien precisamente es el presidente del P.P.D., partido principal de oposición al del gobierno actual y candidato a la gobernación en las próximas elecciones de noviembre de 1996. Ante ello, resulta evidente que el anuncio sirve un propósito que trasciende la mera información sobre el programa de la tarjeta de salud, no teniendo otro propósito que el de servir de vehículo a la propaganda político-partidista.[27]

---

[27] Tomamos conocimiento judicial del anuncio auspiciado por el Partido Nuevo Progresista, en el cual se amplía la información contenida en el anuncio impugnado

Al adelantar un objetivo político-partidista, este anuncio no sólo constituye un ejemplo de propaganda partidista, sino que le confiere una ventaja económica al partido de gobierno sobre el candidato a la gobernación del partido demandante.

Ciertamente, la participación del Departamento de Salud en el debate en torno a la prestación de servicios de salud es importante. Sin embargo, no podemos validar la erogación de fondos públicos para mensajes político-partidistas que redundan en perjuicio del partido demandante. Esto constituye un ejemplo clásico del uso indebido de fondos públicos que sanciona la Sec. 9 del Art. VI de nuestra Constitución, *supra*, y el Estado, en particular el Departamento de Salud, ha trascendido su facultad o deber de informar a la ciudadanía, adentrándose en la arena político-partidista. No afecta la conclusión anterior el hecho de que los mencionados anuncios hayan sido provocados por otros anuncios previamente publicados por el Municipio de San Juan. Como ya hemos señalado, no pasamos juicio sobre si estos anuncios previos cumplen o no con los criterios esbozados en esta opinión, por no estar éstos ante nuestra consideración, ya que nunca se recurrió de ellos judicialmente.

Determinado lo anterior, se dictará sentencia que revoque la sentencia recurrida en este caso y emitiendo, a su vez, una orden de *injunction* para prohibirle permanentemente al Estado Libre Asociado de Puerto Rico, así como a la señora Secretaria de Salud de Puerto Rico, a sus agentes, mandatarios, empleados y demás funcionarios del Estado Libre Asociado de Puerto Rico, la utilización de fondos públicos para la publicación del anuncio objeto de este pleito. En cuanto al remedio de restitución al erario, se desestimará esta causa de acción, por carecer los demandantes de legitimación activa para hacer dicho reclamo.

---

en el presente caso y se refiere a esto como un incumplimiento del Alcalde Acevedo con un programa de tarjeta de salud para el Municipio de San Juan, atacando así a este candidato a la gobernación. El referido anuncio fue transmitido por televisión el 5 de diciembre de 1995 durante la noche, por el Canal Once.

Igualmente se desestimará la demanda en cuanto al Hon. Pedro Rosselló González, en vista de que ni de las alegaciones de las partes ni de sus estipulaciones y evidencia documental que tuvo ante sí el tribunal de instancia surge causa de acción alguna en su contra. Así lo reconoció la parte demandante apelante en la vista oral celebrada ante este Tribunal.

B. *Pérez Preston v. Aponte, Caso Civil Núm. AP-95-9*

En este caso se impugnó la difusión por todo el Municipio de Carolina de un logo con el número diez (10) y la frase "UNA DÉCADA DE SUPERACIÓN", cuyo período corresponde a la incumbencia del alcalde demandado, resaltando en el interior del número diez (10) los años 1985–1995, cuyo período corresponde a la incumbencia del alcalde demandado. En síntesis se alegó, y así *fue estipulado*, que el referido logo ha sido desplegado en propiedad del gobierno municipal mediante el uso de pegatinas (*bumper stickers*), rótulos y anuncios publicados en varios periódicos.

De igual modo, mediante una moción en auxilio de nuestra jurisdicción presentada por la parte demandante el 15 de diciembre de 1995, se trajo ante nuestra consideración un folleto de cuarenta y ocho (48) páginas, a todo color, publicado por el Municipio de Carolina.[28] En dicha moción se nos informa que la publicación de este folleto sobrepasa los cien mil (100,000) ejemplares y se nos solicita que extendamos el *injunction* preliminar que se invoca al referido folleto. La parte recurrida compareció el mismo día mediante un escrito de réplica en oposición a la extensión de dicho remedio preliminar a tal folleto. Acompañaron dicho escrito con una carta suscrita por la Directora de Prensa

---

[28] A tenor con lo dispuesto en las Reglas 15, 31 y 54 del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI, aceptamos en evidencia el folleto presentado por la parte demandante apelante.

del Municipio en la cual informa que, "próximos a concluir el presente año, llega a su fin también la campaña de orientación y divulgación pública 'Una Década de Superación'". Añade en dicha misiva que "esto supone que para el 1ro. de enero de 1996, deberíamos estar en disposición de haber removido [sic] toda rotulación o emblema alusivo a esta campaña que haya sido colocado en la municipalidad o en nuestra flota vehicular". Una evaluación de este material impreso revela que por escrito y gráficamente se exaltan los logros y programas de la administración del Municipio de Carolina durante los pasados diez (10) años. En el texto se destacan unos mensajes colocados precisamente debajo de la expresión "1985–1995: Una Década de Superación". Estos mensajes son los siguientes:

*de la *bancarrota* a la solvencia y liquidez ...
*de la *vergonzoza* [sic] *ineficiencia administrativa* (solo 13% del presupuesto municipal dedicado a obra y servicios a la ciudadanía) a una impresionante agilidad y eficiencia en gerencia moderna ...
*del *total descalabro fiscal*, sin capacidad alguna para tomar prestado ni poder administrar fondos federales, a gozar de un crédito excelente y gran credibilidad fiscal ...
*de una *total dependencia parasitaria del Gobierno Central*, al gran orgullo de lograr la Autonomía Municipal, para seguir adelante trazando nuestra propia ruta de crecimiento y superación. (Énfasis suplido.) Folleto *Carolina: 10 años de Superación Gigante*, pág. 3.

Las antes citadas expresiones describen despectivamente a la anterior administración perteneciente al Partido Nuevo Progresista con el propósito de adelantar los objetivos político-partidistas de la actual administración y su alcalde, pertenecientes al Partido Popular Democrático. Evidentemente se pretenden enaltecer los logros de la presente administración y de su alcalde en anticipo a las elecciones de 1996, en las cuales éste figurará como candidato a la reelección. Además de las expresiones en el folleto, se observan unas fotografías a todo color que muestran el despliegue masivo, a nivel municipal, del logo impugnado. Sin

necesidad de un análisis ulterior concluimos que este folleto *solamente* pretende resaltar las obras y los logros de la administración del alcalde demandado obteniendo éste una ventaja económica para su candidatura en perjuicio del candidato Lcdo. Max Pérez Preston, quien tendrá que incurrir necesariamente en cuantiosos gastos para responder a la campaña oficialista realizada por el actual incumbente con fondos públicos. En la misma medida y por los mismos motivos, se perjudican los electores demandantes, afiliados al Partido Nuevo Progresista, el cual postula ·como candidato al licenciado Pérez Preston.

Ya hemos concluido que tanto el candidato demandante, licenciado Pérez Preston, como los dos (2) electores de dicho municipio que también son demandantes, poseen legitimación activa para incoar el presente pleito. De los hechos estipulados y de la publicación del folleto descrito anteriormente se desprende con claridad que el referido candidato y los mencionados electores han alegado y demostrado haber sufrido un daño real, inmediato y preciso. Igualmente han demostrado que lo continuarán sufriendo de no concederse el remedio interdictal solicitado.

■■ Recientemente reiteramos que la concesión o no de un *injunction* preliminar debe determinarse a la luz de los criterios siguientes:

(1) la naturaleza de los daños que pueden ocasionárseles a las partes de concederse o denegarse el *injunction*;
(2) su irreparabilidad o la existencia de un remedio adecuado en ley;
(3) la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo;
(4) la probabilidad de que la causa se torne académica de no concederse el *injunction*, y sobre todo,
(5) el posible impacto sobre el interés público del remedio que se solicita. *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 784 (1994).

Al aplicar tales criterios a los hechos alegados y probados en el presente caso nos permite concluir que de no con-

cederse el remedio preliminar solicitado, los mencionados demandantes continuarán sufriendo una privación o menoscabo del derecho constitucional que tienen a disfrutar de la igualdad electoral, ya que no existe remedio otro alguno adecuado en ley para vindicar ese derecho en este momento. Igualmente concluimos que de no concederse tal remedio existe la probabilidad de que la solicitud al referido remedio en equidad se torne académica y, después de todo, resulta aparente que la concesión de tal remedio no tendrá impacto alguno sobre los intereses del Municipio de Carolina.

A tenor con lo anteriormente expuesto, se dictará sentencia para revocar la sentencia recurrida. Se concederá el *injunction* preliminar solicitado para prohibir a los demandados, el Alcalde y la Directora de Finanzas del Municipio de Carolina, y a sus agentes, funcionarios, empleados y mandatarios, la publicación, impresión, difusión o divulgación del referido logo y para prohibir, además, todo desembolso para el pago de la publicación, impresión, difusión o divulgación del referido logo. Se ordenará, además, a dichos demandados, el Alcalde José E. Aponte y a la Directora de Finanzas del Municipio de Carolina, que procedan inmediatamente a remover, a su cargo y de su propio peculio, dicho logo de todos los lugares en que ha sido colocado o impreso con fondos públicos, incluso vehículos municipales, canchas, rótulos y otros lugares y objetos. En adición, se prohibirá el uso por empleados y funcionarios de dicho municipio de camisetas en las cuales se haya impreso o colocado el mencionado logo con fondos públicos. Se le ordenará también a la parte demandada que detenga inmediatamente la publicación y distribución del folleto "Carolina: 10 años de Superación Gigante" y cualesquiera otra publicación, escrita, oral o visual, de naturaleza análoga, y se devolverá el caso al Tribunal de Primera Instancia, Sala Superior de Carolina, para la continuación de los procedimientos y la concesión de todos aquellos otros reme-

dios que en derecho procedan, conforme con lo aquí resuelto.

C. *Partido Popular Democrático, etc. v. Partido Nuevo Progresista, etc., Caso Civil Núm. CT-95-10*

En este caso el P.P.D. impugnó una serie de anuncios publicados por algunas dependencias del Gobierno y corporaciones públicas, alegando que constituían una campaña concertada y desarrollada por el Gobierno en coordinación con el P.N.P. Mediante estipulación de las partes, se presentaron en evidencia los anuncios impugnados, al igual que prueba pericial en las áreas de comunicaciones y publicidad.

En cumplimiento con nuestra Orden de 1ro de diciembre de 1995 el Tribunal de Primera Instancia nos remitió las determinaciones de hecho resultantes de la referida evidencia. Evaluadas éstas, a la luz de toda la prueba obrante en autos, incluso la transcripción de los testimonios periciales, concluimos que tales determinaciones están plenamente sostenidas por la prueba, en vista de lo cual las adoptamos y concluimos lo siguiente:

1. Los anuncios de la Oficina de Gerencia y Presupuesto, del Departamento de Educación, del Departamento de Transportación y Obras Públicas, de la Autoridad de Carreteras y del Departamento de Corrección y Rehabilitación destacan la labor realizada por dichas dependencias gubernamentales e incluyen el lema "compromiso cumplido" o la frase "el Departamento ha cumplido con el compromiso del Gobernador Pedro Rosselló". De este modo se resaltan los supuestos logros de dichas dependencias públicas y utilizan el lema propagandístico del partido en el poder con el propósito de conferir una ventaja al candidato a la gobernación de dicho partido.

2. Los anuncios de la Administración de Seguros de Salud, del Departamento de la Familia, del Departamento de

Trabajo y Recursos Humanos, y de la Administración de Compensaciones por Accidentes de Automóviles proveen información de alguna utilidad o beneficio a la comunidad, promoviendo programas y servicios, pero los mismos incluyen el lema de *"compromiso cumplido"*, lo que demuestra el claro propósito de adelantar y promover los fines políticos del partido en el poder y de su candidato a la gobernación.

3. A pesar de que los anuncios del Departamento de Educación incluyen información sobre los servicios ofrecidos por dicho departamento, incluyen además *un recuadro en el que se expresa que se ha cumplido con el compromiso del Dr. Pedro Rosselló*, utilizando el lema propagandístico de dicho candidato y con el obvio propósito de conferir a éste una indebida ventaja sobre los candidatos opositores.

4. Los anuncios del Departamento de Hacienda informan cambios o reformas que afectan a la ciudadanía, *pero incluyen la frase "compromiso cumplido"*, en obvia referencia al candidato a la gobernación del partido en el poder y con iguales fines político-partidistas que los mencionados anteriormente.

5. Solamente cuatro (4) anuncios de los evaluados carecen de mensajes político-partidistas. Estos anuncios corresponden a las siguientes agencias: (a) Departamento de la Familia (en éste se promueven las oportunidades de empleo para ciudadanos de cincuenta y cinco (55) años o más);[29] (b) Departamento del Trabajo y Recursos Humanos (en este anuncio se promueve el empleo de residentes en viviendas públicas);[30] (c) Departamento de Salud (promueve y provee información sobre la lactancia materna);[31] (d) Departamento de Transportación y Obras Públi-

---

[29] Este anuncio fue publicado en *El Nuevo Día* el 16 de noviembre de 1995, *Exhibit* 54 de la parte demandante.

[30] Publicado en *El Nuevo Día* el 15 de noviembre de 1995, *Exhibit* 55 de la parte demandante.

[31] Publicado en *El Nuevo Día* el 16 de noviembre de 1995, *Exhibit* 56 de la parte demandante.

cas (en este anuncio se avisa o alerta al público sobre un programa de mejoras a la transportación en el área metropolitana de San Juan).(³²)

' Con excepción de los cuatro (4) anuncios antes indicados, la campaña publicitaria del Gobierno se caracteriza por el lema "compromiso cumplido", acompañado de una marca de cotejo. A pesar de que resulta evidente que la utilización de este lema responde a fines político-partidistas, la prueba pericial despejó todo tipo de duda al demostrar fehacientemente que el lema en cuestión corresponde a la campaña que simultáneamente conduce el P.N.P. en consideración a las elecciones generales de 1996.(³³) Observamos, además, que mientras la campaña publicitaria del Gobierno se distingue por el lema "compromiso cumplido", en la campaña del P.N.P. se enfatiza las supuestas promesas "sin cumplir" de Héctor Luis Acevedo, candidato a la gobernación por el P.P.D. A su vez, estos estribillos se com-

---

(³²) Publicado en *El Nuevo Día* el 16 de noviembre de 1995, *Exhibit* 57 de la parte demandante.

(³³) Sobre esto el doctor Gaztambide, perito de la parte demandante, testificó lo siguiente:

"... por las características de los anuncios que hemos, que yo pude ver tanto de prensa como de televisión, hay unos elementos en común tanto en los lemas como en el uso de una serie de motivos particulares, por ejemplo el uso del color, el color azul con regularidad, el uso del lema "compromiso cumplido", o palabras similares. [...] Llevan a la percepción de que están todos pensados por un ente central. En otras palabras, una de las características de una campaña es que tienen un mensaje común y que tienen unos elementos comunes, de manera que aunque puedan cambiar los detalles de cada uno de ellos, el mensaje que se lleva es esencialmente el mismo. Y por eso es la importancia de los elementos comunes. Esta campaña que yo pude estudiar tiene esas características, de tener esos elementos comunes a pesar de ser de agencias distintas o de venir de emisores distintos, viene a mi entender a constituir una campaña." Refiérase a la pág. 101 de la Transcripción de la vista celebrada el 4 de diciembre de 1995.

"... yo entiendo que en la medida en que se está estableciendo que se han cumplido algunas de las cosas que aparecían en aquellas cuñas, por ejemplo, sobre la educación, sobre la salud, se está estableciendo una conexión entre lo que sucedió en aquel momento en el '92 y los anuncios de hoy en día, además de las conexiones de tipo, como le decía, de color y de la idea de compromiso cumplido. [...] Realmente es una campaña muy sofisticada, que trata de, creo yo, llevar el crédito por la obra de gobierno a otras personas que no son necesariamente la agencia misma, sino que al hacer uso de el color azul y del compromiso cumplido, yo creo que hace referencia a otros entes políticos y otras personas, o personajes políticos. ... o entiendo que se refiere al Partido Nuevo Progresista ... [a]l Gobernador Sr. Pedro Rosselló." Transcripción, *supra*, págs. 103–104.

plementan con el lema "prometimos y cumplimos" que se destaca en el comité central de campaña del P.N.P.

Concluimos que en este caso nos encontramos ante una campaña publicitaria concertada, de manifiesto corte político-partidista, subvencionada con una gran cantidad de fondos públicos, so pretexto de cumplir con un fin público determinado. *La utilización de símbolos o insignias de naturaleza político-partidista, tales como la palma y la estrella, ciertamente identificables con el P.N.P., es contraria al fin público que exige nuestro ordenamiento constitucional en la administración del erario y al axioma de paridad económica entre las fuerzas electorales que le sirve de norte.* Como acertadamente destaca el Prof. Steven Shiffrin, "permitirle al gobierno, armado con el mayor tesoro de campaña —el erario público— intentar dominar un proceso electoral, atenta contra la integridad básica del proceso democrático". (Traducción nuestra.) S. Shiffrin, *Government Speech*, 27 UCLA L. Rev. 565, 612 (1980). A fin de cuentas, "no es función del Gobierno, reelegirse a sí mismo". (Traducción nuestra.) E. Ziegler, *Government Speech and the Constituition: The Limits of Official Partisanship*, 21 B.C. L. Rev. 578, 604 (1980), citando a T. Emerson, *The System of Freedom of Expression* 698–699 (Vintage Ed. 1971).

Indudablemente, con los adelantos tecnológicos también se producen cambios en los estilos y esquemas de comunicación.

[L]os medios de comunicación de masas ... [pueden] elimina[r] el juego de la libertad de opinión y de palabra, por lo menos en su función social como mecanismo normal de la democracia, pues al lado de las pobres manifestaciones del pensamiento, según la forma tradicional, los nuevos recursos técnicos ... permiten "fabricar" la opinión pública a través de ideas y de apreciaciones razonables. *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, Ed. U.P.R., 1954, pág. 212.

El reconocimiento de esta realidad no puede escapar a nuestra atención. De la evidencia que tuvo ante sí el Tri-

bunal de Primera Instancia surge palpablemente el propósito de los demandados de influenciar la opinión pública a favor del partido de gobierno y de su candidato a la gobernación, el actual incumbente Dr. Pedro Rosselló González, mediante una masiva campaña de medios en forma coordinada entre las agencias y dependencias del Gobierno y el P.N.P. mediante el uso repetido de lemas y estribillos de campaña, logos y símbolos del partido en el poder, la fotografía del mencionado incumbente, colores que identifican a dicho partido y el empleo de técnicas visuales que no tienen otro propósito que el de obtener el favor de los votantes en la campaña electoral que se avecina. Todo ello al amparo de un supuesto —y muy lejano— propósito de informar a la ciudadanía del funcionamiento de su gobierno. Si algún objetivo público se logra en estos casos, éste palidece ante la deslumbrante campaña publicitaria que lleva a cabo el Gobierno con el fin obvio de realzar la imagen del P.N.P. y de su candidato a la gobernación en las próximas elecciones generales.

Concluimos, pues, que la parte demandante estableció la realidad del daño sufrido mediante la presentación de su prueba pericial. El daño se manifiesta claramente en la ventaja que proporciona al partido demandado (P.N.P.) sobre el partido demandante (P.P.D.) la difusión de los mencionados anuncios de corte político-partidista sufragado con fondos públicos. Así lo atestó el perito, Sr. Josué Merced Reyes (especialista en comunicaciones, publicidad y mercadeo), al manifestar lo siguiente:

> ... se beneficia ... porque es una inversión que está haciendo el gobierno de Puerto Rico que debería ser una inversión hecha por el Partido Nuevo Progresista[, e]n adición a eso, el volumen de anuncios, el mollero económico da mejores descuentos, obviamente el gobierno de Puerto Rico como entidad tiene disponible unos recursos económicos que necesariamente un partido individual no tendría ... puede obtener mejores negociaciones por ese volumen de dinero que tiene y tercero ... tiene todo un año o el tiempo que haya corrido esta campaña [para] seguir adelantándose a la [é]poca eleccionaria que [v]ien[e] en el '96.

Transcripción de la vista en su fondo, 4 de diciembre de 1995, págs. 213–214.

Conforme a la prueba pericial antes aludida, el resultado de sufragar tales anuncios político-partidistas con fondos públicos es un ahorro para el P.N.P., que no tiene que desembolsar de sus propios fondos para adelantar su campaña electoral llevada a cabo con el propósito de elegir a su candidato a gobernador en los próximos comicios generales.[34]

La discreción que posee la Rama Ejecutiva para determinar lo que constituye un fin público está limitada por la prohibición contenida en nuestra Constitución y por la legislación aplicable. Ninguna de las ramas del Gobierno puede, bajo el subterfugio de la inaplicabilidad de la veda electoral, utilizar fondos públicos para fines político-partidistas, ya que ello no constituye un fin público en nuestra jurisdicción.

No nos corresponde pasar juicio sobre la sabiduría de los gastos incurridos en publicidad, siempre que éstos respondan a fines públicos. Sin embargo, es nuestra responsabilidad, como máximos intérpretes de la Constitución, velar por que estos fondos respondan directamente a las necesidades de la ciudadanía y no a los fines de partido o candidato político alguno. Tomando conocimiento judicial de ello, nos preocupa la proliferación de varias publicaciones hechas y distribuidas en los últimos días, aparentemente con fondos públicos, por otras administraciones municipales y ramas de gobierno que adolecen de los mismos defectos constitucionales que hoy señalamos.

Indiscutiblemente, el Gobierno se extralimitó en su facultad o deber de mantener al Pueblo informado, violando

---

[34] El perito señor Merced también concluyó que el Partido Popular Democrático "obviamente va a comenzar su campaña eleccionaria en el '96 sin la ventaja de tener algo en el '95, segundo[,] el dinero que está invirtiendo si son 1, 6, 20 millones la cantidad de dinero que se determine, pues no los tiene a su disposición para invertir aparte del mollero económico de negociar con mayor presupuesto". Transcripción de la vista en su fondo, 4 de diciembre de 1995, pág. 214.

de esta forma la disposición constitucional que confina la utilización de fondos públicos a fines públicos y el axioma constitucional de igualdad económica de los partidos y candidatos a puestos electivos. Por tal motivo, *procede que dictemos el "injunction" preliminar, solicitado en este caso, para prohibir a los funcionarios demandados y al Estado Libre Asociado de Puerto Rico la publicación, costeada con fondos públicos, de anuncios de la naturaleza de los mencionados anteriormente, y para extender tal prohibición a sus agentes, funcionarios, mandatarios y empleados, ya sea que éstos actúen solos o de común acuerdo con otras personas. Se prohibirá, además, al Estado Libre Asociado de Puerto Rico, a los demás demandados y a sus agentes, funcionarios, empleados y mandatarios, el desembolso de fondos públicos para el pago de las publicaciones hechas de tales anuncios o que, en lo sucesivo, se hagan en violación a la referida orden de "injunction", hasta tanto otra cosa se disponga finalmente en este caso.*

*Se ordenará, además, la devolución de este caso al Tribunal de Primera Instancia para la continuación de los procedimientos todavía pendientes en forma compatible con lo aquí resuelto. Reconocemos que el foro de instancia tiene facultad, a base de la evidencia que se le presente, para extender permanentemente el "injunction" preliminar que hemos dictado, incluso la facultad de prohibir permanentemente cualquier actuación, conducta, campaña o actividad de parte de los demandados que haya sido llevada a cabo o se lleve en el futuro, en violación de las normas expuestas en esta opinión. Igualmente se reconoce la facultad de dicho tribunal para ordenar cualquier otro remedio que en derecho proceda, incluso la compensación de los daños sufridos por la parte demandante, todo ello después de dar oportunidad a la parte demandada de ser oída y presentar sus defensas.*

*En cuanto al representante demandado, Hon. Luis Maldonado Rodríguez, la postura procesal de la reclamación en su contra es distinta a la de los demás demandados. Éste no compareció a la vista y se le anotó la rebeldía. Tomando en consideración los hechos alegados en la demanda y la evidencia presentada en la vista evidenciaria celebrada por el foro de instancia, se le ordena al Representante Hon. Luis Maldonado Rodríguez a que retire inmediatamente de todo vehículo propiedad del Estado Libre Asociado de Puerto Rico que en la actualidad esté utilizando y que en lo sucesivo utilice, y que se abstenga permanentemente, por sí o a través de sus agentes, mandatarios, empleados y toda persona que con él actúe en concierto y de común acuerdo, de colocar, además, en tales vehículos cualquier pegatina, calcomanía, rótulo o insignia representativa de un partido político o candidato, o que identifique y promueva los intereses electorales de cualquier partido político o candidatos.*

Los Jueces Asociados Señores Hernández Denton y Fuster Berlingeri emitieron unos opiniones de conformidad. El Juez Asociado Señor Negrón García emitió una opinión concurrente. Los Jueces Asociados Señores Rebollo López y Corrada Del Río emitieron unos opiniones concurrentes y disidentes.

— O —

Opinión concurrente del Juez Asociado Señor Negrón García.

I

*Trasfondo conceptual: derechos en discusión; valores constitucionales y jurisprudenciales atinentes; gravedad del problema*

"No es función del gobierno, por sí, lograr su reelección." (Traducción nuestra.)([1])

Bajo el *postulado multidimensional de igualdad* inmerso en nuestra Constitución, en interacción con otros derechos fundamentales, principalmente ante el Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, no es válido ni permisible el uso de fondos públicos para anuncios y campañas publicitarias propagandistas de carácter político-partidista,([2]) sea clara, indirecta, sutil, disimulada, sofisticada o esté entremezclada con actividades informativas legítimas.([3])

"A fin de cuentas, se llaman 'fondos públicos' porque provienen de todos los contribuyentes del país y del más amplio *spectrum* político. *NO SON PRIVATIVOS DE QUIENES POLÍTICAMENTE OSTENTAN LAS RIENDAS DEL PAÍS DURANTE DETERMINADO CUATRIENIO." Noriega v. Hernández Colón*, 126 D.P.R. 42, 72 (1990), voto disidente. "Y tras el telón, los fondos públicos van a parar a las 'agencias de publicidad [que] cuentan con expertos conocedores de la conducta humana. *Ideas, imágenes, detalles visuales y gráficos aparentemente insignificantes pueden esconder solapadamente un mensaje político.* Por lo tanto, no podemos abstraernos de los adelantos de la industria de las comunicaciones y del desarrollo de complejas

---

([1]) T. Emerson, *System of Freedom of Expression*, Ed. Random House, 1970, pág. 699.

([2]) Excepto en virtud del esquema visualizado en el Fondo Electoral que asigna unas cantidades a los partidos políticos *en igualdad de condiciones* y, claro está, las asignaciones presupuestarias a la Comisión Estatal de Elecciones para implantar la Ley Electoral de Puerto Rico. Véanse: *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 750–751 (1976); *P.S.P. v. Srio. de Hacienda*, 110 D.P.R. 313, 324–325 (1980).

([3]) "La corrupción y el desembolso indebido o ilegal de fondos públicos —en sus formas múltiples, a veces burdas y otras sofisticadas— son actos incompatibles con el sistema de gobierno democrático consagrado en nuestra Constitución y apuntalado en el respeto a la dignidad humana y el dinero del pueblo como único soberano. *No importa las modalidades que adopten, ni la jerarquía del funcionario involucrado; las mismas son intolerables.* En última instancia, quien verdaderamente se perjudica, no sólo en lo económico sino en lo moral, es la ciudadanía en general independientemente de su afiliación política. Es pues, obligación de los tribunales reivindicar esos valores fundamentales." (Énfasis el original suprimido y énfasis suplido.) *A.E.E. y A.A.A. v. P.N.P.*, 128 D.P.R. 294, 294–295 (1991), voto concurrente.

técnicas para encubrir mensajes. *P.N.P. v. Hernández, Srio. D.T.O.P.*, 122 D.P.R. 362, 388–389 (1988), opinión concurrente." *Noriega v. Hernández Colón*, supra, pág. 69.

*Los fondos del erario son sagrados; lo manda la Constitución y legislación.* Así lo entendieron muchos buenos servidores, que décadas atrás nos precedieron en la administración de la cosa pública. Lamentablemente, en los últimos cuatrienios, la recta y sana administración pública ha sido totalmente confundida con el manejo de lo sectario partidista. *Como correctamente concluyó el ilustrado tribunal de instancia (Hon. Arnaldo López Rodríguez, Juez), este mal proceder ha trascendido en las distintas administraciones, ha hecho crisis en los últimos cuatrienios, controlados por el P.N.P. y P.P.D.; incluso dentro de la administración municipal.* Ya para el 1990, en *Noriega v. Hernández Colón*, supra, págs. 68–69, habíamos cuestionado esta práctica perjudicial. Dijimos:

> ... ¿quién le pondrá freno a esa disputa y saturación de anuncios "públicos"?, ¿quién controlará la sangría presupuestaria?
> Esta aterradora visión del futuro, ¿no es más bien típica de una campaña electoral entre partidos de oposición en año eleccionario? ¿Por qué trasladarla al escenario gubernamental y gravar los fondos públicos al amparo de la cuestionable práctica de "informar" al pueblo?
> Recapitulando, este tipo de campaña, impulsada para ganarse la opinión pública, abre camino a una contienda político-ideológica de mayor envergadura.

La mezcla e interacción de estos dos (2) componentes importantes en nuestra democracia —gobierno y partido mayoritario— *ahora alcanzan proporciones inimaginables en el renglón publicitario.* Los dos (2) anuncios publicados por el Municipio de San Juan que criticaban al gobierno estatal y que generaron un duelo en virtud de otros anuncios escritos y en la televisión —por parte del Departamento de Salud Central— los cuales atacaban directamente al Alcalde de San Juan, Hon. Héctor L. Acevedo; la campaña del logotipo personal difundida por el Alcalde del

Municipio de Carolina, Hon. José A. Aponte (P.P.D.), y los masivos anuncios publicados por los funcionarios demandados del gobierno central, son *todos* apoyados en el deber que tienen de informar a la ciudadanía sobre la cosa pública y los logros. Alegatos Procurador General, págs. 14 y 21, respectivamente; Alegatos Alcalde Carolina, pág. 27.

Por su parte, el P.N.P. y el Gobernador, Hon. Pedro Rosselló, la justifican en virtud del énfasis que éste le dio a las ideas vertidas por David Osborne y Ted Gaebler en el libro *Reinventing Government*, que serviría de guía a la nueva orientación de su gestión gubernamental. Dichos autores "recomiendan que se adopten lemas, metáforas o 'slogan' para transmitir los valores primordiales, lograr la excelencia y el resultado positivo en todos sus componentes e informar al pueblo la política pública del Gobierno". Alegato del P.N.P. y Gob. Hon. Rosselló en su carácter personal, págs. 8–9.

Esta proposición equivale —usando una frase conocida— al infructuoso intento del Baron de Münchhausen *de salir del pantano tirando de su propia coleta*. Demás está decir que, por bien intencionado que sea, el implantar cualesquiera ideas de esos y otros autores no puede subvertir los principios constitucionales y el ordenamiento jurídico que rige en nuestro país. *La divulgación y el proselitismo no deben converger girando contra el tesoro del ciudadano. En el ámbito de la información gubernamental, esa "reinvención del gobierno" es equivocada, dañina, ilegal y contraviene claros principios constitucionales.*

*Los funcionarios del gobierno central o municipal en el poder no tienen derecho a usar el dinero público para su reelección; en este sentido, el Estado y la administración de turno no son sinónimos. Este criterio y rigor jurídicos de juzgar no son nuevos.* Desde el voto disidente en *P.P.D. v. Junta Revisora Electoral*, 109 D.P.R. 464, 465 (1980), consignamos "nuestro deber judicial darle virtualidad y con-

vertir en realidad el ideal legislativo de *igualdad* en el debate político". (Énfasis en el original.) *Hace mucho tiempo descubrimos* que "[l]a igualdad es ingrediente medular del ideal de justicia que constantemente *late* en la Constitución. Por su naturaleza dinámica es susceptible de manifestarse en diversas dimensiones". (Énfasis suplido.) *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 633 (1984). Allí declaramos que el *"principio de igualdad electoral es continuo* ... [e] intenta disuadir que en determinada época un partido, que controla mayoritariamente los poderes ejecutivo o legislativo, o lo comparta con otro —mediante anuencia o consenso— ... *agrave la situación de los partidos de oposición existentes*, o introduzca cambios de cual[quier] forma en las leyes y reglas que rigen la contienda electoral en beneficio y ventaja ...". (Énfasis suplido.) *P.R.P. v. E.L.A.*, supra, págs. 637–638.

Posteriormente, en *P.N.P. v. Hernández, Srio. D.T.O.P.*, 122 D.P.R. 362, 370 (1988) —*injunction* presentado por dicho partido político para solicitar que se prohibiera una campaña masiva de anuncios gubernamentales— al remitirnos a nuestro disenso en *P.P.D. v. Junta Revisora Electoral*, supra, pág. 370, sostuvimos que "[a]un cuando la Ley Electoral de Puerto Rico guardara silencio al respecto, *subsistiría el principio igualitario constitucional de que los desembolsos públicos para fines de propaganda política no son lícitos ni tolerables.* Ante reclamos meritorios, los tribunales tienen la facultad inherente para impedir, reivindicar y remediar infracciones a ese derecho. Después de todo, '[a]l presente, en materia electoral no se cuestiona seriamente el postulado de igualdad inmerso en nuestra Constitución. Históricamente ese ideal ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos políticos y los candidatos'. *Marrero v. Mun. de Morovis*, 115

D.P.R. 643, 646 (1984); *P.S.P. v. Srio. de Hacienda*, supra".
(Énfasis suplido.)(⁴)

---

(⁴) Como ponentes de *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984), y *Marrero v. Mun. de Morovis*, 115 D.P.R. 643 (1984), nunca hemos ignorado estos principios constitucionales y su aplicación a todo proceso electoral, sean primarias, elecciones, plebiscitos o referéndum.

En nuestro disentir en *Noriega v. Hernández Colón*, 126 D.P.R. 42 (1990), cuestionamos la facultad y autoridad del Primer Ejecutivo para ordenar al Banco Gubernamental de Fomento que otorgara contratos de campañas publicitarias —*anuncios de radio, televisión y prensa que versaban sobre la fábula de una vaca (Fortunata) y los beneficios de la venta por su dueño*— por ser contrarios a la política pública plasmada en las leyes mediante la cual se adquirió y retendría para el pueblo la Puerto Rico Telephone Co.

Concluimos que los desembolsos eran ilegales y explicamos así "la similitud y diferencia básica entre los programas de acción de los partidos políticos frente a una política pública oficial gubernamental. Ambos son de contenido ideológico e incluyen los planes sociales, económicos e idearios políticos. Ahí termina la semejanza. Una vez sometidos al electorado, culminada la elección de los funcionarios y debidamente juramentados, estos pueden transformar sus programas partidistas en política pública de acción a través de los canales constitucionales que corresponden al Primer Ejecutivo y a la Asamblea Legislativa". *Noriega v. Hernández Colón*, supra, pág. 59.

Subsiguientemente, sostuvimos en *Berríos Martínez v. Gobernador II*, 137 D.P.R. 195, 271 esc. 3 (1994), opinión disidente:

"Desde el primer incidente procesal de 2 de septiembre de 1994, constatamos la naturaleza político-partidista de las propuestas. El P.P.D. adujo que el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, impedía al Gobierno difundir anuncios de propaganda en año electoral. Los demandados argumentaron que sólo aplicaba en el contexto de elecciones generales, no en referendos, y que era de naturaleza cívico-social. Invocaron la resolución del Tribunal en *Regl. Creac. y Func. Unidad Esp. J. Apel.*, 134 D.P.R. 670 (1993). La mayoría del Tribunal, mediante resolución, devolvió la controversia al Tribunal Superior. En nuestro disenso, expresamos que no cabía hacer distinciones entre elecciones generales y referendos, pues en ambos se ejercitaba el sufragio electoral, el cual tenía que ser libre de coacción. Señalamos, además, que la prohibición estaba fundada en el principio de igualdad electoral y en el juego justo electoral, reproduciendo así nuestra[s] expresiones disidentes de *Gierbolini Rodríguez v. Gobernador*, 129 D.P.R. 402 (1991).

"En *Gierbolini Rodríguez v. Gobernador*, supra, la mayoría, tras una hermética y restrictiva aplicación de las técnicas procesalistas de justiciabilidad, entendió que no tenía jurisdicción para expresarse en los méritos. *El efecto práctico fue que el Gobierno de entonces, dominado por el P.P.D., desató una masiva y costosa campaña publicitaria con miras al referéndum de ese año.*

"Oportunamente, el asunto regresó a este Foro. En *P.P.D. v. Gobernador I*, 136 D.P.R. 861 (1994), mediante *per curiam*, finalmente el Tribunal reconoció que aplicaba dicha prohibición, adoptando implícitamente la esencia de los fundamentos de nuestra opinión disidente de *Gierbolini Rodríguez v. Gobernador*, supra.

"Al respecto, se decidió que el derecho del pueblo al sufragio universal —libre de coacción— y el principio de igualdad económica electoral hacían imperativo su aplicación a los referendos, igual que a las elecciones generales."

*Con vista a esta invariable psicodinámica decisoria, no podemos conformarnos con una simple cirugía selectiva.*(⁵)

(⁵) En nuestro análisis, nos concentraremos en las cuestiones sustantivas fundamentales. No entraremos en una disquisición extensa sobre los planteamientos clásicos de *justiciabilidad*, a saber, *legitimación activa, academicidad* y *cuestión política*, los cuales consideramos improcedentes.

*Legitimación activa*

En nuestro *voto disidente* de 1ro de diciembre de 1995 (CT-95-10) en virtud del mandato claro de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3101 *et seq.*, caracterizamos como *inmeritoria* la alegación de falta de capacidad del P.P.D., como partido político, para demandar y ser demandado.

Basta reiterar que no albergamos duda alguna de que el P.P.D. tiene legitimación activa. *Primero*, es incorrecto afirmar que no alegó haber sufrido daño alguno. *Segundo*, si alguien debe tener legitimación activa para impugnar el uso de fondos públicos para pagar anuncios político-partidistas, es un partido, candidatos y sus electores individualmente. Véase *P.R.P. v. E.L.A.*, supra.

Jamás hemos suscrito una interpretación restrictiva en materia de legitimación activa. En todas las decisiones en que este Tribunal se ha negado a reconocerla, hemos disentido, confiriéndola a legisladores de minoría, organizaciones estudiantiles *bona fide* (F.U.P.I.), aspirantes o candidatos, e indistintivamente a *todos* los partidos políticos y sus electores.

" 'El sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el *elector individual.*' (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 407 (1980). Como verdaderos destinatarios del sistema, el Art. 2.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3051, *in fine* expresamente les concede como 'electores la *capacidad para iniciar o promover cualesquiera acciones legales* al amparo de [la] *Declaración de Derechos y Prerrogativas de los Electores* ante el Tribunal de Primera Instancia que corresponda'. (Énfasis suplido.)." *Sánchez y Colón v. E.L.A. I*, 134 D.P.R. 445, 454–455 (1993), opinión concurrente y disidente.

En el Caso Civil Núm. AP-95-9, tanto el Lcdo. Max Pérez Preston —Presidente del Comité Local del P.N.P. y aspirante a la alcaldía del Municipio de Carolina— al igual que los legisladores de Distrito y electores de ese partido poseen legitimación activa. *Acevedo Vilá v. Corrada Del Río*, 138 D.P.R. 886 (1995), opinión disidente. Bajo el predicado de igualdad constitucional electoral, no podemos distinguir entre incumbentes y aspirantes. *Marrero v. Mun. de Morovis*, supra, pág. 647. Véase E. Chemerinsky, *Protecting the Democratic Process: Voter Standing to Challenge Abuses of Incumbency*, 49 Ohio St. L.J. 773 (1988).

*Academicidad*

Ninguno de los recursos es académico por su *naturaleza repetitiva*. Según señalado, reclamos idénticos judiciales han surgido antes bajo diversas administraciones del P.N.P. y P.P.D. En todos los casos anteriores el Estado ha planteado que no puede haber restricción judicial; ahora otra vez insiste y reclama poder continuar haciéndolo. El carácter *recurrente* derrota la tesis de academicidad. Además, otros anuncios pagados por fondos públicos continúan publicándose en la prensa del país a un ritmo acelerado.

*Cuestión política*

Se trata de reclamos justiciables. La situación ante nos dista mucho de presentarse como *tabú* o *cuestión política*. La controversia real es una *pura de derecho*: interpretar si es constitucionalmente válido el uso de fondos públicos para la propaganda política. *Ello es función judicial por excelencia.*

Acoger la tesis del Estado y demás demandados, *"representaría obliterar el sistema de separación de poderes.* Convertiría a la Asamblea Legislativa y al Ejecutivo

La tesis gubernamental de poder anunciar irrestricta-mente "logos, metas y proyecciones", exige una cura radical. *El escalpelo judicial ha de usarse con mano firme para intentar erradicar permanentemente ese mal.* La cues-tión reclama remediar el malgasto y cristalizar la justa y auténtica aspiración de todo un pueblo que pide, quiere y merece la mejor, más recta y escrupulosa administración de sus fondos. *No debe, pues,. opacarse la trascendencia del asunto principal ("issue") ante nos. Se trata de millonarios recursos del pueblo que hacen mucha falta y que se desva-necen en la atmósfera de las ondas radiales, televisivas y el papel impreso.* Grandes recursos económicos que, so pre-texto de informar, se emplean en proselitismo partidista, en detrimento de hospitales, medicinas, escuelas, libros, viviendas, seguridad pública, mejores salarios, etc.

Adjudicarlos eficaz y justicieramente no es validar ni significa negarle al Gobierno su potestad de comunicarse con la ciudadanía para informarle *asuntos de interés pú-blico legítimos.* Sin embargo, enfatizamos que no cabe ha-blar aquí de un derecho constitucional gubernamental a la libre expresión. Decir que el Gobierno tiene "derecho" a expresarse es meramente reconocer que necesita poder co-municarse con los ciudadanos para dar a conocer las leyes y los reglamentos que aprueba, anunciar subastas, convo-car a audiencias públicas y brindar otras informaciones de legítimo interés público. No debe confundirse con el dere-

---

en jueces absolutos de sus propios actos. ' "¡No corresponde ocuparse, naturalmente, *de aquellos otros que, impresionados por la vibración, diré sonora, de las palabras 'cuestiones políticas',* no penetran el concepto de la 'justiciabilidad' y piensan, nada menos, que se pretende 'politizar a la justicia' cuando lo que se quiere es 'despolitizar a las soluciones jurídicas' ...!" ' L.M. Boffi Boggero, *La función judicial y la abogacía,* 115 Rev. Jur. Arg. La Ley 1095, 1104 (1964)". (Énfasis suplido y en el original.) *Sánchez y Colón v. E.L.A. I,* supra, pág. 459.

"El carácter del pleito —de consecuencias y móviles políticos— no desvirtúa, sino que fortalece la naturaleza eminentemente justiciable de la controversia y de la cualidad jurídica de los remedios invocados, a saber, la ilegalidad en el uso de los fondos públicos y la desigualdad creada entre los partidos políticos de oposición. *P.S.P. v. Srio. de Hacienda,* supra; *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* 110 D.P.R. 248 (1980); *Ortiz Angleró v. Barreto Pérez,* 110 D.P.R. 84 (1980); *Santa Aponte v. Srio. del Senado,* 105 D.P.R. 750 (1977); *Clemente v. Depto. de la Vivienda,* 114 D.P.R. 763, 770–771 (1983)." *P.N.P. v. Hernández, Srio. D.T.O.P.,* 122 D.P.R. 362, 378 (1988).

cho de los ciudadanos a exigir información en manos del Gobierno; en tal situación hablamos propiamente de una obligación gubernamental a informar, esto es, el derecho de acceso del ciudadano a información oficial. *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982);[6] *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153 (1986).

Ahora bien, esta facultad gubernamental tiene límites. No es carta blanca para un desenfrenado e irrazonable desembolso de fondos públicos en anuncios. *De lo contrario, entramos en una forma de democracia degenerada o demagógica en que el diálogo natural y legítimo entre gobernantes y gobernados se convierte en un simple monólogo de los primeros.* Surge así la *partidocracia* que hemos denunciado en el pasado,[7] en que el epicentro gubernativo se entremezcla con el partido en el poder y su dialéctica interna;[8] claro está, mientras "más organizado, más oligárquico, y cuanto más oligárquico, más arbitrario". P.L. Zarpeti, *Democracia y poder de los partidos—El nuevo régimenpPolítico*, Madrid, Ed. Iberoamericana, 1970, pág. III.

La cuestión medular —presente en estos recursos— es identificar cuáles son los límites constitucionales y estatutarios de los anuncios gubernamentales sufragados con

---

[6] "Es lógico, pues, concluir que existe una estrecha correspondencia entre el derecho a la libre expresión y la libertad de información. La premisa es sencilla. Sin conocimiento de hechos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada cuatro (4) años." *Soto v. Srio. de Justicia*, 112 D.P.R. 477, 485 (1982).

[7] *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 662–663 (1988); *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra; *Noriega v. Hernández Colón*, supra; *Gierbolini Rodríguez v. Gobernador*, supra; *Sánchez y Colón v. E.L.A.*, supra; *Com. Electoral P.I.P. v. C.E.E.*, 139 D.P.R. 48 (1995), opinión disidente.

[8] "En materia de instituciones políticas encontramos cierta simbiosis entre forma —estructura y dinámica de los órganos y contenido— lo que se puede realizar—. Por esta razón la clasificación de sistemas que hace el hombre político va teñida, en última instancia, de un juicio de valor en bueno o malo. *Bueno es el sistema que él preconiza*, el que sirve a sus propósitos; malo, el de los antagonistas *en la lucha política o el que entorpece la finalidad propia. Los valores inmanentes son una rareza en el combate político.*" L.F. Martínez Ruiz, *El político, el jurista y las leyes*, Rev. Jur. de Cataluña, pág. 872.

fondos públicos estatales y municipales. En esa tarea es menester repasar los fundamentos de la prohibición constitucional.

## II

*Carácter y alcance de la prohibición; Ley Electoral de Puerto Rico*

En nuestra democracia, la legitimidad del Gobierno depende del consentimiento de los ciudadanos, esto es, *"la voluntad del pueblo es la fuente del poder público ..."*. (Énfasis suplido.) *Preámbulo*, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 251. Damos este consentimiento mediante elecciones imparciales y justas. Confiamos que cada elector votará libremente según sus preferencias con arreglo a su conciencia. Por lo tanto, nuestra Constitución manda que "[l]as leyes garanti[cen] la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y prote[jan] al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2, Const. E.L.A., *supra*, pág. 261.

Para que la democracia triunfe y alcance su más alto potencial es menester que los ciudadanos puedan considerar y deliberar todas sus opciones en un espíritu de libertad de conciencia.([9]) *Se atenta contra sus cimientos, cada vez que el Gobierno intenta socavar la capacidad ciudadana de votar libremente, sin coacción ni manipulación, usando recursos gubernamentales para favorecer un partido y sus candidatos.*([10])

---

([9]) "No importa la teoría que endosemos —modelo del libre mercado de ideas, modelo del proceso democrático, modelo de libertad o modelo de tolerancia— promover el desarrollo saludable en una sociedad democrática implica ... [que n]uestras opiniones y las de[l] prójimo, sean o no prejuiciadas, no pueden ser objeto de control gubernamental. Ello atentaría contra la naturaleza humana y sofocaría el libre pensamiento y la expresión." *Noriega v. Gobernador*, 130 D.P.R. 919, 925 (1992).

([10]) Esta premisa es argumentada y sostenida por casi todos los que han escrito sobre el tema. Véanse: Chemerinsky, *supra*; M.A. Yudof, *When Government Speaks*, Berkeley: Univ. of California Press, 1983; S. Shiffrin, *Government Speech*, 27 UCLA L. Rev. 514 (1980); E.H. Ziegler, Jr., *Government Speech and the Constitution: The*

La veda sobre gastos de difusión pública del Gobierno establecida en el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, sólo es una prohibición y limitación *estatutarias* impuesta a los gastos gubernamentales de publicidad.[11] Excepto por las disposiciones del Fondo Electoral, vale aclarar que *la Ley Electoral de Puerto Rico prohíbe siempre el uso de fondos públicos para pagar anuncios político-partidistas*. El Art. 3.011 (16 L.P.R.A. sec. 3111) proscribe el uso de propiedad *mueble* o inmueble del Gobierno en cualquier campaña política, dentro ó fuera de un año eleccionario. Y el Art. 8.010 (16 L.P.R.A. sec. 3360) tipifica como *delito grave, en todo momento*, el uso de fondos públicos para propósitos político-partidistas.

El Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, simplemente establece un procedimiento *especial* para años electorales, cuando es inminente el peligro del malgasto. *El esquema estatutario presume vedado todo anuncio gubernamental*, a menos que sea expresamente requerido por ley, sea de urgencia o emergencia, y la Comisión Estatal de Elecciones autorice difundirlo como información de interés público. *No significa que nuestra Constitución queda eclipsada o entra en estado de hibernación*;[12] todo lo contrario, como veremos, a la luz de nuestro orde-

---

*Limits of Official Partisanship*, 21 B.C. L. Rev. 578 (1980); Nota, *The Constitutionality of Municipal Advocacy in Statewide Referendum Campaigns*, 93 Harv. L. Rev. 535 (1980); R.D. Kamenshine, *The First Amendment's Implied Political Establishment Clause*, 67 Cal. L. Rev. 1104 (1979); Emerson, *op. cit.*

[11] Dispone:

"Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.

"Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones." 16 L.P.R.A. sec. 3351.

[12] Incluso hemos rechazado el ingenioso argumento de boletines informativos publicados regular y permanentemente por la Oficina de Comunicaciones del Gobernador.

namiento prevaleciente, prohíbe *siempre* el desembolso de fondos públicos para fines partidistas y, además, impone limitaciones en el campo de la publicidad y los anuncios legítimos gubernamentales.

La existencia de una legislación y reglamentación electoral específica para gastos de difusión no le resta virtualidad a la prohibición general, subyacente en la Constitución, que prohíbe el empleo de fondos públicos y de propiedad gubernamental en campañas político-partidistas. El Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, en este sentido, es una nueva versión legislativa al esquema reglamentario clásico para funcionar en época eleccionaria,(13) *no un principio de igual jerarquía.*

---

"El que una publicación se haya venido realizando *antes* del período de veda del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, y esté sufragada regularmente, ¿desvirtúa su carácter de anuncio?; ¿pierde su calidad de gastos con fondos públicos que al Boletín de la Gobernación se le caracterice de 'naturaleza oficial y continua'?; ¿establece, honestamente, alguna diferencia que lo prepare la propia Oficina de Comunicaciones y no una agencia de publicidad privada? En su origen, ¿de dónde provienen tales fondos? Estas interrogantes quedan contestadas al confrontarnos con la innegable realidad de que es la sustancia y no la apariencia lo crucial y determinante; *esto es, que la fuente verdadera son los fondos provenientes del erario público.*

"En todo esto hay un eufemismo impermisible. Nada hay en la *Constitución*, en la Ley Electoral de Puerto Rico y en su historial en qué apoyar semejante proposición. *Todo lo contrario —sin límite de tiempo— con referencia a toda propiedad mueble e inmueble gubernamental, por interacción recíproca,* los Arts. 3.001 y 3.012 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3108c y 3108d, respectivamente, proscriben su uso 'a los fines de hacer campaña política a favor o en contra de cualquier partido político o candidato', y la concesión a tales efectos de cualesquiera privilegios especiales. De manera expresa, el Art. 3.012 de la Ley Electoral de Puerto Rico, *supra*, consagra el principio constitucional igualitario de que '[t]odos los partidos políticos y candidatos y grupos independientes tendrán el mismo acceso y oportunidad[es] ...'.

"En resumen, el uso de fondos públicos para fines de propaganda partidista está prohibido, aun cuando el Gobierno prescinda de los medios de difusión comercial pública del país o de agencias de publicidad privadas.(4) ...

"(4) De prevalecer esta contención, podría llegarse al absurdo de que concertadamente todas las agencias establecieran antes del año de elecciones, a través de sus propias oficinas de comunicaciones, un programa de publicación regular y directa —bajo el manto de información de incuestionable interés público— y así continuar haciendo lo que frontalmente la Constitución y la Ley Electoral de Puerto Rico prohíben." (Énfasis suplido y en el original.) *P.N.P. v. Hernández, Srio. D.T.O.P.,* supra, págs. 382–384.

(13) Una diferencia cognoscible es que existe una mayor necesidad de establecer unos controles *previos* a estos desembolsos mientras más próximas las elecciones. *Nuestra memoria es porosa,* por lo que un anuncio publicado pocos meses o semanas

La función de veda del Art. 8.001, *supra*, es principalmente un *mecanismo procesal*: establece una presunción de ilegalidad al requerir autorización *previa* a la publicación. "[L]a *premisa* del estatuto es que un anuncio no autorizado representa una propaganda político partidista en favor del partido político que gobierna los destinos del país en determinado momento." *P.P.D. v. Junta Revisora Electoral*, supra, pág. 472. En contraste, la prohibición general del Art. 3.011 de la Ley Electoral de Puerto Rico, *supra*, es la *norma sustantiva* que se encuentra libre de presunción, por lo que corresponde el peso de la prueba al objetante o promovente.

La lógica integral del esquema estatutario es de fácil comprensión. Lejos de ser una licencia al desenfrenado desembolso de fondos públicos para campañas de publicidad político-partidistas, la Ley Electoral de Puerto Rico *siempre* las prohíbe. De ordinario, sería suficiente referirnos a ella para resolver las controversias jurídicas ante nos. No obstante, en vista de que la prohibición estatutaria a este tipo de anuncios tiene su génesis y su razón de ser en principios constitucionales de mayor envergadura, es imperativo penetrar sus raíces para demostrar que la Constitución es portaestandarte de *una prohibición de rango superior y anterior a la veda estatutaria.*

### III

*Naturaleza y fundamentos de la prohibición constitucional*

No es nuevo el temor de que el proceso democrático sea subvertido. Todo lo contrario, la preocupación de que el dinero o el poder *corrompan (o aparenten corromper)* el proceso electoral, ha sido la motivación principal de la legislación de reforma electoral. 4 *Rotunda and Nowak, Treatise*

---

antes de las elecciones será más efectivo que uno publicado dos años antes; además, los electores, candidatos y partidos políticos agraviados tendrán menos tiempo para acudir y conseguir acción remedial en los tribunales.

*on Constitutional Law* Sec. 20.50 (1992). Para garantizar
unas elecciones imparciales y neutrales, "a la par que evi-
tar contribuciones cuantiosas e irrestrictas que pudieran
comprometer el curso ulterior del gobierno en orden a in-
fluencias indebidas o favoritismos por razón de tales apor-
taciones" —*P.N.P. v. Tribunal Electoral*, supra, pág. 751—
la Asamblea Legislativa adoptó unas medidas que limitan
cuánto dinero cada ciudadano o grupo de ciudadanos puede
contribuir a las campañas políticas de candidatos para
puestos gubernamentales. Ley Electoral de Puerto Rico, 16
L.P.R.A. sec. 3001 *et seq.*

Irónicamente, el monopolio que tiene el Gobierno sobre
el uso de la fuerza como factor coercitivo, junto a sus in-
mensos recursos económicos, lo hacen propenso a la arbi-
trariedad y lo dotan de unos poderes de persuasión y coac-
ción que podrían convertirle en la peor amenaza a la
legitimidad de nuestra democracia. Para que funcione la
democracia no es suficiente limitar el control que puedan
tener los intereses económicos sobre las elecciones. Es im-
perativo impedir que un grupo de ciudadanos utilice los
recursos del Estado para propaganda, máxime cuando son
los *mismos incumbentes* que mediante ese abuso intentan
permanecer en el poder.([14]) "Lo contrario atentaría contra

---

([14]) En esta área, el fenómeno de los excesos de funcionarios y modus operandi
no es privativo de Puerto Rico. En el escenario estadounidense, se ha acuñado la
frase *abuso del incumbente* para describir "el uso de los recursos gubernamentales,
no disponibles a ningún otro candidato, para ayudar a un incumbente en su
reelección. Hay muchas maneras en que un incumbente puede usar su cargo para
adelantar su campaña eleccionaria. Por ejemplo, algunos candidatos han tratado de
usar fondos públicos para pagar los gastos de campañas, incluyendo los costos de
viajar, de publicaciones y salarios. Muchos han sido acusados de abusar el 'privilegio
del franqueo', enviando literatura de campaña a sus representados con cargo a sus
gastos gubernamentales. Otra forma de abuso del incumbente es usar empleados del
gobierno para realizar tareas de campaña mientras están en la nómina pública. De
hecho, algunos incumbentes expresamente han amenazado despedir aquellos em-
pleados que se han negado a apoyarlo en sus campañas de reelección.

"Alegadamente algunos incumbentes han manipulado la concesión de subven-
ciones y contratos gubernamentales para premiar a sus seguidores y de ese modo
promover que los recipientes potenciales apoyen su esfuerzo de reelección. Otras
formas de abuso son más sofisticadas y virtualmente imposibles de controlar. Por
ejemplo, se ha acusado algunos presidentes de manipular las estadísticas guberna-
mentales durante el tiempo eleccionario para mejorar la imagen de la adminis-

el principio supremo que insufla vida a la misma Constitución, esto es, recoger la voluntad del Soberano, que no es otro que el Pueblo." *Berríos Martínez v. Gobernador II*, 137 D.P.R. 195, 267 (1994), opinión disidente.([15])

Las comunicaciones y propaganda gubernamental, especialmente aquellas que gozan de un carácter fundamentalmente político-partidista, adolecen de varios defectos constitucionales. *Primero*, al publicar anuncios partidistas, el Gobierno viola la jerarquía de poder político establecido en nuestra Constitución. *Preámbulo*, supra; Art. I, Sec. 2 y Art. II, Sec. 2, Const. E.L.A., *supra*. *Nos encontramos ante un intento gubernamental de subvertir esta jerarquía, esto es, tornarla al revés; el pueblo, aunque soberano, tiene ante sí al Gobierno tratando de controlar y manipularlo. Segundo*, se apunta el efecto nocivo que puede tener la propaganda del Gobierno sobre la libertad de expresión de los ciudadanos; el "libre mercado de ideas", y la libertad de asociación.([16])

Las "[l]eyes o programas que operan para restringir la libre expresión de un individuo no son la única amenaza para el sistema de libertad de la palabra. Programas gubernamentales que diseminan información o ayudan a di-

---

tración. En todos los niveles, funcionarios han manipulado los eventos noticiosos para coincidir con la elección". (Traducción nuestra y escolios omitidos.) Chemerinsky, *supra*, págs. 775–776.

([15]) "La democracia concibe una gobernación por mayorías temporeras sucesivas. La capacidad de desplazar a los funcionarios que ocupan puestos en el gobierno a favor de los representantes de una mayoría recientemente incoada, es, por lo tanto, un atributo esencial del sistema electoral en una república democrática. Por consiguiente, los ciudadanos y tribunales, ambos deben sospechar de los esfuerzos de los funcionarios del gobierno para controlar el mismo sistema electoral que sirve como freno principal a su poder. Pocas eventualidades son tan antitéticas al concepto de gobernación por el pueblo como la de una mayoría temporera atrincherándose, manipulando mañosamente el sistema electoral mediante el cual los electores, en teoría, pueden registrar su disgusto escogiendo un nuevo liderato." (Traducción nuestra.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1097.

([16]) Ya en *West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 642 (1943), el Tribunal Supremo federal había proclamado que "[s]i hay alguna estrella fija en nuestro firmamento constitucional, es que ningún oficial, de alta o baja jerarquía, puede prescribir lo que será ortodoxo en la política, nacionalismo, religión o en otros temas de opinión". (Traducción nuestra.)

seminadores privados, también crean una amenaza para ese sistema." R.D. Kamenshine, *The First Amendment's Implied Political Establishment Clause*, 67 Cal. L. Rev. 1104, 1106 (1979). El problema es complejo y multifacético aun fuera del contexto específico político partidista.[17]

Advertimos, pues, que mediante el uso de propaganda, el Gobierno puede manipular sutilmente la opinión pública "para prescribir lo que será ortodoxo"; quizás más efectivamente que la censura directa. Este peligro alcanza su mayor magnitud cuando los funcionarios gubernamentales utilizan los poderes de comunicación y fondos del Gobierno para adelantar una agenda político-partidista. En campañas publicitarias masivas, como la de estos casos, estamos ante una burda distorsión de lo que se supone sea la comunicación Gobierno-ciudadano. *La información gubernamental acapara y satura el mercado de ideas; es decir, los anuncios y comunicaciones gubernamentales son tan extensos e intensos que tienden a ahogar las expresiones de otros partidos políticos, entidades ciudadanas e individuos.*[18]

La participación del Gobierno y sus funcionarios incumbentes en el debate político, en cuanto persiguen *mantenerse y crear* una nueva "opinión pública", ataca directamente aquella autonomía de conciencia y pensamiento de los ciudadanos en la cual descansa la justificación de los

---

[17] "El ejemplo de la instrucción en las escuelas públicas ... no es el único ejemplo del poder que tiene el gobierno para crear e inculcar valores ideológicos. Sólo tenemos que fijar nuestra atención en el acceso fácil que tienen los funcionarios del gobierno a los medios de comunicación en masa, el privilegio de franqueo, el flujo constante de informes y publicaciones legislativas y ejecutivas, y el sistema de concesiones directas y subsidios indirectos al proceso de comunicación (incluyendo el financiamiento federal de elecciones), *para reconocer que la expresión financiada o controlada por el gobierno juega un papel enorme en el mercado de ideas.*" (Traducción nuestra.) Shiffrin, *op. cit.*, pág. 569.

[18] "[S]eguramente, el gobierno está obligado constitucionalmente a no usar su poder de comunicación, como cualquier otro de sus poderes, para disminuir la libertad de expresión. Además, no incurrimos en una verdadera paradoja cuando invocamos la Primera Enmienda para restringir la comunicación del gobierno. El propósito de la Primera Enmienda es proteger las comunicaciones privadas, y nada en la garantía impide que el gobierno controle sus propias comunicaciones o las de sus agentes." Emerson, *supra*, pág. 700.

derechos de libertad de expresión y de sufragio. *¿Qué otro objetivo tiene la propaganda sino la manipulación de la opinión?*([19]) El extender al pueblo las consignas y los lemas partidistas del gobernante de turno en la propaganda gubernamental, ¿no es un instrumento para moldear, formar, canalizar y dirigir la opinión ciudadana hacia un eventual triunfo electoral?([20])

Hay evidencia indicativa de que las personas de pensamiento independiente y crítico, tienden generalmente a resistir estos intentos de manipulación. Sin embargo, esa tendencia no es garantía suficiente para anular sus efectos

([19]) La publicidad es el "arte de dar a conocer las excelencias de un artículo, de un servicio o de *una idea, por todos los medios imaginables*; es hoy el más eficaz auxiliar del comercio y se ha convertido en una industria pujante, con empresas especializadas, escuelas, tratados, teorías y sistemas que se relacionan íntimamente con la psicología individual y social y estudian todos los medios para hacer efectiva la propaganda por medio de la prensa, la radiodifusión —ulteriormente y con eficacia estragadora a veces la televisión— los carteles, letreros luminosos, atracciones, exposiciones, y todo cuanto pueda llamar la atención del presunto cliente o adepto. El proceso psicológico de la captación por medio de la *publicidad* comprende: atraer la *atención*, grabar en la *memoria*, suscitar el *interés*, avivar el *deseo*, crear la *voluntad*, para lograr la *adquisición, suscripción o inscripción". Diccionario Enciclopédico de Derecho Usual*, 20ma ed., Buenos Aires, Ed. Heliasta, 1981, T. VI, págs. 509–510. La *propaganda* "es la difusión de cualesquiera doctrinas o ideas por toda clase de medios de expresión (radiotelefonía, televisión, prensa, discursos, carteles y cuanto impresione los sentidos), para ensalzar la bondad de una causa, escarnecer otras, atraer partidarios, inflamar el espíritu de partido o nacional, o desmoralizar al adversario o enemigo. *Anuncio de un producto, con recomendación, generalmente exagerada, de sus cualidades y excelencias, superiores a todos* los artículos o procedimientos similares según quien lo difunde o aquel a cuyo servicio lo ensalza." Íd., pág. 461.

([20]) Es innegable la "realidad viva y la fuerza creciente en la formación y manipulación de la opinión pública por los llamados medios de comunicación social: prensa, radio, televisión, etc. Véanse: W. Overbeck y R.D. Pullen, *Mayor Principles of Media Law*, 2da. ed., Nueva York, Ed. Holt, Rinehart y Winston, 1985; D.E. Casper, *Media and the Formation of Public Opinion: A Checklist*, 1975–1984, Illinois, Vance Bibliographies, 1985; D.A. Graber, *Mass Media and American Politics*, 2da. ed., Washington D.C., Ed. Congressional Quarterly, 1984. 'Como bien ha señalado Alf Ross, la propaganda apunta directamente a los instintos, estando probado que la sugestión emotiva, obedeciendo a normas de psicología colectiva, es mucho más eficaz que las apelaciones subjetivas a la razón ([*op. cit.*], p[ág]. 32). Por efecto de la propaganda, se puede cambiar la expresión de una voluntad popular 'verdadera' por otra voluntad popular 'sintética' ([í]dem, p[ág]. 32), y frente a este riesgo, que es de tanta peligrosidad para la democracia, estima Ross que la mejor salvaguarda está en 'inmunizar a la población contra la propaganda, es decir, desarrollar en ella un sentido crítico que constituya la mejor inmunización contra la infección espiritual inducida por la sugestión propagandista' ([í]dem, p[ág]. 32).' Vanossi, *supra*, págs. 1287–1288". *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, pág. 388.

nocivos.([21]) En todo caso, e independientemente de cuán efectivos sean los anuncios político-partidistas en general, es incontrovertible que todos son publicados con la *intención* de influenciar la opinión pública para favorecer un lado u otro.([22]) Lógicamente, ningún partido político incurriría en gastos millonarios de publicidad de no creer que generan un efecto concreto y favorable a su causa. *Mientras la publicación de anuncios políticos por los partidos y otras entidades privadas es ejemplo positivo de la libertad de expresión, su publicación por el Gobierno es anatema a esa misma libertad.*([23])

Esta distinción fundamental nos lleva al tercer defecto constitucional del desembolso de fondos públicos para la publicación de anuncios político-partidistas: *una lesión al postulado de igualdad económica entre los partidos políticos. Marrero v. Mun. de Morovis*, supra, pág. 646; *P.S.P. v. Srio. de Hacienda*, 110 D.P.R. 313 (1980).

Por analogía, siguiendo el análisis en *A.E.E. y A.A.A. v. P.N.P.*, 128 D.P.R. 294 (1991), es evidente que al recibir un partido o un alcalde los beneficios de una campaña publicitaria costeada con fondos públicos, se enriquecen, en la medida en que no tuvieron que incurrir en esos gastos. Allí dijimos: "[l]a cuestión no es nueva. Un comentarista específicamente nos ilustra así: '[t]ambién puede constituir el enriquecimiento en un *ahorro de gastos, supuesto distinto*

---

([21]) Véase Yudof, *supra*, en general, especialmente su Capítulo 5, titulado *"El Impacto Indeterminado de las Comunicaciones en Masa"*.

([22]) La misma Comisión Estatal de Elecciones, en su *Reglamento de Gastos de Difusión Pública del Gobierno*, tiene el propósito de "evitar la divulgación publicitaria indiscriminada con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes del gobierno *que en alguna forma coaccionen o afecten la voluntad de los electores*". (Énfasis suplido.)

([23]) *"La valoración que hace el político es, pues, relativa. Valora con relación a un punto de vista determinado: el suyo.* Este punto de vista no es sólo función de ideología política; es también función de interés. Por esto el político, de modo consciente o no, valora de *distinta manera* los elementos de combate cuando *está instalado en el poder que cuando aspira a conquistarlo.* El que está en el poder tiene tendencia a estorbar los medios de lucha política de sus antagonistas; éstos, por el contrario, quieren vía libre." Martínez Ruiz, *op. cit.*, pág. 872.

*de recibir un incremento patrimonial,* como cuando *se emplea sin derecho* la actividad profesional *ajena* evitándose desembolsos por parte del que lo utiliza, siempre que la ventaja obtenida sea valuable en una suma de dinero'. (Énfasis nuestro.) J. Santos Briz, *Comentarios al Código Civil y compilaciones forales,* Madrid, Ed. Rev. Der. Privado, 1984, T. XXIV, pág. 33." (Énfasis en el original.) Íd., pág. 298.

Aclarado este extremo, rechazamos el argumento de que los partidos o candidatos de oposición no sufren daño alguno cuando el Gobierno central o municipal incurre en propaganda partidista con fondos públicos, bajo la tesis de que, en el pasado, esos excesos han sido contraproducentes y cruciales para una derrota en las urnas. Hace tiempo reconocimos que, además de la solvencia económica de los partidos, en el desenlace final electoral "entran en juego un sinnúmero de factores tales como naturaleza de las controversias, organización, liderazgo, destreza, prestigio, control y extensión de información y publicidad ...". *P.N.P. v. Tribunal Electoral,* supra, pág. 751.

"Teóricamente, el proceso político puede contrarrestar el abuso del incumbente pues el opositor puede convertir el acto inconstitucional en una gran controversia de campaña. Se espera que los electores disgustados rehúsen elegir incumbentes que han malusado sus cargos para ayudarse en sus aspiraciones de reelección. Sin embargo, la noción de que esa reacción pueda ocurrir asume que habrán más electores influenciados por las denuncias de impropiedad que influenciados por las prácticas ilegales tales como anuncios pagados con fondos públicos y empleados en campaña. ... En síntesis, no es apropiado tolerar prácticas inconstitucionales, que frustran el proceso democrático bajo la expectativa de que en algún momento el proceso político electoral puede lograr cancelar los efectos de esa violación." (Traducción nuestra.) Chemerinsky, *supra,* págs. 778–779.

Cabe distinguir las asignaciones y la facultad legislativa en el empleo discrecional —equivocado o no— de los fondos públicos por la administración de turno, digamos, invertir excesivamente en vías públicas y poco o nada en hospitales públicos. Se trata de una cuestión discrecional de prioridades, cuya sabiduría en ausencia de un reclamo constitucional justiciable, quedaría fuera del alcance de los tribunales y su remedio correspondería a las urnas por ser un asunto prima facie dentro del ámbito político-electoral; a lo sumo estaríamos ante una mala distribución de fondos públicos.

Distinto de esa mala inversión y distribución, estos casos versan sobre un gasto ilícito del tesoro público para mejorar la imagen de los incumbentes del partido de turno (central y municipal). Además de reflejar una mala administración de esos dineros, per se constituye una práctica ilegal e inconstitucional, que independiente pueda generar unos resultados electorales negativos, es justiciable y puede remediarse judicialmente.

El argumento, sin embargo, nos permite adentrarnos en el cuarto y principal defecto constitucional: los anuncios partidistas violan la prohibición de usar fondos públicos para fines no públicos. El efecto claro de estas infracciones es el derroche del tesoro público, *en detrimento de los partidos de oposición y todo ciudadano; y de que se beneficie políticamente al partido que gobierna, los funcionarios incumbentes y, por añadidura, el lucro de las agencias de publicidad y demás medios de difusión.*

La interrogante principal consiste en determinar cuáles fines son públicos y legítimos. El concepto "fin público" se define mediante referencia a otras disposiciones que a continuación veremos en la misma Constitución. En particular, cuando un desembolso gubernamental lesiona los valores encarnados en la libertad de expresión y en el derecho al voto, el desembolso no responde a un *fin público* y, por ende, es *ilegal.* Según expuesto, nuestra Constitución con-

tiene varias disposiciones dirigidas a garantizar que el proceso de deliberación democrático permanezca libre, y no discriminatorio. Una de las funciones principales de la libertad de expresión es fortalecer el debate de ideas políticas entre los ciudadanos, pues no puede haber consentimiento democrático cuando no se pueden expresar opiniones contrarias, disidentes y heterodoxas. Igualmente, al establecer el derecho al voto, la Sec. 2 del Art. II, Const. E.L.A., *supra*, lo entrelaza con su propósito ulterior de garantizar la expresión libre de la voluntad ciudadana. Finalmente, la libertad de asociación integra estos dos (2) derechos al preservar un espacio en el cual los ciudadanos puedan congregarse en organizaciones con el fin de unir sus voces y expresar sus preferencias políticas.

Sin embargo, es la combinación de estas dos (2) secciones con la Sec. 9 del Art. IV, Const. E.L.A., *supra*, lo que verdaderamente permite poner en vigor la política pública fundamental que las inspira. *Mientras la libertad de expresión impide que el Gobierno directamente obligue a callar aquellas voces con las cuales discrepa, la prohibición al uso de fondos públicos opera de forma complementaria para negar al Gobierno la posibilidad de añadir su estentórea voz a la conversación política y así ahogar otras voces.*[24] Por otro lado, el principio de igualdad económica entre los partidos políticos,[25] combinado con la prohibición de uso de fondos públicos para fines no públicos, provee un *remedio tangible* a las violaciones del primero. Es decir, desde un punto de vista práctico, sería muy difícil calcular los daños sufridos como consecuencia de una campaña político-partidista inconstitucional, pero una violación al Art.

---

[24] Al hacer esta aseveración, no negamos que la Sec. 9 del Art. VI de la Constitución del E.L.A., L.P.R.A., Tomo 1, tenga otras funciones. Obviamente, su función principal es evitar el derroche del erario. Pero sin una definición de "fines públicos", la prohibición amenazaría convertirse en tautología. Nuestros esfuerzos, pues, están encaminados hacia desarrollar una interpretación que le dé contenido sustantivo.

[25] *P.P.D. v. Gobernador*, supra; *Marrero v. Mun. de Morovis*, supra; *P.N.P. v. Tribunal Electoral*, supra.

VI, Sec. 9, Const. E.L.A., *supra*, entre otras formas, se remedia *al decretar la nulidad del pago y ordenar la restitución al erario del dinero desembolsado, cantidad fácil de calcular.*

## IV

*Esquemas estatutarios limitativos a la facultad gubernamental en anuncios; criterios de legalidad en desembolsos de fondos*

Dentro de la concepción más amplia del denominado fin público —consustancial con los principios constitucionales expuestos y, según veremos, a tono con la intención legislativa plasmada en las leyes vigentes que regulan los anuncios y su contabilidad— cabe preguntarse si es lícito y legal que un gobierno de turno, central o municipal, pueda anunciar sus alegados "logros, metas y proyecciones" con fondos públicos.

La *cultura política* —más bien canibalismo tribal en nuestro país— en especial en tiempos recientes, ha sido que el aspirante, en su campaña preeleccionaria, somete y promete ciertos programas de gobierno que luego en su incumbencia ostenta haber logrado o intenta posteriormente cumplir. La experiencia demuestra que no siempre se materializan todas las promesas de campaña. Aún así, en su afán de ser reelecto y mantenerse activo en la posición dentro de las filas de su partido, el aspirante opta por anunciar sus logros usando fondos públicos como medio de garantizar su reelección.

En su sustrato, anunciar alegados logros ("compromisos cumplidos"), otras metas y proyectos, no es otra cosa que iniciar y llevar una campaña de reelección *antes* del período preeleccionario en que se activa expresamente la veda electoral. Es *enmascarar* el proselitismo y utilizar impermisiblemente los fondos públicos para fines privados: reelección del incumbente y retención del poder del partido

político. *Semejante práctica debe suspenderse para siempre.*

En esa función remedial —distinto de como se ha argumentado por las partes— no estamos ante un vacío estatutario que nos impida adjudicar en recta juridicidad o dejar de formular criterios básicos *controlantes* a la facultad gubernamental de informar legítimamente a la ciudadanía. *Como dijimos, no es absoluta ni ilimitada.* De entrada, merece destacarse la Ley Núm. *141* de 29 de abril de 1949, según enmendada por la Ley Núm. *52* de 6 de agosto de 1994 (3 L.P.R.A. secs. 946–947).

De su breve pero enjundiosa exposición de motivos surge la innegable importancia que la Asamblea Legislativa atribuyó a "los medios de comunicación, en nuestro sistema de vida democrático". Exposición de Motivos de la Ley Núm. 52, *supra*, 1994 Leyes de Puerto Rico 279. También, de la necesidad de mantener a la ciudadanía adecuadamente informada de todos los acontecimientos relacionados con el pueblo, asegurar los intereses de la sociedad y, sobre todo, de mantener *"un control sobre la información y servicios transmitidos al público".* Íd., pág. 280.

A tal efecto, el año pasado la Legislatura actualizó la Ley Núm. 141, *supra*, a las exigencias del mundo contemporáneo, extendió y autorizó la publicación de anuncios gubernamentales en la televisión e impuso unos límites; todo con el propósito de asegurar al pueblo su fuente, *el control de la información transmitida* y, simultáneamente, brindarle *"una información completa y veraz".* (Énfasis suplido.) Por su pertinencia en la solución de estos recursos, analicémosla.

*Primero*, la Ley Núm. 52, *supra*, tiene una amplia cobertura. Dispuso que abarcaría "departamento, negociado, división, junta, comisión, administración, oficina independiente, municipios o el gobierno de la Capital, autoridades y corporaciones públicas y cualquier otra instrumentalidad del Gobierno de Puerto Rico". Art. 1 (3

L.P.R.A. sec. 947). Por ende, *no excluye* al Primer Ejecutivo. *Segundo*, se extiende a *todo anuncio* que se publique *dentro* de la demarcación *territorial* de Puerto Rico. *Tercero*, contiene dos (2) excepciones: (1) fundada en el "mejor interés público" ante lo cual se autoriza la *publicación* en Estados Unidos y otros países, y (2) respecto a "la publicación de avisos por la Compañía de Turismo, la Administración de Fomento Económico y las corporaciones públicas, en revistas, folletos y otras publicaciones *especializadas* que circulan principalmente *en Puerto Rico o a turistas*". (Énfasis suplido.) 3 L.P.R.A. sec. 946. *Cuarto*, aplica a la publicación de todas "notificaciones, citaciones, edictos, subastas y *demás anuncios* a través de la radio, *televisión*, diarios y *revistas* en Puerto Rico ...". (Énfasis suplido.) 3 L.P.R.A. sec. 946(a). Ello implica que la forma material o el medio en que se publique, divulgue, imprima y circule —periódico, radio, televisión, folleto, revista, catálogo u hoja suelta, sea vía personal— no desvirtúa su carácter de publicación gubernamental sujeta a la ley. *Quinto*, los *gastos publicitarios* que generen todos estos anuncios estarán restringidos, y serán "exclusivamente con cargo a las partidas y asignaciones" (3 L.P.R.A. sec. 946(a)) presupuestadas para tal fin. *Sexto*, "[l]as notificaciones, citaciones, edictos y subastas *deberán* ser publicados en periódicos de circulación general en Puerto Rico". (Énfasis suplido.) 3 L.P.R.A. sec. 946(o). *Séptimo*, "[d]ichas publicaciones deberán identificar claramente la agencia gubernamental que promulgan los mismos, excepto en anuncios sobre maltrato de menores, violencia doméstica y crimen en que el medio de comunicación sufrague por lo menos el setenta y cinco (75%) del costo de la difusión del anuncio". 3 L.P.R.A. sec. 946(a). Y *octavo*, en "anuncios relacionados con trámites administrativos, como subastas, avisos y edictos, *se prohíbe el uso de fotografías de los Jefes de agencia y funcionarios* .... 3 L.P.R.A. sec. 946(a). Por excepción, el Gobernador o su delegado pueden autorizar

"la presentación de una *figura* para enviar [a la ciudadanía un *mensaje*] *de control, calma o continuidad de servicios*". (Énfasis suplido.) 3 L.P.R.A. sec. 946(a).

En el contexto de esta ley, la palabra *figura* crea cierta confusión. Significa "cosa que es signo o símbolo de otra". Casares, *Diccionario Enciclopédico de Derecho Usual, op. cit.*, T. VII, pág. 390. *Signo* es una cosa que por naturaleza o por convenio evoca el entendimiento de otra. Íd., pág. 769. Por *símbolo* se entiende, objeto, animal u otra cosa que se tiene como tipo *para representar un concepto moral o intelectual, por alguna semejanza o correspondencia.* Íd., pág. 771. Interpretamos que la Asamblea Legislativa quiso decir que el Gobernador podía delegar y autorizar "la presentación de una [*persona de renombre*] para, [en su sustitución], enviar un mensaje a la ciudadanía de control, calma o continuidad de los servicios".

Es innegable que esta Ley Núm. 52, *supra*, impone diáfanamente unos *límites y controles* aplicables a *cualquier* aviso o campaña publicitaria gubernamental y pone de manifiesto una clara *política legislativa restrictiva de sana administración pública en el desembolso de fondos públicos para anuncios.* Más importante aún, es una *prohibición expresa* a que los funcionarios del gobierno central y municipal y demás jefes de agencia publiquen sus fotografías. Advertimos que la ley sólo permite la figura del Gobernador o su representante delegado para situaciones que configuran emergencia y urgencias, a saber, comunicarle a la ciudadanía mensajes "de control, calma o continuidad de servicios". 3 L.P.R.A. sec. 946(a).

La veda de fotografías de funcionarios y jefes de agencias revela una *inequívoca* intención legislativa de que *ningún anuncio* pueda usarse con fines *egocentristas o propagandistas.* La fotografía o retrato de un funcionario público es la representación visual más exacta de la imagen de su persona; pero, ¿qué del anuncio cuyo tamaño, arte, colores, nombre de la agencia o instrumentalidad

anunciante —*aún sin el retrato del funcionario*— es de contenido exaltador (logros, planes, proyectos y metas)? ¿Qué del uso de consignas, lemas, símbolos o *logotipos* que también así identifican y relacionan al funcionario ejecutivo o municipal? ¿Podemos seriamente negar que en mayor o menor grado tienen igual propósito y equivalencia funcional propagandista? Ciertamente, es razonable concluir que esta prohibición cubre los anuncios de logros, metas y proyecciones, cuyo propósito y contenido *intrínsecamente* tienda, a través de la entidad gubernamental, a realizar delante del pueblo la imagen del funcionario que la dirige.

La aplicación de la Ley Núm. 52, *supra*, no significa una asepsia absoluta del ingrediente partidista en la gestión y descargo de la función oficial pública por el Primer Ejecutivo y otros funcionarios gubernamentales o municipales. "Bajo nuestro sistema constitucional, algunas formas de partidismo oficial son tolerables." (Traducción nuestra.) Ziegler, *op. cit.*, pág. 584. Nos referimos a la *exposición pública natural* de ciertos funcionarios —Primer Ejecutivo, secretarios de gabinete, directores de agencias y corporaciones públicas, miembros de la Asamblea Legislativa, alcaldes y otros— en los medios de divulgación, incluso en avisos y actividades oficiales. Así, cuando el Primer Ejecutivo habla al país, rinde a la Asamblea Legislativa su mensaje anual —o aquellos otros que estime necesarios— publica un escrito o informe, recibe en su persona, los beneficios directos, indirectos e incidentales de esa gestión pública. Lo mismo ocurre cuando inaugura una carretera, hospital, escuela, edificio o parque público, pronuncia discursos en conferencias, seminarios, etc. Igual *exposición y beneficios* obtienen los funcionarios que suscriben convocatorias y audiencias a vistas públicas, edictos de subasta, etc.

Se trata de la obra de gobierno que genera de manera *natural* la más *efectiva y positiva publicidad.* Si ésta responde y coincide con promesas previas de campaña parti-

dista cumplidas y convertidas en obras y programas guber-
namentales oficiales, el prestigio e imagen del funcionario
alcanza su máxima exposición en forma legítima. Clara-
mente, los gastos y desembolsos *necesarios y prudentes* de
fondos públicos relativos a esos actos, eventos, actividades
y anuncios oficiales —desprovistos de características polí-
tico-partidistas— no pueden clasificarse como ilegales por
el hecho de que realcen la imagen del Gobernador o esos
funcionarios, y colateral e incidentalmente redunden en
una ventaja político-partidista.

Ahora bien, la relación bilateral *gobierno-ciudadano*
amerita una protección íntegra. ¿Qué hay de los anuncios
gubernamentales *incompletos o no veraces?* Desde la pers-
pectiva ética y lógica, *la verdad es valor moral indiscutible,
cuya exigencia no admite excepción gubernamental.* Sería
un contrasentido que el Gobierno pudiera publicar anun-
cios engañosos.(26)

Según indicado, en la Ley Núm. 52, *supra*, la Asamblea
Legislativa dejó fiel constancia de su intención de que los
anuncios fueran *completos y veraces. Completo* significa
que su contenido es cabal, íntegro, con todas las cualidades
y los requisitos del elemento de veracidad. En la relación
*bilateral* que genera toda comunicación *gobierno-ciuda-
dano*, un anuncio *veraz* simplemente significa que no sea
falso o, como corrientemente se dice, que no sea una men-
tira o engaño. En sus dos (2) vertientes conlleva, *activa-
mente*, el deber del anunciante de decir la *verdad* y, *pasi-
vamente*, el derecho ciudadano a que siempre se le diga la
verdad. No cumple estos requisitos ningún anuncio *falso* o
cuya expresión externa dé un sentido o alcance distinto del

---

(26) Este principio se desparrama en diversas leyes que prohíben la publicación
de anuncios falsos, exagerados o engañosos en el negocio de construcción de vivien-
das (17 L.P.R.A. sec. 509); en la rotulación de productos textiles (10 L.P.R.A sec.
2156); en alimentos, drogas y cosméticos (24 L.P.R.A. sec. 729); en la industria de
seguros (26 L.P.R.A. sec. 1004); en la venta de bienes inmuebles fuera de Puerto Rico
(10 L.P.R.A. sec. 103); en la marca, precio, cantidad, tamaño, calidad, cualidad, sa-
lubridad, o cualquier característica en productos, artículos o servicios al consumidor
(23 L.P.R.A. sec. 1014).

natural y obvio, o sea *incompleto*, o deje fuera alguna frase, o que se le pueda atribuir un significado extraño. Tampoco aquel que sólo presenta parcialmente la verdad o para esconderla, emplea palabras de doble sentido.

Lo *verdadero* tiene atributos de real, exacto, sincero, auténtico, etc. Como juicio o proposición, no puede negarse su racionalidad.([27]) *La verdad es omnicomprensiva porque conduce a la objetividad*, esto es, "la actitud crítica imparcial que se apoya en datos y situaciones reales, despojada de prejuicios y apartada de intereses, para concluir sobre hechos o conductas". M. Osorio, *Diccionario de Ciencias Jurídicas, Políticas y Sociales*, Argentina, Ed. Claridad, 1984, pág. 495.

Sabemos que la comunicación de hechos o noticias no se da siempre en un *estado químicamente puro*. Cabe, pues, la información gubernamental *no partidista* unida a la crítica u opinión, perfectamente diferenciables de la información. No postulamos una exactitud matemática ni una infabilidad crítica de los acontecimientos públicos y gubernamentales. Sin embargo, aspiramos a su máxima aproximación. No cumple el requisito legislativo de información gubernamental *veraz*, aquella carente de *objetividad o neutralidad*, que *altera la realidad*. *Lo importante es que la opinión sobre unos hechos objetos del aviso gubernamental deje intactos los hechos.*

*En nuestra democracia, ningún funcionario del Gobierno puede reclamar el monopolio de la verdad; menos,*

---

([27]) "Una sociedad civilizada no puede legitimar ni *elevar* a rango de virtud la mentira." (Énfasis suplido.) *Aut. Edif. Púbs. v. Unión Indep. Emp. A.E.P.*, 130 D.P.R. 983, 985 (1992).

Aunque cabe admitir la diferencia del derecho y la moral como dos (2) órdenes normativos separados, es innegable que todo precepto jurídico en nuestra Constitución está cimentado en una norma moral subyacente. *En los conflictos concretos relativos a la publicidad gubernamental, ineludiblemente todo anuncio deberá ajustarse a la verdad.* "El legislador no puede —racionalmente— colocarse en el supuesto de que el orden normativo que establece o contribuye a organizar llegue a ser apto para otorgar facultades cuyo ejercicio llegue a contrariar el orden moral. ... Deja entonces al Juez la posibilidad de apreciar si esa actividad (formalmente lícita) debe ser amparada jurídicamente en razón de su contenido y fines." C. Mouchet, *Los conflictos entre la Moral y el Derecho*, XX Rev. Jur. U.P.R. 7–8 (1950).

*abroquelarse la facultad de mentir al pueblo.* No sólo es impermisible la información gubernamental falsa, sino aquella carente de sustancia, artificiosa o hueca; no puede ser esotérica e incomprensible para su destinatario, el ciudadano corriente. *El anuncio gubernamental ha de evitar el error, la inexactitud o la obscuridad, características que sólo alientan y promueven interpretaciones contradictorias y que provocan un duelo o una escalada sucesiva de anuncios, aclaraciones, réplicas y, por ende, mayores gastos.* Es *objetivo* el anuncio que presenta los hechos en un contexto fiel y completo, *sin omitir lo que debe ser dicho para que sea exacto*; aquel que supera el contenido parcialmente inexacto o aglutinado de *fragmentos de verdad con girones de falsedad.* En fin, el anuncio gubernamental válido es aquel que respeta la *verdad*; como presupuesto legislativo de vida social repudia la mentira, rechaza el error, se aleja de la fragmentación, evita la omisión y aborrece la desproporción, el sensacionalismo y la exageración.

Además de la Ley Núm. 52, *supra*, complementa y entronca nuestro análisis jurídico decisorio la Ley de Contabilidad del Gobierno de Puerto Rico, Ley Núm. 230 de 23 de julio de 1974 (3 L.P.R.A. sec. 283 *et seq.*), y varios *principios elementales de contabilidad aplicables a la recta administración de los fondos públicos puertorriqueños.* Sabido es que la "contabilidad reconoce y acepta los conceptos legales y éticos de la sociedad sobre la propiedad y los derechos como estándares para determinar el balance equitativo entre los distintos intereses de una organización. La contabilidad mira su medio ambiente para ver los estándares en cuanto a qué derechos protege la sociedad, qué valores reconoce la sociedad y qué entiende la sociedad que es justo y equitativo". (Traducción nuestra.) Kieso y Weygandt, *Intermediate Accounting*, 6ta ed., 1989, págs. 3–4. También "acepta que vivimos en un mundo de escasos recursos. Dado este hecho, tratamos de conservarlos, de utilizarlos eficientemente e identificar y alentar a aquellos

que pueden utilizarlos, de manera efectiva. A través de un uso eficiente de los recursos, el nivel de vida mejora. La contabilidad juega un papel importantísimo en obtener un mejor nivel de vida porque ayuda a identificar quienes usan los recursos eficiente o ineficientemente". (Traducción nuestra.) Kieso y Weygandt, *op. cit.*, pág. 3.

Estos principios de máxima economía y óptima utilización de los recursos es política pública, encarnada en la referida Ley de Contabilidad del Gobierno de Puerto Rico. La misma Asamblea Legislativa ordenó que los gastos de gobierno —que incluyen, naturalmente, anuncios y los demás renglones de la publicidad gubernamental— "se hagan dentro de un marco *de utilidad* y *austeridad*".([28]) (Énfasis suplido.) 3 L.P.R.A. sec. 283a(g).

Para implantar y lograr esa *austeridad*, esta ley de contabilidad impone a todo funcionario el *deber* de evitar gastos *"extravagantes, excesivos e innecesarios". Extravagante*, significa "gasto *fuera de orden y de lo común*, contra razón, ley o costumbre, *que no se ajusta a las normas de utilidad y austeridad del momento*". Por *excesivo* se entiende, pagar por cotizaciones mayores que las normales en el mercado o no adquirir productos sustitutos más baratos e igualmente durables, con el mismo resultado. *Innecesarios*, son los gastos *no indispensables o no necesarios* para que la dependencia o entidad corporativa desempeñe las funciones encomendadas por ley. 3 L.P.R.A. sec. 283h(i).

Finalmente, como *regla de hermenéutica legislativa*, ante la falta de claridad en la propia Ley de Contabilidad del Gobierno de Puerto Rico, la Asamblea Legislativa ordena considerar "los principios, prácticas y teorías de contabilidad generalmente aceptados en el momento de tomar

---

([28]) El término *austeridad* es la calidad de austero, que significa "severo, rigurosamente ajustado a las normas de la *moral*". Según el *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1992, pág. 991, *moral* se define como "[q]ue no pertenece al campo de los sentidos, por ser de la apreciación del entendimiento o de la conciencia ... que no concierne al orden jurídico, sino al fuero interno o al respeto humano. ... *Ciencia que trata del bien en general, y de las acciones humanas en orden a su bondad o malicia"*. (Énfasis suplido.)

la decisión". 3 L.P.R.A. sec. 2831. Demás está decir que "[l]os contadores utilizan los principios de contabilidad generalmente aceptados para preparar estados financieros que presenten de manera *imparcial, justa, clara y completa* la situación económica sobre la existencia y operación de la entidad". (Traducción nuestra.) Kieso and Weygandt, *op. cit.*, pág. 6.

Es evidente, pues, *que desde 1974* la Asamblea Legislativa estableció *permanentemente* el principio de *austeridad* en los gastos con fondos públicos y que éstos están sujetos al criterio de *razonabilidad* (no extravagantes, excesivos o innecesarios). *En consecuencia, la legalidad de todo anuncio gubernamental también está sujeta a estos criterios legislativos; cualquier otra conclusión atentaría contra los principios más básicos de sana administración y contabilidad públicas.*

Aparte de aquellos avisos y anuncios requeridos por ley, el concepto de divulgación legítima está imbricado al de *información de interés público*, satisfactoriamente definido como "[t]oda divulgación que afecte en forma significativa los derechos, las obligaciones, o el bienestar de la ciudadanía en general, en el ámbito de responsabilidad de cada agencia del gobierno, según sus deberes y funciones y que por ser *vital e indispensable* se requiere que la ciudadanía advenga en conocimiento de la información propuesta". Reglamento de Gastos de Difusión Pública del Gobierno, Sec. 1.4(5).

Dentro del concepto de la divulgación legítima que la buena administración gubernamental requiere, una cosa es el anuncio público sobrio y suficiente, y otra, muy distinta, el *bombardeo publicitario*. Esto último incide cuando lo primero se repite en los medios excesivamente. *El alimento es indispensable y saludable en proporción y medida, pero se torna en veneno cuando se le abusa; la gula siempre ha sido aborrecida por la sociedad, y ha merecido también el rechazo bíblico-moral.*

En este sentido, además de los controles de formato y de contenido de la Ley Núm. 52, *supra* —*veraz, completo* y *objetivo* (no político-partidista)— uno de los factores principales sujeto al eventual escrutinio judicial en la determinación de si anuncios subsidiados con fondos públicos cumplen con el criterio de *razonabilidad* (no extravagantes, ni excesivos o innecesarios) expuesto en la Ley de Contabilidad del Gobierno de Puerto Rico, es el *número de veces* que se publican en los periódicos, revistas y folletos o se transmiten por la radio, televisión y cines. Nuestro ordenamiento, en diversas leyes y reglas, provee ciertos parámetros que sirven de ayuda y guía. *Nos referimos a aquellas disposiciones que establecen el esquema procesal a través del cual se le brinda a la ciudadanía información gubernamental y de otra naturaleza consustancial con los principios constitucionales —régimen de legalidad y debido proceso de ley— en que se basan numerosas leyes civiles y penales.* Al igual que sucede en los anuncios, el objetivo es precisamente informar las leyes, ordenanzas y normas que rigen la conducta social de un pueblo, convocar la ciudadanía a eventos electorales, notificar proclamas, avisos de subasta, edictos, avisar sobre vistas públicas referentes a propuestas de cambio en áreas tales como zonificación, impacto ambiental, avisar de situaciones de interés general del tránsito, programas sociales, ayuda de emergencia y otras análogas.[29]

---

[29] A tal efecto, de importancia vital conforme los preceptos constitucionales básicos mencionados, el Secretario de Estado tiene el deber de publicar en no menos de *dos* (2) periódicos de circulación general las leyes y resoluciones conjuntas aprobadas por la Asamblea Legislativa. 2 L.P.R.A. sec. 188. Para proteger y hacer viable el derecho de toda parte —susceptible de ser afectada por un reglamento o regla administrativa— a expresar su punto de vista *previo* a su aprobación, toda agencia administrativa que pretenda adoptar, enmendar y derogar una regla o reglamento tiene que publicar *un* (1) aviso en un periódico de circulación general. 3 L.P.R.A. sec. 2105. Una vez se presenta en el Departamento de Estado el reglamento o regla administrativa debidamente adoptado, enmendado o derogado, el Secretario de Estado publicará en *dos* (2) periódicos de circulación general una síntesis de lo allí presentado. 3 L.P.R.A. sec. 2128. El emplazamiento judicial —paso inaugural del debido proceso de ley para conferir jurisdicción a los tribunales— si se hace mediante edicto, se publica *una* (1) sola vez en un periódico de circulación diaria. 32 L.P.R.A.

De estas instancias aflora, como premisa subyacente, que para *el Gobierno informar debida y satisfactoriamente* a la ciudadanía de las leyes que viene obligada a acatar, convocarla válidamente para vistas públicas de asuntos de interés público o someterla a la jurisdicción y coacción civil y penal de los tribunales (anuncios, avisos o edictos), *son suficientes las publicaciones que oscilan* desde una (1) a cuatro (4) veces en uno (1) o dos (2) periódicos de circulación general. En términos de configurar una norma aplicable a los recursos ante nos sobre la gestión lícita del Gobierno de mantener informada a la ciudadanía de los asuntos públicos no político-partidistas, estas instancias *aportan una idea de mínimo y máximo indispensables* sobre las veces que debe publicarse un anuncio. Como *regla general*, salvo emergencias, podemos concluir que rebasan el criterio de *razonabilidad* el desembolso de fondos públicos para pagar anuncios legítimos que, sin justa causa, se publican más de dos (2) veces en dos (2) periódicos de circulación general.

La razón es obvia. Estos parámetros legislativos de divulgación por muchas décadas han merecido el aval del debido proceso de ley exigido en nuestra Constitución. *¿Cómo entonces justificar que lo que es bueno y suficiente en el trámite y proceso judicial —donde está en juego la propiedad y hasta la libertad del individuo— no lo sea en esa otra dimensión pública gubernamental, que también persigue informar a la ciudadanía?* Repetimos, aquí nos referimos al número de publicaciones, no a las restricciones en

---

Ap. III, R. 4.4. Cuando se demuestra a satisfacción del tribunal que una persona demandada en el pago de hipoteca está ausente de nuestra jurisdicción, se requiere la publicación de *un* (1) edicto *una* vez por semana durante *cuatro* (4) semanas consecutivas. 30 L.P.R.A. sec. 2714. En los procesos de ejecución de hipotecas, basta que la subasta se anuncie con la publicación de un edicto en un periódico de circulación general cuando menos *una* (1) vez por semana, y no menos de *tres* (3) veces. 30 L.P.R.A. sec. 2719. Y en procedimientos de expropiación forzosa, si el propietario no puede ser notificado personalmente, se publica un (1) edicto *una* vez por semana por no menos de *tres* (3) semanas sucesivas en un diario de circulación general. 32 L.P.R.A. Ap. III, R. 58.4.

Existen muchos otras disposiciones de ley que rigen las convocatorias en trámites o actuaciones cuasilegislativas y cuasijudiciales. No és necesario acotarlas todas.

cuanto a su contenido y formato que hemos examinado bajo la Ley Núm. 52, *supra*. Según hemos expuesto, nadie seriamente puede argumentar que la propaganda política partidista —sea aislada o masiva— puede ser financiada por el erario más allá de la partida igualitaria asignada por el Fondo Electoral. Aun bajo el supuesto de un anuncio de información legítima gubernamental, ni siquiera afectado por matices partidistas, el criterio de razonabilidad, el *principio de austeridad y la tradición de mesura y suficiencia de un edicto judicial sirve como parámetro, de tiempo y propósito en un anuncio del ejecutivo, legislativo, incluso la Rama Judicial en su función administrativa.*

El diseño estatutario en la Ley Núm. 52, *supra*, antes analizada, sólo autoriza aquellos anuncios sobrios y mandatorios de ley —como subastas, convocatorias a audiencias, etc., y otros como maltrato de menores, violencia doméstica, crímenes y *asuntos de interés general análogos*— ejemplo de los cuales es el típico anuncio de subasta pública *en blanco y negro* que consigue transmitir efectivamente el mensaje legítimo gubernamental y *nada más*. Por el contrario, atenta contra el *principio de austeridad* y es *espúrio* aquel anuncio o folleto de páginas enteras que tiene poco contenido sustantivo informativo y derrocha en colores, fotografías y escenas el costoso espacio del periódico o el minuto televisivo, y contribuye muy poco a la comprensión ciudadana de los asuntos públicos. *Éstos, en el fondo, persiguen un mensaje exaltador partidista.*

En *resumen*, todo anuncio pagado con fondos públicos tiene que ser *necesario, completo y objetivamente veraz*. A tono con la política fiscal pública de *austeridad*, debe responder a un mandato de ley o corresponder a *información veraz legítima, de claro interés público*, a saber, aquella que afecte significativamente los derechos, las obligaciones o el bienestar del ciudadano en general, dentro del ámbito de responsabilidad, deberes y funciones de la agencia gubernamental, *la cual por ser vital e indispensable requiere*

*su divulgación.* Su publicación no puede exceder el criterio de *razonabilidad* en tiempo y número de veces,. y, en lo posible, su formato debe prescindir de toda *cromotipografía.*(30) Únicamente un anuncio correspondiente al Primer Ejecutivo puede contener su retrato —o aquel de una persona de prominencia— en circunstancias que configuran una necesidad de "llevar a la ciudadanía mensaje de control, calma o continuidad de servicios".

## V

*Conocimiento judicial del contenido de los anuncios; apreciación fáctica; carácter político-partidista de las campañas; procedencia de los "injunctions"*

Para adjudicar los méritos de estos recursos en su valor inmanente, la *justicia*, es necesario exponer dos (2) principios evidenciarios: *Primero*, bajo la Regla 11 de Evidencia, 32 L.P.R.A. Ap. IV, siempre hemos tomado conocimiento de esta clase de avisos y anuncios, por ser éstos "de conocimiento general dentro de nuestra jurisdicción territorial". Como dijimos en *Gierbolini Rodríguez v. Gobernador*, 129 D.P.R. 402, 438 (1991):

" 'Los Jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe.' *Pueblo v. Marrero*, 79 D.P.R. 649, 658 (1956). A fin de cuentas, 'nuestro papel, aunque limitado, no se desarrolla en un *vacío*. Cuando los hechos son suficientemente abrumadores, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en desconocer metódicamente lo que todo el mundo sabe'. (Énfasis suplido.) *Ballester v. Tribunal de Apelación*, 61 D.P.R. 474, 507–508 (1943)." *Noriega v. Gobernador*, 122 D.P.R. 650, 696 (1988), opinión de conformidad.

En estos litigios, en que precisamente el gobierno central y el Municipio de Carolina alegan estar "informando"

---

(30) "Arte de imprimir en colores." *Diccionario de la Real Academia Española, op. cit.*, T. I, pág. 398.

al pueblo, sería un absurdo y un contrasentido sostener lo contrario. De hecho, todas las partes coinciden en este aspecto y, en momentos distintos, pidieron a instancia que se tomara conocimiento judicial de los anuncios.[31]

*Segundo*, que el estribillo, la consigna, el lema, el refrán (*slogan*) se usa "en las luchas políticas que libran los partidos; como lema de propaganda, frase pegadiza o impresionante para reclutar adeptos o para crear a los enemigos dificultades para rebatirlos". *Diccionario Enciclopédico de Derecho Usual,* 20ma ed., Buenos Aires, Ed. Heliasta, 1981, T. VII, pág. 456.[32]

Además, hemos de recordar que la palabra oral vuela y la escrita permanece. El examen de los múltiples anuncios de las diversas agencias del gobierno central y municipal, tanto de San Juan como de Carolina, nos lleva a precisar la distinción entre éstos y el mensaje verbal improvisado o espontáneo en una conversación o como una contestación a una pregunta o respuesta en una conferencia de prensa por un funcionario público.

El mensaje espontáneo, si bien puede estar matizado por cierta estrategia ideológica preconcebida del interlocu-

---

[31] En su demanda jurada, el P.P.D. acompañó copia de los anuncios impugnados. Pidió al tribunal de instancia que tomara conocimiento judicial de los colores, símbolos y lemas del P.N.P., de su candidato a la gobernación, Honorable Rosselló, y de la candidata a la Alcaldía de San Juan, Hon. Zaida Hernández Torres. Alegaciones 23–28. Además, que tomara conocimiento de los numerosos de anuncios que acompañó. Alegación 29.

Los demandados, en sus respectivas contestaciones y comparecencias, no negaron la publicación de los anuncios ni que fueron pagados con fondos públicos. De hecho, el P.N.P., mediante una moción presentada en el foro de instancia el 30 de noviembre de 1995, solicitó que se tomara conocimiento judicial sobre una serie de anuncios en periódicos y el programa radial auspiciados por el Municipio de San Juan y su Alcalde Hon. Héctor L. Acevedo (Alegato P.N.P., Ap. 1).

Iguales solicitudes sobre conocimiento judicial hicieron el licenciado Pérez Preston, los legisladores y los electores demandantes (Apelación, Ap. 29). Idéntico pedido hicieron el Alcalde Honorable Aponte y la Directora de Finanzas, Sra. Yolanda Villafañe (Apelación, Ap. 80).

[32] De igual modo, como símbolo, es una "[r]epresentación, imagen o figura de una cosa por medio de otra, con parecido más o menos próximo, y a veces por atribución convencional; como la bandera con respecto a la nación. *El objeto del símbolo es despertar o sugerir la misma idea que la contemplación directa, cuando sea posible, de lo simbolizado*". *Diccionario Enciclopédico de Derecho Usual, op. cit.,* T. VII, pág. 427.

tor, también puede surgir como respuesta no prevenida ante una pregunta desconocida o un cuestionamiento imprevisto.

Esa diferencia justifica *mayor rigurosidad judicial* al evaluar los anuncios publicados que son mensajes preparados en la atmósfera tranquila y profesional de los expertos en el manejo de la opinión pública, como son los publicistas, diestros en mercadeo, comunicación, etc. *En los recursos que nos ocupan, esta intención resulta palpable si notamos que los anuncios del gobierno central y los municipales comparten ciertos mensajes comunes, repetidos o reiterativos, tipo de letra, énfasis de los colores y símbolos fácilmente identificables con los partidos políticos.*

No podemos ser tan ingenuos de pensar que es la mera casualidad o la naturaleza la que ha logrado un concierto de mensajes escritos tan perfecto y armónico.

*P.P.D. v. Rosselló González et al., Caso Civil Núm. AP-95-7*

Con vista a los principios expuestos, examinemos los méritos del Recurso Núm. AP-95-7, en el que el P.P.D. cuestiona un anuncio publicado por el Departamento de Salud. Expongamos sucintamente sus antecedentes.

El 10 de marzo de 1995, el Municipio de San Juan publicó en *El Nuevo Día* un anuncio que defendía la decisión de diseñar un plan de seguro médico municipal separado del Departamento de Salud Central. Dos (2) días después, publicó otro sobre el mismo tema, esta vez comparando y criticando explícitamente el método de financiamiento del plan de salud estatal.

El *primero* exponía las razones por las cuales necesita su propio seguro médico. Como premisa, consignó que sus ciudadanos "merecen tener más y mejores servicios de salud [con] cubierta mayor y que responda a sus necesidades específicas". Aludía a la necesidad de crear un plan individual ante la "imposibilidad de extenderse a San Juan la reforma de salud del gobierno estatal bajo las mismas con-

diciones ofrecidas a otros municipios", ante lo cual se había "diseñado un programa más abarcador que cuenta con los fondos recurrentes que lo garantiza para el futuro", sin poner "en riesgo el empleo de 3,000 jefes de familia empleados del Municipio". Además exponía las siguientes necesidades: mantener sus programas docentes y de investigación; los programas de promoción y previsión a conservar la salud; que el plan de salud "pueda ser pagado para mantenerse en años futuros"; y a los sanjuaneros de tener un seguro de salud que responda a "sus propias necesidades". Lo firma el Director de Salud municipal, Dr. Javier Morales. Al lado de cada "necesidad", un dibujo alusivo a ésta. Al pie del anuncio, los logos del Municipio y del M.A.S. Este anuncio tiene el mensaje de que el Municipio de San Juan se vio obligado a crear su propio plan ante la imposibilidad del gobierno estatal de extenderle su reforma de salud. Curiosamente no se ofrecen datos ni fundamentos que avalen las siete (7) premisas del anuncio, excepto por la firma de una "voz de autoridad" —que parece representada por un médico— que con su firma avala lo expuesto sin fundamentos.

El *segundo*, bajo el título *JUZGUE USTED*, exponía tres (3) hechos sobre el nuevo modelo de salud de San Juan (M.A.S.) y contenía dos (2) tablas contrastantes de las virtudes de ese plan, frente al del gobierno estatal. El hecho 1 indica que el gobierno central de Puerto Rico "se ha negado a implantar su plan de salud en San Juan en las mismas condiciones en que lo ha hecho en otros municipios" y que se le había requerido que "se le pasara todo el presupuesto del Depto. de Salud de la Capital al gobierno Central ...". El hecho 2 expone que "ante la necesidad imperiosa" de mejorar los programas de salud de San Juan, se le pidió al Dr. Javier Morales, Director de Salud de la Capital, reunirse a un grupo de expertos. Estos sugirieron la elaboración del modelo de salud capitalino M.A.S., que ofrece "una cubierta de servicios *más* amplia que las del gobierno de

P.R." (nos refiere a una tabla comparativa 1 que contiene los servicios de la tarjeta M.A.S. y a la del gobierno central, favoreciendo a la primera). El hecho 3 señala que, "para mejorar estos servicios (de salud) hay que asignar recursos adicionales". Dice que hay dos (2) formas de hacerlo: (a) tomar préstamo "como lo ha hecho el gobierno de P.R. ... cuyo principal comienza a pagar luego de las próximas elecciones... b) ajustar las contribuciones de la propiedad en San Juan. ("entendemos es la más responsable..."). Luego da unas cifras que sugieren que ese ajuste sólo afectará a la clase económica pudiente y que "se ajustarían las contribuciones de la propiedad exactamente al mismo nivel que.las tiene hace años la ciudad de Bayamón y de las que tienen Guaynabo y Cataño donde no existe la tarjeta de salud ...". El anuncio tiene una tabla 2 comparativa al respecto.

Finaliza con la frase destacada "¡con la salud de nuestra gente no se juega!" Al pie del anuncio, aparece el escudo de la ciudad, el logo del plan M.A.S. y un logo con figuras tomadas de la mano que dice: "Municipio de San Juan - juntos por la salud de San Juan."

Aunque a primera vista, el anuncio informa gráficamente al pueblo de San Juan sobre el plan que propone el municipio para la salud, el anuncio parte de las siguientes premisas de *corte político-partidista*: La frase inicial "Juzgue usted" invita al lector a juzgar unos "hechos" que *aparecen plagados de insinuaciones partidistas*. El hecho 1 señala que el gobierno estatal ha discriminado de tal forma, que ha obligado al Municipio a descartar su plan y elaborar el suyo propio. El hecho 2 indica que unos expertos municipales norteamericanos, han ideado el plan preciso para San Juan. De paso, dicen, que este plan es *más* (se llama M.A.S.) abarcador que el del Gobierno. Y el hecho 3 indica de dónde saldría el dinero para costear el plan M.A.S. Expone, como punto comparativo, que aunque signifique ajustar contribuciones a la propiedad, éstas serán

similares a las que ha tenido Bayamón (municipio P.N.P. por excelencia) y menores que en Guaynabo y Cataño (también ciudades del gobierno P.N.P.), donde no existe la tarjeta de salud.

La inferencia es clara. En términos de costo, el plan significa unos ajustes contributivos que cobrarán a los pudientes. Descarta la forma de préstamo que el gobierno central escogió para subsidiar su tarjeta, para lo cual ha comprometido al pueblo hasta "luego de las próximas elecciones". *Este último comentario alude directamente al proceso político electoral.* La percepción visual y sensación que causa el anuncio con sus frases publicitarias es que el gobierno central discrimina contra el Municipio de San Juan y lo ha obligado a tener que diseñar su propio plan de salud.

En síntesis, ambos anuncios informaban por qué el Municipio no tenía un plan de salud. Su contenido expositivo era altamente crítico y tenía algunos *ribetes político-partidistas* en cuanto a las exigencias del gobierno central de que se transfiriera todo su presupuesto municipal de salud, siguiera pagando los empleados y operando las facilidades sin ese *presupuesto*. Además, *reprobaba* al Gobierno central haber cogido prestado para financiar su plan "cuyo principal comienza a pagar luego de las próximas elecciones", frente a la alternativa, "más responsable [de] ajustar las contribuciones en San Juan".

Como *respuesta*, el Departamento de Salud preparó un anuncio en el cual, en resumen, comparaba el número de tarjetas de seguro de salud distribuidas por "el Alcalde Acevedo en San Juan" y por *"el Gobierno de Puerto Rico"*.([33]) Lo transmitió por varios canales de televisión el

---

([33]) En su texto se leía:

"¿Después de 7 años, cuántas tarjetas de salud ha distribuido el alcalde Acevedo en San Juan?

"0 [cero en dígitos grandes]

"¿Después de dos años, cuántas tarjetas de salud ha distribuido el Gobierno de Puerto Rico en el resto de la Isla?

18 de abril de 1995, y luego lo publicó en *El Nuevo Día* en dos (2) ocasiones posteriores: el 19 y el 26 de abril de 1995.

El anuncio contenía, además, una reproducción fotográfica de la tarjeta del Seguro de Salud de Puerto Rico y un símbolo que identificaba el anuncio como auspiciado por el Departamento de Salud.

A la luz de los principios y límites informativos constitucionales y estatutarios expuestos, no albergamos duda de que el Departamento de Salud tenía derecho a informar a la ciudadanía las razones por las cuales no había extendido el plan estatal al Municipio de San Juan. Sin embargo, excedió lo constitucional y legislativamente permisible al inyectarle crudamente el elemento partidista, personalizando así el debate, mencionando por nombre y desacreditando *directamente* al Alcalde Honorable Acevedo. En términos de replicar las razones aducidas por el Municipio, *su contenido informativo* —aparte de que la tarjeta de salud del gobierno central está en funciones y que, según sus datos, trescientos quince mil (315,000) personas la disfrutan— *es casi imperceptible.* Su lenguaje, color y arreglo revelan escueta y claramente que la *intención primordial* fue transmitir un mensaje político-partidista a favor del gobierno central actual y atacar al Alcalde Honorable Acevedo, Presidente y candidato a la gobernación por el principal partido de oposición (P.P.D.).

No cabe argumentar que el anuncio del Departamento de Salud se justificaba como respuesta a los dos (2) anun-

---

"*315,000* [en dígitos grandes]

"En sólo dos años, más de 315,000 puertorriqueños están disfrutando de la reforma de salud y de la Tarjeta de Seguro de Salud del Gobierno de P.R. La misma que el alcalde Acevedo rechazó para el municipio de San Juan, en momentos en que el sistema de salud de este municipio atraviesa su peor crisis.

"Ahora después de 7 años prometiendo un plan de salud para San Juan, el Alcalde anuncia una tarjeta que no existe. Por otro lado, cientos de miles de puertorriqueños están disfrutando del poder de la salud con la tarjeta probada del Gobierno de Puerto Rico.

"Por el bienestar de la salud de nuestro pueblo es importante que conozcas la verdad.

"*Dando Salud center ... a tu Vida.*"

cios previamente publicados por el Municipio de San Juan, los cuales, según hemos concluido, *también tenían un carácter político-partidista*. Semejante proposición implícitamente admite que los anuncios estaban motivados exclusivamente por consideraciones político-partidistas. "Dos males definitivamente no constituyen un bien." *Autoridad de Edificios Públicos v. Unión Independiente*, supra. Además, significaría fomentar un duelo de anuncios partidistas pagados con fondos públicos en perjuicio de la ciudadanía.

En conclusión, admitidamente, tanto el Municipio de San Juan como el Departamento de Salud, tenían derecho a informar a la ciudadanía sobre la situación en dicho municipio en torno a los planes de las tarjetas de salud. Sin embargo, *esa legitimidad la perdieron ambos*, ya que ninguno tenía derecho a cargar la mano e inyectar en sus respectivos anuncios los ingredientes del partidismo político.

*Pérez Preston et al. v. Aponte et al., Caso Civil Núm. AP-95-9*

En el Caso Núm. AP-95-9 del licenciado Pérez Preston *et al.*, contra el Alcalde Honorable Aponte y el Municipio de Carolina, de la evidencia documental presentada e inferencias razonables surge, diáfanamente, que dicho alcalde y tales funcionarios municipales han estado llevando una campaña publicitaria político-partidista al hábilmente crear y usar un *logotipo*, esto es, "distintivo formado por letras, abreviaturas, etc. peculiar de una empresa conmemorar marca o producto",[34] para transmitir como recuerdo una década de superación en Carolina, período que *precisamente* corresponde a la incumbencia del Alcalde Honorable Aponte y control del P.P.D. en la administración del gobierno municipal.

Su campaña representada por un *logotipo* consiste de un número diez (10). En el uno (1) los años 1985–1995 y en

---

[34] *Diccionario de la Real Academia Española, op. cit.*, T. II, pág. 841.

el cero (0), la palabra *Carolina Tierra de Gigantes*; sobre éste una "cinta" roja con la frase "una década de superación". Junto al número diez (10) aparece un dibujo del Monumento a Jesús T. Piñero situado en la Avenida 65 de Infantería, entrada al Pueblo de Carolina. No existe controversia en que dicha campaña también está sufragada con fondos públicos.

El *logotipo* ha sido desplegado a través del Municipio, sustituyendo el escudo oficial, en vehículos de saneamiento, Obras Públicas y Guardia Municipal. También, el escudo oficial municipal se ha eliminado de los zafacones en el Área de Isla Verde para cambiarlo por el logotipo anterior, al igual que en otras propiedades municipales. Ha sido utilizado en anuncios de prensa, subastas públicas e impreso en camisetas para uso de los empleados municipales los días que el público visita los servicios a la familia.

La *actitud partidista* del Alcalde, Honorable Aponte, es manifiestamente contraria a los mejores intereses ciudadanos y *un claro abuso de poder.*

Según la *Moción Informativa y Solicitando Orden Urgente en Auxilio de Jurisdicción,* presentada a este Foro el 15 de diciembre por los demandantes apelantes Pérez Preston *et al.,* luego de la vista oral judicial del día 8, el Alcalde Honorable Aponte publicó un *folleto* de cuarenta y ocho (48) páginas con impresiones a todo color, alegadamente "distribuido casa por casa, usando empleados y vehículos municipales, a través de dicho municipio". Por información, aducen que su publicación sobrepasa cien mil (100,000) ejemplares. Nos exponen que la "campaña político partidista pagada con fondos públicos del Alcalde Aponte, cada día resulta más patente y más flagrante en la medida en que nos acercamos a la prohibición o veda de anuncios durante el próximo año electoral".(35)

---

(35) Como ejemplos, invitan nuestra atención que del propio folleto que nos acompañan surgen: "a. Frase *'10 AÑOS DE SUPERACIÓN GIGANTE'* en la portada, en un trasfondo rojo; b. A la página 2, la fotografía a color del Alcalde y sobre

Coincidimos con los apelantes Pérez Preston *et al.*, de que una simple ojeada de este folleto revela "que su impresión es una cara y costosa. El despilfarro de fondos públicos por José Aponte en anuncios políticos 'hiere la retina'. Este no tuvo la más elemental cortesía en paralizar la campaña política masiva con fondos públicos impugnada ante este Honorable Tribunal Supremo, por el contrario, arreció la misma". Además, que "[c]ada día que pasa el daño irreparable que sufren los demandantes-apelantes es mayor y más se agrava éste". En *violación abierta* a la Ley Núm. 52, *supra*, esa publicación contiene su retrato.

*Salta a la vista el carácter ilegal de esta masiva campaña publicitaria político-partidista del Alcalde, Honorable Aponte, cuyo propósito es destacar y realzar con fondos públicos su administración municipal, con miras a adelantar su causa y reelección el próximo año.*

Sin ulterior trámite, procede paralizarla, ordenar a su costo la expedita remoción del logo de los diez (10) años de los vehículos municipales (*i.e.*, motoras y carros de la Guardia Municipal, camiones de Obras Públicas), de la propiedad inmueble y de cualquiera otra propiedad municipal, y que se abstenga de desplegarlo en el futuro. Además, estará sujeto a la continuación de los trámites en ins-

---

ésta las palabras '*Visión...Compromiso...Superación...*' (Subrayado original); 3. A la página 3, y centralizado al mismo nivel que las palabras anteriores, aparece lo siguiente: '*1985–1995: Una Década de Superación*'; d. Al observarse en el folleto las páginas 2 y 3 (las cuales aparecen unidas una al lado de la otra) es una sola la frase *Visión... Compromiso... Superación...1985–1995: Una Década de Superación*' —con la foto a todo color del Alcalde Aponte al calce de la página 2 y el logo de los diez (10) años al calce de la página 3— lo cual resulta el mensaje político central de éstas; e. Inmediatamente debajo de las palabras '*1985–1995: Una Década de Superación*', a la página 3 del folleto, se indica: '*de la bancarrota a la solvencia y liquidez... —de una vergonzosa ineficiencia administrativa ... a una impresionante agilidad y eficiencia en gerencia moderna...— del total descalabro fiscal... a gozar de un crédito excelente...*'; f. En la página 9, aparece un cartel con el logo de los diez (10) años montado en cuartones en propiedad municipal; g. En la página 11, personas con camisetas con el logo de los diez (10) años (presumimos son empleados municipales); h. A la página 13, el logo de los diez (10) años frente a una escuela; i. En la página 18, el logo de los diez (10) años en un 'trolley' municipal; j. A las páginas 25 y 28, el logo de los diez (10) años sobre los zafacones en el Area de Isla Verde; k. A las páginas 44 a la 47, ambas inclusive, las letras de las oficinas del Municipio de Carolina, al igual que las de los departamentos están impresas en letras rojas en un trasfondo blanco."

tancia dirigida a lograr otros remedios, sin excluir la restitución al erario municipal.

*P.P.D. v. P.N.P. et als., Caso Civil Núm. CT-95-10*

Réstanos examinar el Caso Núm. CT-95-10 incoado por el P.P.D. contra el Estado, numerosas agencias públicas, el Gobernador Honorable Rosselló —en su capacidad oficial y personal— y el P.N.P. Coincidimos con la ilustrada sala de instancia en cuanto al carácter político-partidista de la campaña publicitaria. Ésta identifica *directamente* los intereses políticos del P.N.P. y el Primer Ejecutivo. Como sentenció dicho foro, pecaríamos de ingenuos al creer que no estamos ante "una campaña político partidista hábilmente diseñada para destacar los logros del P.N.P. y del Dr. Pedro Rosselló. En todos los anuncios existen elementos en común: lemas, colores y símbolos ... todos contienen propaganda político-partidista. Algunos sólo presentan parte de la información, con el propósito de persuadir al lector o televidente y crear una imagen positiva del partido en el poder. Además, los logros de las distintas agencias y corporaciones se presentan como logros del partido en el poder al incorporar la frase 'Compromiso Cumplido' refiriéndose a las promesas de campaña del Dr. Pedro Rosselló. También algunos anuncios muestran palmas y destacan distintas tonalidades de azul, símbolos del P.N.P.".

Ciertamente "existe una relación con la campaña del Gobierno y la campaña política del P.N.P. de 1992. La campaña [impugnada] trata de llevar el crédito de la obra de gobierno a otras personas que no son las agencias del Gobierno sino al P.N.P. y al Dr. Pedro Rosselló González. Esta conexión surge con la inserción en los anuncios de la frase 'Compromiso Cumplido' (que alude a las promesas de campaña del P.N.P. de 1992), los colores predominantemente azul en los anuncios, el gigantesco letrero que existe en los cuarteles generales del P.N.P. de 'Prometimos y Cumplimos' y el suplemento de naturaleza político-partidista circulado en los periódicos de circulación general del país pa-

gado por el P.N.P. atacando la obra del P.P.D. y del Alcalde Héctor Luis Acevedo".

Esta campaña oficial gubernamental no sólo se entrelaza con la campaña política del P.N.P. en 1992, *sino que se proyecta hacia las elecciones del próximo año.* Mientras el Gobierno y el Gobernador Honorable Rosselló gastan cuantiosos fondos públicos en anuncios exaltadores, esto es, de autoalabanza —campaña *positiva* de haber cumplido sus promesas políticas— coincidentalmente, el P.N.P. desarrolla una campaña *negativa* contra el Alcalde Acevedo, Presidente del P.P.D., y candidato opositor a la gobernación, fundada en que *no cumple sus compromisos.*

En esta etapa, no procede la desestimación solicitada por el P.N.P. y el Honorable Rosselló en su carácter personal. Los hechos expuestos están íntimamente relacionados con dicho partido y la persona de éste, como Presidente. Es difícil creer que esta campaña masiva fue espontánea o producto individual de las agencias del Gobierno e instrumentalidades públicas. Su organización revela una coordinación y preparación típica de un órgano central. La prueba, hasta ahora, tiende a indicar que probablemente se desarrolló en la *Fortaleza, específicamente, en la Oficina de Comunicaciones del Gobernador.* El testimonio del Secretario de Hacienda, Hon. Manuel Díaz Saldaña, fue a los efectos de que la frase "Compromiso Cumplido *la vimos* en Fortaleza, en la *Oficina de Comunicaciones*". T.E., pág. 282. De hecho, este funcionario admitió que "Prometimos y Cumplimos" —lema de gran tamaño en los cuarteles del P.N.P.— y *Compromiso Cumplido,* "van en la misma dirección". T.E., págs. 283–284.

## VI

*Remedios judiciales*

Aparte del *injunction* inmediato, que prohíbe estas campañas y anuncios ilegales, es amplio el inventario de reme-

dios judiciales, de carácter penal y civil, contra los funcionarios y el partido político beneficiado.

*Primero*, en *P.P.D. v. Junta Revisora Electoral*, supra, pág. 472, señalamos la posibilidad de descontarle del Fondo Federal al partido en el poder el costo del anuncio ilegal. Subsiguientemente, en *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, pág. 376 esc. 2, reiteramos que "[e]n ausencia de otro remedio, la evolución jurisprudencial no puede descartar la posibilidad de que los tribunales puedan exigir —con cargo al fondo electoral del partido político que promueve el anuncio ilegal— que se conceda a los partidos minoritarios de oposición una cantidad global pecuniaria equivalente al costo del anuncio, de modo que éstos puedan utilizarla con el fin de contrarrestarlos".

*Segundo*, la susodicha Ley de Contabilidad del Gobierno de Puerto Rico impone responsabilidad en *primera instancia* a los jefes de dependencias y de las entidades corporativas, o sus representantes autorizados, "de la *legalidad*, corrección, exactitud, *necesidad y propiedad* de [sus] operaciones fiscales" —(énfasis suplido) Art. 2(f), 3 L.P.R.A. sec. 283a(f)— ello independientemente del control previo general establecido para todas las operaciones de cada rama gubernamental. Esa responsabilidad puede ser *"con sus fondos o bienes personales*, por cualquier pago *ilegal*, impropio o incorrecto", que haya satisfecho el Secretario de Hacienda en virtud de un "certificado legal y correcto" expedido por el jefe de la dependencia o su ayudante autorizado. Art. 9(g), 3 L.P.R.A. sec. 283h(g).[36]

Y *tercero*, nada impide que luego de los trámites judiciales correspondientes, en acción separada, sean demandadas las agencias de publicidad y los medios de difusión que recibieron los pagos y, previa determinación de *nulidad*

---

[36] El Secretario de Hacienda puede relevar de esta responsabilidad personal si, previa investigación suya, del Contralor de P.R. o de ambos, determina que el funcionario "no actuó intencionalmente en perjuicio de los intereses del gobierno, [y éste] recibió servicios o suministros que propiamente justificaban el pago". Art. 9(h)(1) y (2), 3 L.P.R.A. sec. 283h(1) y (2).

*contractual,* oportunamente se les obligue a reintegrar al erario los dineros recibidos. Un ejemplo al respecto es la comparecencia de ayer de la agencia de publicidad *Public Affairs Consultants* (PAC), la cual consignó ante este Foro la suma dos mil cuatrocientos ochenta dólares con ochenta centavos ($2,480.80) en concepto del valor de los anuncios del Departamento de Instrucción Pública publicados en varios periódicos regionales "erróneamente y no con la intención de desobedecer ninguna orden", luego de recibir instrucciones expresas del Secretario de Educación Hon. Víctor Fajardo de que no se pautaran.

## VII

*Conclusiones*

Conforme traslucen las distintas teorías y los planteamientos legales ante nos —en ocasiones, recíprocamente contradictorios— y los intereses en juego de los protagonistas y partidos políticos implicados, el fenómeno abusivo de invertir fondos públicos en campañas político-partidistas es percibido así: para el *Gobernador, los funcionarios ejecutivos y Alcaldes,* el uso legítimo del erario para informar a la ciudadanía en asuntos de interés general; para el *partido político en el poder,* la utilización *solapada* de fondos públicos para beneficio de los funcionarios incumbentes afines y exaltar sus logros y metas con miras a una reelección; *para los partidos políticos y candidatos de oposición,* una amenaza al principio constitucional de igualdad política que genera una desventaja económica electoral; *para las agencias de publicidad y los medios comerciales de difusión,* una fuente sustancial e inagotable del presupuesto fiscal para lucrarse; *para el ciudadano común,* un derroche y mal uso, por el Gobierno, de los (sus) limitados recursos

económicos del Pueblo,([37]) y *para la democracia*, un ataque directo dirigido a la consciencia y capacidad ciudadana de votar libremente.

*A los ojos del jurista, una práctica perjudicial inconstitucional que inflige una lacerante herida al entretejido sociodemocrático.* Procede detenerla, proscribirla mediante el remedio de *injunction*,([38]) y remitir los tres casos al tribunal de instancia para la continuación y adjudicación de los remedios procedentes.

[Más allá de su valor de precedente judicial, algún propósito aleccionador ha de tener esta experiencia para madurar nuestra DEMOCRACIA. *En situaciones análogas, todo empleado público debe saber que puede ser incluido como demandado y, al final, también ser responsable.*

Es hora de *desterrar* de nuestro suelo la PARTIDOCRACIA, esto es, la creencia de que el Gobierno y el partido político mayoritario son una misma cosa. De acuerdo con nuestra Constitución, es axiomático que si la conducta en la que se incurrió es

---

([37]) Las infracciones a los principios constitucionales de igualdad económica electoral tienen su más claro impacto en los partidos políticos. Pero no podemos olvidar que éstos son instrumentos de sus miembros; "... sujeto[s] principal[es] de la arquitectura moderna estructural electoral". *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 407 (1980).

Tenemos reservas de negarles a los partidos y electores legitimación activa total bajo la tesis de que no existe una conexión entre el remedio de restituir los fondos públicos, aduciéndose que éstos no ingresarían al fondo electoral del partido reclamante. Opinión mayoritaria, págs. 674–675. En su origen, ¿de donde salieron los fondos públicos para costear las campañas publicitarias? Ciertamente, no puede decirse que fue del fondo electoral, en cuyo caso no habría controversia alguna que adjudicar.

Preocupa, pues, el aserto de que "[e]ste tipo de acción correspondería ejercerla, en última instancia, a los *representantes del Estado* y no a los demandantes de los casos de epígrafe". Opinión mayoritaria, pág. 675. ¿Se refiere al Secretario de Justicia? En la alternativa, ¿son los propios funcionarios, gobernador, jefes de agencias, directores de las instrumentalidades y alcalde, aquí *demandados*, los únicos con legitimación activa para *después* solicitar la restitución de los fondos públicos *por ellos mismos gastados?* ¿Significa que tienen que demandarse a sí mismos? ¿No serían ellos potencialmente los llamados a responder e ir contra su propio peculio, para restituir el despilfarro publicitario? Siendo realistas, ese enfoque restringido, ¿no presupone que hay que esperar un cambio de administración por otro partido?

La cuestión es vital. Lamentablemente, la funcionaria idónea para ello —la Contralor de Puerto Rico— no está facultada en ley para, *de oficio*, incoar acciones judiciales por este mal uso de fondos.

([38]) No existe duda del remedio interdictal permanente contra el representante P.N.P. Luis Maldonado Rodríguez, para que remueva de su vehículo oficial la propaganda publicitaria. *Marrero v. Mun. de Morovis*, supra.

ilegal, o atenta contra las sanas normas jurídicas o administrativas vigentes para el mejor desembolso de fondos públicos, la lealtad de un ciudadano —incluso la de los funcionarios públicos hacia su partido político— ni la obediencia jerárquica son defensas válidas. (Énfasis en el original suprimido y énfasis suplido.) *A.E.E. y A.A.A. v. P.N.P.*, supra, págs. 298–299.

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton.

Al evaluar las controversias presentes en los casos de autos, partimos de la premisa de que el Estado posee la facultad de comunicarse con la ciudadanía para educar e informar al país sobre los programas gubernamentales. También somos conscientes de que todos los gobiernos regularmente desarrollan campañas en los medios de comunicación para promover el turismo, atraer inversiones industriales y anunciar algunos de los servicios y productos más importantes del Estado. Igualmente, reconocemos que los ciudadanos tienen derecho a obtener información sobre la obra gubernamental para juzgar su labor y exigir remedios o reparación de agravios.

Sin embargo, anteriormente hemos señalado que "existe otro tipo de comunicación gubernamental que, lejos de cumplir la ineludible obligación de informar, constituye un bombardeo de propaganda parcializada que tiene el efecto de coaccionar el libre pensamiento del pueblo, además de malgastar sus escasos recursos económicos". *P.P.D. v. Gobernador II*, 136 D.P.R. 916, 932 (1994), opinión de conformidad. Este tipo de información tiene el propósito de manipular la opinión pública y existe el peligro de que una parte de estos anuncios se utilice indebidamente con fines político-partidistas, en violación del Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, y del axioma de igualdad en materia electoral inmerso en nuestro ordenamiento constitucional. La práctica descrita

es contraria a los valores más fundamentales de nuestra sociedad democrática.

Aunque distinguir entre ambos tipos de actuación gubernamental es una tarea sumamente compleja, tenemos la ineludible obligación de interpretar los preceptos constitucionales para asegurar que éstos reflejen los cambios sociales y políticos, y garantizar la vigencia de los principios rectores de la Constitución. Así evitamos los abusos de poder y aseguramos la integridad del proceso electoral y la igualdad de condiciones que exige nuestro ordenamiento entre los partidos políticos.

Los tres (3) recursos ante nuestra consideración son los primeros que expide esta Curia en que se cuestiona la legalidad de unas campañas masivas de anuncios del gobierno central y sus agencias, y de un municipio que alegadamente están diseñadas e implantadas con unos elementos comunes que le dan coherencia y unidad, y que tienen el propósito de enaltecer la figura del incumbente un (1) año antes de las elecciones generales. En todos se alega que estas campañas publicitarias crean una desigualdad económica entre los partidos políticos principales a costa de los fondos públicos, en clara violación de la Sec. 9 del Art. VI de la Constitución, *supra*.

Nunca antes habíamos tenido ante nuestra consideración una controversia análoga. Aunque en cuatrienios anteriores otros incumbentes también habían utilizado los medios de comunicación comerciales para anunciar sus logros, esta es la primera vez que unos partidos de oposición, tanto en el nivel municipal como en el central, cuestionan este tipo de campaña gubernamental multimillonaria durante el período preelectoral.

La opinión del Tribunal evita que el partido de turno que esté en el poder, tanto en el gobierno central como en los municipales, comience el año de elecciones con una ventaja indebida frente a los otros partidos principales mediante la utilización de fondos públicos en una campaña

publicitaria que tiene un propósito político-partidista. La Sec. 9 del Art. VI de nuestra Constitución, *supra*, no permite el uso de fondos públicos con estos propósitos. Por ende, suscribimos la decisión de esta Curia. Así evitamos que los funcionarios electos por el pueblo utilicen los fondos gubernamentales con el propósito político-partidista de promover sus respectivas candidaturas.

I

En los tres (3) recursos consolidados, la controversia medular es si los incumbentes violaron el axioma constitucional de igualdad económica inmerso en nuestra Constitución y la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, *supra*, al utilizar fondos públicos para sufragar sus campañas publicitarias. Como en cada uno de los casos los Tribunales de Primera Instancia resolvieron de distintas maneras las controversias ante su consideración, endosamos la expedición y consolidación de los recursos. Así consolidados, podemos formular los criterios aplicables a una controversia donde existen diversos enfoques en los foros de instancia.

En el primero, *P.P.D. v. Rosselló*, Caso Civil Núm. AP-95-7, el P.P.D. nos solicita que revoquemos la decisión del Tribunal de Primera Instancia que declaró sin lugar una demanda presentada por esa entidad política en la que se impugna una campaña de anuncios del Departamento de Salud atacando directamente el Plan de Salud del Alcalde del Municipio de San Juan, Hon. Héctor Luis Acevedo. El P.P.D. sostuvo que la utilización de fondos públicos para esa campaña político-partidista constituía un uso indebido de fondos públicos prohibido por la Sec. 9 del Art. VI de la Constitución de Puerto Rico, *supra*, que ponía en desventaja a esa entidad política.

A base de los hechos estipulados por las partes, el foro de instancia determinó que el P.P.D. tenía acción legitimada para incoar la acción, pero denegó la petición de *injunction* porque entendió que en la reglamentación de la Ley Electoral de Puerto Rico la prohibición de los anuncios gubernamentales no era extensiva al año antes de las elecciones. En vista de esta conclusión, dicho foro no consideró la alegación del P.P.D. de que los anuncios del Departamento de Salud constituían un ataque político-partidista.

En el segundo recurso, *Pérez Preston v. Aponte*, Caso Civil Núm. AP-95-9, el candidato a alcalde de Carolina por el P.N.P., junto a varios legisladores y electores, solicitan que revisemos la decisión del Tribunal de Primera Instancia que denegó una demanda contra el Alcalde de esa ciudad, Hon. José A. Aponte. En su acción, ellos cuestionaron una campaña publicitaria del Municipio de Carolina en que se destacaban los logros del gobierno municipal durante los diez (10) años de la incumbencia del Alcalde, Hon. José Aponte, candidato a la reelección por el P.P.D. En su petición sostuvieron que esta campaña ponía al P.N.P. en una posición desventajosa, desvirtuando el postulado constitucional de igualdad en el proceso electoral. El foro de instancia desestimó la demanda porque los demandantes no tenían acción legitimada y, por ende, la controversia no era justiciable.

En el tercer recurso, *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, revisamos la sentencia dictada por el Tribunal de Primera Instancia que declaró con lugar una petición de *injunction* contra una campaña publicitaria de varias agencias gubernamentales destacando los logros del Gobernador, Hon. Pedro Rosselló González. En su demanda el P.P.D. alegó que las agencias violaron la Constitución cuando utilizaron fondos públicos en una campaña publicitaria multimillonaria para exaltar la imagen del Goberna-

dor y adelantar la causa electoral del P.N.P. en las elecciones del próximo año.

A diferencia de los otros casos, donde el tribunal adjudicó a base de los hechos estipulados, en el tercero se recibió prueba documental y testifical. Concluido este proceso, dicho foro adjudicó la controversia y decretó la inconstitucionalidad de la campaña publicitaria. Por entender que la transcripción de la prueba presentada ante nos avala la decisión del ilustrado Tribunal de Primera Instancia, procede que examinemos la evidencia considerada por el foro de instancia al adjudicar la controversia de autos.

## II

Por considerarlo pertinente, reseñamos la prueba desfilada en el tercer recurso (Caso Civil Núm. CT-95-10). En la vista celebrada para considerar la solicitud de *injunction* preliminar testificaron por el P.P.D. dos (2) peritos en comunicación pública (el Dr. José Rubén Gaztambide y el Sr. Josué Merced Reyes) y el Sr. Gilberto Torres Collazo, en representación de Publish Records Service. Por los demandados testificó el Hon. Manuel Díaz Saldaña, Secretario del Departamento de Hacienda.

El Dr. José Rubén Gaztambide Géigel, Profesor de la Escuela de Comunicación de la Universidad de Puerto Rico, testificó que había examinado los anuncios de prensa y televisión de las agencias del gobierno cuestionados por el P.P.D. Además, declaró que había estudiado unas cintas videomagnetofónicas de la campaña política del P.N.P. de 1992 en las que el doctor Rosselló describía los puntos más sobresalientes de sus compromisos programáticos.

Explicó que los anuncios de las agencias difundidos en el 1995 tienen unos elementos comunes tanto en el lema de "compromiso cumplido" como en el uso predominante del color azul y de palmas. Expuso que todos tenían el mensaje de que el gobierno del Dr. Pedro Rosselló había cumplido

sus promesas. Estos elementos comunes le daban unidad a los distintos anuncios que enaltecen la imagen del incumbente antes del comienzo del período electoral. Además, comentó que al comparar los anuncios del Estado con los de la campaña de 1992 había concluido que había una relación entre las propuestas del candidato y los anuncios del Gobierno en la que se informa como logros el cumplimiento de unas promesas políticas del candidato. Por último, expresó que había una "conexión" entre la campaña de "compromiso cumplido" del Gobierno con una campaña que simultáneamente tenía el P.N.P. bajo el lema de "prometimos y cumplimos". Sostuvo que el elemento unificador en las campañas del Gobierno y del partido era la vinculación entre las promesas programáticas y la obra de gobierno en cumplimiento de las promesas de campaña. Veamos:

P Testigo, puede usted, en su opinión pericial, indicarnos si existe una relación entre esos partes de prensa con las cuñas del '92, de la promesa de campaña del candidato Rosselló, si en su opinión?
R Sí.
P Sí?
R Yo entiendo que sí, yo entiendo que en la medida en que se está estableciendo que se han cumplido algunas de las cosas que aparecían en aquellas cuñas, por ejemplo, sobre la educación sobre la salud, se está estableciendo una conexión entre lo que sucedió en aquel momento en el '92 y los anuncios de hoy en día, además de las conexiones de tipo, como le decía, de color y de la idea de compromiso cumplido.

P En qué momento hace ese señor la promesa?
R Bueno, las promesas las hace en el '92 originalmente.
P Qué pretendía ese señor en el '92?
R Ser electo como gobernador, no? Yo creo que lo que surge claro también es la conexión con el Partido Nuevo Progresista, yo creo que surge en el anuncio que tienen en su edificio, "Prometimos y cumplimos". Para m[í] la relación es muy clara entre "Compromiso cumplido" y "Prometimos y cumplimos", verdad? T.E., págs. 102–104.

El profesor Gaztambide Géigel explicó que los anuncios del Gobierno también estaban vinculados con la campaña

del P.N.P. contra el Presidente del P.P.D. y candidato a gobernador de esa colectividad, el Lcdo. Héctor Luis Acevedo. Esta otra campaña consistió de unos anuncios que tenían una lista de compromisos programáticos del licenciado Acevedo en su campaña para la reelección a la alcaldía de San Juan e imputaba que durante su incumbencia él no había cumplido con sus promesas. Explicó que claramente esta es "la contraparte de la campaña de 'Compromiso Cumplido'".

Evaluadas todas las campañas integralmente, el profesor Gaztambide concluyó que los anuncios del Gobierno tenían un propósito político-partidista:

> P Testigo, yo lo quisiera confrontar un momentito con el Exhibit No. 4 de la parte demandante, que se ha estipulado que es una publicación de un periódico enviado a publicar por el PNP, pagado por el PNP, y dígame si su en su opinión pericial ese escrito guarda alguna relación con lo que usted ha testificado del '92 de el afiche Exhibit 3 y de la campaña que se está llevando ahora a cabo durante el '95?
>
> R Yo entiendo que sí, que existe una relación muy clara, ya que como habíamos dicho, la campaña que lo que yo estoy catalogando como una campaña, verdad, de estos anuncios de las diferentes agencias, lo que están diciendo es del compromiso cumplido.
>
> Esta separata del periódico, creo que era El Nuevo Día, me parece, tiene como su lema las promesas del alcalde que él no las cumplió, en la segunda página comienza a hacer un listado de las promesas que de acuerdo con este documento el alcalde Acevedo hizo y entonces dice de las 189 promesas, refiriéndose a las promesas del Alcalde Acevedo, no ha sido capaz de cumplir 162, de manera que entiendo yo que el mensaje que está tratando de llevar es el Partido Popular, el Alcalde Acevedo en particular, no ha cumplido con sus promesas de campaña, lo cual es la contraparte de la campaña de "Compromiso Cumplido".
>
> P Testigo, tomando en consideración las cuñas del '92 que usted vio esta mañana, el afiche o foto Exhibit 3 que se le ha presentado, el Exhibit 4 sobre el cual usted acaba de testificar ahora, las cuñas y videos de compromiso cumplido en el '95, que es el Exhibit 52 que usted vio esta mañana, podría indicarnos si la campaña del 1995 que se resume en las cuñas del video del '95 al igual que en los partes de prensa que usted ha exami-

nado, si usted puede concluir como perito si es una campaña político-partidista o no?

R Yo entiendo que sí, que es una campaña político-partidista compuesta de diferentes anuncios y que el propósito no es el de ser, de informar las agencias separadamente sino que es una campaña coherente y unificada, con propósitos, entiendo yo, político-partidistas. T.E., págs. 107–108.

Por el P.P.D. también declaró el Sr. Gilberto Torres Collazo. Él informó que trabajaba en Publish Records Service. T.E., pág. 177. Esta empresa se dedica a llevar un registro de los anuncios de prensa escrita, televisión y radio, y preparar unas estadísticas sobre los gastos incurridos. Torres Collazo informó que entre enero y octubre de 1995 el Gobierno de Puerto Rico había gastado la cantidad de catorce millones quinientos cuarenta y ocho mil siete dólares ($14,548,007) en televisión y periódicos para la campaña de anuncios cuestionados por el P.P.D. T.E., pág. 182.

Por último, declaró el Sr. Josué Merced Reyes, perito en comunicaciones, publicidad y mercadeo. Éste testificó que había examinado la publicidad del P.N.P. de 1992, los anuncios de las agencias impugnadas por el P.P.D., y la campaña del P.N.P. de 1995 contra el Alcalde de San Juan, Hon. Héctor Luis Acevedo. T.E., págs. 208–210.

Explicó que las campañas se originan con compromisos programáticos del P.N.P. en 1992 y tienen una secuencia progresista y un hilo unificador. La primera etapa consistió en los anuncios durante la campaña electoral de 1992 con las promesas del candidato. La segunda se compone de los anuncios del Gobierno que comunican que el doctor Rosselló ha cumplido sus compromisos programáticos desde la gobernación. La tercera etapa consiste de la campaña del P.N.P. atacando directamente al Alcalde Acevedo por incumplir las promesas de su campaña de reelección en el 1992. También, y simultáneamente, incluye una campaña que, bajo el lema de "prometimos y cumplimos", une la publicidad de 1992 con la de 1995. T.E., págs. 209–210.

Merced Reyes expuso que la campaña de las agencias tenía el propósito de "contestar que las promesas de campaña del P.N.P. a través de su candidato a Gobernador han sido cumplidas o están en vías de cumplirse". Declaró que ésta era "la respuesta a la campaña del '92". T.E., pág. 212. Además, explicó que los anuncios de las distintas agencias tenían el lema publicitario de compromiso cumplido que unía las diferentes publicaciones y que tenían un mensaje.

En su testimonio expresó que aunque cada uno de los anuncios separados podía tener un fin legítimo, en su conjunto, al considerar los elementos que los vinculan, pierden su validez.

También, a preguntas del tribunal de instancia, el perito afirmó que al examinar la totalidad de la campaña de las agencias a la luz de los ataques del P.N.P. contra el Alcalde Acevedo y el lema de "prometimos y cumplimos" de la campaña del P.N.P., procedía concluir que había un fin político-partidista:

> HON. JUEZ: Entonces, la pregunta es la siguiente, la responsabilidad es del Tribunal y le voy a permitir al compañero que siga.
> Porqué es que debe interpretarse que compromiso cumplido se refiere a las promesas de campaña y no a la política pública del gobierno?
> R. Porque no es compromiso cumplido solamente Señor Juez es compromiso cumplido son los ataques partidistas que están saliendo firmados por el PNP como en el folleto de Acevedo y la misma línea de partido que está en el edificio y si muy bien compromiso cumplido solo no tengo problema con eso, s[í] tengo problema cuando se amarran todas las piezas partidistas de gobierno más el uso también del azul en una cantidad de piezas publicitarias que en conjunto ya ahí cambia el azul solamente no tengo problema compromiso cumplido solamente no tengo problema pero cuando amarran todas las piezas incluyendo la publicidad PNP contra el Partido Popular ya entonces veo un amarre político-partidista. T.E., págs. 242–243.

Finalmente, Merced Reyes no solamente declaró que el P.N.P. se beneficiaba de la campaña, sino también que el volumen de anuncios y el poder adquisitivo del Estado fa-

cilitaban que se colocaran más anuncios de los que un partido político podía obtener. Además, afirmó que la campaña de gobierno le causaba daño al P.P.D. no solamente porque comenzaba el año electoral con una desventaja, sino por que no tenía esa misma cantidad de fondos públicos para gastar en su campaña.

Por la parte demandante testificó el Sr. Manuel Díaz Saldaña, Secretario del Departamento de Hacienda. Él declaró que el lema "compromiso cumplido" significa que el Gobierno cumplió con una obligación contraída con el pueblo en las elecciones de 1992. Explicó que en el Poder Ejecutivo continuamente se examinaba si se estaba cumpliendo con el programa del P.N.P. de 1992. Señaló que en las elecciones de 1992 el pueblo les dio un mandato y que las agencias tenían que continuamente evaluar si estaban cumpliendo con ese mandato electoral.

Además, contestó que la frase "compromiso cumplido" la había oído por primera vez en la Oficina de Comunicaciones de La Fortaleza:

> HON. JUEZ: Testigo, la pregunta si no la entendí mal fue, ¿que si usted conoce el origen de esa frase? Compromiso Cumplido. ¿Quién se inventó esa frase, que ha pegado tanto?
> R Bueno, nosotros la vimos en Fortaleza, en la Oficina de Comunicaciones. T.E. pág. 281.

Concluidos los testimonios de los peritos en comunicaciones y del Secretario de Hacienda, el Tribunal de Primera Instancia declaró "inconstitucional el uso de fondos públicos para sufragar los gastos de publicidad objeto de esta acción". El tribunal concluyó que la campaña publicitaria violaba el axioma constitucional de igualdad en el proceso electoral y la Sec. 9 del Art. VI de la Constitución del E.L.A., *supra,* que prohíbe el uso de fondos públicos para difundir ideas político-partidistas. Aunque reconoció que el Poder Ejecutivo tiene un interés legítimo "en informar a la ciudadanía sobre la marcha de 'la cosa pública', .... [n]o podemos reconocer que dentro de la facultad de

informar del gobierno exista el derecho del partido en poder a informar sus logros particulares con el obvio propósito de ganarse la opinión pública". Por ende, expidió el *injunction* preliminar que ordenó la paralización inmediata de la campaña publicitaria.

## III

A. Antes de evaluar la controversia medular de los tres (3) recursos y determinar si el Gobierno del E.L.A., por un lado, y el Municipio de Carolina, por otro, violaron nuestra Constitución al utilizar fondos públicos en sus respectivas campañas, procede que examinemos si los demandantes tienen legitimación activa para impugnar el uso de fondos públicos con fines político-partidistas por parte del incumbente. Luego de un examen de la doctrina, tanto en nuestra jurisdicción como en el ámbito federal, coincidimos con la opinión mayoritaria en que, tanto el P.P.D. como el licenciado Pérez Preston tienen legitimación activa.

Por entender que los partidos políticos tienen un interés legalmente reconocido en nuestro ordenamiento constitucional de competir en igualdad de condiciones económicas, hemos decidido exponer unos criterios adicionales que apoyan la decisión mayoritaria y atienden las preocupaciones expresadas por algunos miembros de este Tribunal.

La doctrina de legitimación activa o *standing* ha servido como un instrumento esencial en la preservación del delicado balance que exige nuestro sistema de separación de poderes. Su desarrollo en nuestra jurisdicción ha respondido a un sano criterio de autolimitación y prudencia judicial. No se trata de un mero tecnicismo legal. Los límites que nos impone esta doctrina, así como otras que emanan del principio de justiciabilidad, constituyen las condiciones mínimas para el ejercicio tolerable del poder judicial dentro de nuestro esquema constitucional. *E.L.A. v. Aguayo*, 80 D.P.R. 552, 597 (1958).

A esos efectos, hemos expresado que "el examen de la legitimación activa es un mecanismo usado por nuestros tribunales para delimitar su propia jurisdicción y no adentrarse en los dominios de otras ramas de gobierno, y no lanzarse a resolver cuestiones hipotéticas o planteadas dentro de un contexto inadecuado". (Escolio omitido.) *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593, 598 (1992) Véase *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 399 (1983). En un esfuerzo por brindar mayor claridad al marco doctrinal, hemos expresado que una parte demandante posee legitimación activa si cumple con los requisitos siguientes: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no abstracto o hipotético; (3) que existe un nexo causal entre la acción que se ejercita y el daño alegado, y (4) que la causa de acción surge al amparo de la Constitución o de alguna ley. *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *Hernández Torres v. Hernández Colón et al.*, supra; *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992). En resumen, no se puede activar la maquinaria judicial si no se cumple con los requisitos de daño real, relación causal y reparabilidad al amparo de la Constitución o de alguna ley.

En los casos de organizaciones o asociaciones hemos reconocido que éstas pueden demandar a nombre propio o a nombre de sus miembros o integrantes. *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989). En el primer caso basta que cumplan con los cuatro (4) elementos requeridos a cualquier demandante para instar una acción judicial. En el segundo caso se les ha reconocido legitimación activa para demandar siempre que puedan demostrar que: (1) los miembros de la organización tendrían legitimación activa para demandar a nombre propio; (2) los intereses que se pretenden proteger están relacionados con los objetivos de la organización, y (3) la reclamación y el remedio solicitado no requieren la participación individual de los miembros en el pleito. *Asoc. Maestros P.R.*

*v. Srio. Educación*, 137 D.P.R. 528 (1994); *Col. Ópticos de P.R. v. Vani Visual Center*, supra.

En el caso de los partidos políticos, en diversas ocasiones este Tribunal les ha reconocido legitimación activa. Un partido posee legitimación activa para instar una acción judicial cuando puede demostrar que sus intereses y derechos como entidad política han sido lesionados por una ley o actuación gubernamental. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *P.S.P. v. Srio. de Hacienda*, 110 D.P.R. 313 (1980); *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978). Específicamente, hemos reconocido legitimación activa a los partidos políticos cuando éstos han cuestionado la legalidad del uso de fondos públicos en alegada violación del imperativo de la Sec. 9 del Art. VI de nuestra Constitución, *supra*, que limita el uso de fondos públicos exclusivamente al fin público.[1] En tales casos la legitimación se ha reconocido sobre la base de que la violación del citado precepto constitucional lesionaba los intereses y derechos de los demandantes como partido político.

En el caso *P.S.P. v. E.L.A.*, supra, se le reconoció legitimación activa al Partido Socialista Puertorriqueño, partido que abogaba por la independencia de Puerto Rico, para cuestionar la legalidad del gasto público destinado al financiamiento de las elecciones internas de la filial en Puerto Rico del Partido Demócrata de Estados Unidos. El Tribunal concluyó que "[e]l derecho del apelante a impugnar legislación que a su entender lesiona sus intereses como partido político y aun como grupo general de ciudadanos es manifiesto". *P.S.P. v. E.L.A.*, supra, pág. 595. Años después, adjudicamos en los méritos un cuestionamiento constitucional similar, concediendo legitimación activa a un partido político. *P.I.P. v. C.E.E.*, supra.

En otros casos hemos concedido legitimación a ciudada-

---

[1] "Solo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Art. VI, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 369.

nos y asociaciones para impugnar el uso de fondos públicos con fines político-partidistas. *Marrero v. Mun. de Morovis*, 115 D.P.R. 643 (1984). En *Marrero*, supra, se reconoció la legitimación de un grupo de ciudadanos y una asociación de desempleados para cuestionar la constitucionalidad de una disposición de la Ley Electoral de Puerto Rico que autorizaba el uso irrestricto de los automóviles del Gobierno para fines político-partidistas. En este caso, el Alcalde de Morovis había colocado en su automóvil oficial tres (3) insignias del P.P.D. Apoyados en la Sec. 9 del Art. VI, Const. E.L.A., *supra*, los ciudadanos y la asociación alegaron que dicha actuación era "inconstitucional por constituir un uso ilegal e impermisible de fondos públicos que permitía 'd[i]seminar un determinado mensaje ideológico con el que el ciudadano no necesariamente tiene que coincidir' ". *Marrero*, supra, pág. 644.

Recientemente, en *P.P.D. v. Gobernador II*, supra, reconocimos implícitamente que el partido demandante tenía legitimación para cuestionar el uso de fondos públicos por el Gobierno para financiar una campaña publicitaria en los medios de difusión pública del país, cerca de un evento electoral. El interés lesionado en dicho caso fue el derecho constitucional a la igualdad electoral. Íd.

En síntesis, un partido político puede cuestionar la constitucionalidad de una actuación gubernamental cuando se cumplen los siguientes dos (2) requisitos: (a) la actuación gubernamental viola un precepto legal o constitucional, y (b) esa particular violación lesiona los intereses y derechos del partido como entidad política.

B. Los demandantes alegan un menoscabo en el derecho constitucional a la igualdad electoral. Dentro del axioma de la igualdad electoral inmerso en nuestra Constitución se encuentra el principio de paridad económica entre los partidos y los candidatos. *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 646 (1984). En *Marrero*, supra, pág. 647, citando el análisis del caso *P.N.P. v. Tribunal Electoral*, 104

D.P.R. 741, 750–751 (1976), este Tribunal expuso la importancia de la paridad económica en el proceso democrático. Desde entonces reconocimos que

[a]un cuando no existe una correlación entre los resultados electorales y la capacidad económica de un partido político o candidato —ya que en adición entran en juego un sinnúmero de factores tales como la naturaleza de las controversias, organización, liderazgo, destreza, prestigio, control y extención de información y publicidad— *las contribuciones económicas y por ende, la solvencia de los partidos políticos afectan positiva o negativamente y en gran medida los factores mencionados y por ende el desenlace final.* (Énfasis en el original.) *Marrero v. Mun. de Morovis,* supra, págs. 647–648.

Por tal razón, el legislador creó el Fondo Electoral con el propósito de disminuir las ventajas económicas entre los partidos políticos y salvaguardar el principio constitucional de la igualdad electoral.

En *Marrero v. Mun. de Morovis,* supra, reconocimos que la paridad económica entre los partidos es un aspecto medular del axioma de igualdad electoral. Íd. En dicho caso se declaró inconstitucional una ley que violaba ese principio de paridad económica. El alcance del axioma de la igualdad es una determinación que corresponde al Tribunal Supremo como intérprete final de las leyes y de la Constitución.

Sobre la importancia de la paridad económica de los partidos en nuestro ordenamiento democrático, expresamos:

En nuestra democracia los partidos políticos son indispensables para su funcionamiento. ... Constituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país. Como tales, formulan programas de administración y promueven candidatos a puestos políticos. El subsidio a través del fondo electoral para financiar sus actividades es un ejemplo vivo de esa característica pública. ...

La realización de esas funciones cuasi gubernamentales y la asignación de fondos públicos justifican la igualdad en el trata-

miento de la Ley Electoral. *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 638 (1984).

En *P.P.D. v. Gobernador II*, supra, quedó meridianamente claro que el derecho constitucional a la paridad económica trasciende la protección que la Legislatura provee, con la veda durante el año electoral, a través del Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351. Dicha protección es una manifestación legislativa del principio más amplio de paridad económica. Esa disposición no supone el alcance máximo de la protección constitucional. A esos efectos nos ilustran las expresiones de la opinión per curiam:

> El concepto de igualdad económica con relación a la distribución de fondos públicos en el proceso electoral impide que un partido que ostente el poder de gobernar al pueblo *en un momento* dado utilice fondos públicos, tomando ventaja indebida para promover su postura. El Art. 8.001 es precisamente una medida preventiva para que dicha práctica no ocurra. Íd.

Resulta claro que la protección constitucional no se limita a la veda de la Ley Electoral de Puerto Rico. La veda dispuesta en el Art. 8.001, *supra*, es una medida, entre otras posibles, para garantizar la paridad. La medida legislativa no determina, por sí sola, el alcance del axioma de la igualdad y paridad económica.

Debe recalcarse que el propio legislador ha reconocido implícitamente que el principio de la igualdad y paridad económica entre los partidos no se limita al año electoral ni a fechas cercanas a eventos electorales. A esos efectos, la Ley Electoral de Puerto Rico provee para la subvención equitativa de fondos públicos para los partidos políticos, tanto en años electorales como en los años no electorales del resto del cuatrienio. Art. 3.023 de la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977, según enmendado, 16 L.P.R.A. sec. 3116. Como resultado de la Ley Electoral de Puerto Rico, los partidos tienen un derecho a recibir esa subvención, si cumplen con los requisitos

dispuestos en el estatuto, y una expectativa legítima de que el Estado tomará las medidas correspondientes para asegurar que se distribuirán en partes iguales.

En síntesis, nuestro orden constitucional y la Ley Electoral de Puerto Rico les reconocen a los partidos políticos *un interés legal* de paridad económica frente a los demás partidos que compiten en la contienda electoral. Por lo tanto, éstos tienen un interés legítimo en asegurar ese trato igual en la subvención directa o indirecta de fondos, tanto en años electorales, como en el resto del cuatrienio. Bajo el palio de este ordenamiento, el uso de fondos públicos para fines político-partidistas en cualquier período del cuatrienio por parte del partido gobernante resulta en un claro menoscabo del derecho a la paridad de los partidos opositores y del interés legal protegido por el axioma de igualdad inmerso en nuestra Constitución.

C. Nos resta determinar si el menoscabo al principio de la igualdad económica de los partidos configura por sí solo el requisito de daño real, claro, palpable e inmediato exigido por la doctrina de legitimación activa. En los casos de autos el Procurador General ha cuestionado la legitimación del P.P.D. porque "no ha demostrado un daño claro y palpable, más bien ha alegado un daño abstracto". En el caso de Max Pérez Preston, también se cuestiona la legitimación activa del demandante porque "no es un partido político", sino meramente un aspirante a la Alcaldía de Carolina por el P.N.P.

Anteriormente hemos aclarado que el sujeto activo que impugna la constitucionalidad de una ley "no puede valerse de una mera alegación a los efectos de que la ley es inconstitucional. Su legitimación activa debe estar sustentada a través de todas las etapas procesales del pleito a los efectos de que ha sufrido un daño claro, palpable y no especulativo". Véase *Hernández Torres v. Gobernador*, supra. Sin embargo, la determinación de si existe un daño real, claro y palpable no puede hacerse en el vacío, sin

referencia al derecho positivo. En muchos casos, el "daño" sólo puede caracterizarse adecuadamente a la luz del interés legal creado o protegido por la Constitución o por una ley. C.R. Sunstein, *Standing Injuries*, 1993 Sup. Ct. Rev. 37–64 (1993); C.R. Sustein, *What's Standing after Lujan? Of Citizen Suits, "Injuries", and Article III*, 91 Mich. L. Rev. 163, 191 (1992); W. Burnham, *Injury for Standing Purposes When Constitutional Rights are Violated: Common Law Public Value Adjudication at Work*, 13 Hastings Const. L.Q. 57, 75–77 (1985). Para efectos de la legitimación activa, lo que es un daño dependerá del interés que la ley o la Constitución pretendió proteger. No se puede divorciar el concepto de daño real del interés protegido por la ley, debido a que la caracterización del primero depende del segundo. La Constitución o la ley crea un interés legal a favor de una parte, cuyo menoscabo puede configurar "un daño" para efectos de la legitimación activa. Un interés que se concibe "judicialmente abstracto" puede transformarse en claro, concreto y palpable al ser reconocido por ley.

En los casos de autos, los demandantes sostienen que fueron lesionados sus derechos constitucionales a la igualdad electoral reconocidos en nuestro ordenamiento. *P.P.D. v. Gobernador II*, supra. Este aspecto de la doctrina de "legitimación activa" que caracteriza al daño real como un menoscabo ha sido reconocido recientemente por el Tribunal Supremo federal en el caso *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656 (1993).

En *Jacksonville*, una compañía (AGC) impugnó la constitucionalidad de una ordenanza que establecía un trato preferencial en la licitación de proyectos en favor de unas compañías poseídas por minorías. AGC alegó que regularmente licitaban en dicha ciudad y que la ordenanza menoscababa el principio de igualdad inmerso en la cláusula de la igual protección de las leyes de la Constitución federal. La Corte de Apelaciones federal resolvió que AGC no tenía

*standing* por carecer su alegación de daño real, claro y palpable (*injury in fact*). Concluye el tribunal que los demandantes no alegaron que su licitación hubiese sido más exitosa de no haber existido la ordenanza.

El Tribunal Supremo federal revocó. La revocación se debió a una particular caracterización del requisito de daño real (*injury in fact*). El daño alegado no fue el hecho de no haber recibido los contratos, sino el menoscabo de su capacidad de competir en igualdad de condiciones, en abierta violación de la cláusula de igual protección de las leyes. Sobre esta concepción del daño, expresó el Tribunal:

> Cuando el gobierno erige una barrera que hace más difícil para los miembros de un grupo obtener un beneficio de lo que lo es para un miembro de otro grupo, un miembro del primer grupo que intenta cuestionar la barrera no necesita alegar que, ausente dicha barrera, hubiera obtenido el beneficio para establecer que posee legitimación activa. El "daño real" en un caso de igual protección de las leyes de este tipo es la denegación de trato igual como resultado de la imposición de la barrera, no la inhabilidad final de obtener el beneficio. ... [*E*]*l "daño real" es la inhabilidad de competir en igualdad de condiciones ....* (Traducción nuestra.) *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, supra, pág. 666.

El Tribunal distingue el caso *Fla. Gen. Contractors v. Jacksonville*, supra, de *Warth v. Seldin*, 422 U.S. 490 (1975), al señalar que en este último no se alegó que el daño era que la clasificación sospechosa privaba al demandante de la capacidad de competir en igualdad de condiciones por los beneficios que concedía la ley. Esa precisamente fue la alegación que le concedió *standing* a los demandantes en *Jacksonville*. El Tribunal Supremo federal distingue, por lo tanto, el posible daño que es producto de la desigualdad de otro tipo de daño que se configura en el menoscabo de la capacidad de competir en igualdad de condiciones. Íd. El Tribunal reconoce que para efectos de *standing*, el daño real, claro y palpable es la privación del derecho a la igualdad de condiciones entre competidores, y que no es necesario demostrár el efecto nocivo que tuvo la

ley o acción gubernamental en el resultado de la competencia.

Aunque el Tribunal Supremo federal no ha tenido ocasión de aplicar la mencionada variante de "legitimación activa" a casos de igualdad política, algunos tribunales federales sí se han expresado sobre este asunto. Así se ha desarrollado en la jurisdicción federal la teoría de *competitor advocate standing*. Véase C.T. Sealander, *Standing Behind Government-Subsidized Bipartisanship*, 60 Geo. Wash. L. Rev. 1580 (1992). Bajo esta teoría se ha reconocido legitimación activa a los partidos minoritarios cuando éstos pueden demostrar que una ley o actuación gubernamental concede una ventaja indebida a los partidos mayoritarios y correlativamente sitúa al partido o grupo minoritario en una desventaja. Véanse: *Fulani v. League of Women Voters Educ. Fund.*, 882 F.2d 621 (2do Cir. 1989); *In re United States Catholic Conference*, 885 F.2d 1020 (2do Cir. 1989); *Fulani v. Hogsett*, 917 F.2d 1028 (7mo Cir. 1990), *cert.* denegado, 501 U.S. 1206 (1991).[2]

En *League of Women Voters Educ. Fund.*, supra, se reconoció legitimación activa a un partido minoritario que fue excluido de un debate presidencial televisado subsidiado por fondos públicos. El tribunal basó la legitimación activa en la ventaja competitiva que se le concedía a los partidos principales invitados al debate y en la pérdida correlativa de ventaja competitiva sufrida por el partido de Fulani. El tribunal expresó:

> En esta era de telecomunicación moderna, quién puede dudar el poderoso efecto ventajoso que la exposición a los medios de comunicación puede tener hoy día sobre la candidatura de un importante aspirante que busca ser electo a un puesto político nacional ...No hay duda de que la participación en estos debates confirió a los candidatos que aparecieron en los mismos al-

---

[2] Aunque existen jurisdicciones que han rechazado conceder *standing* a base del daño a la igualdad en la competencia política, la tendencia predominante ha sido la que sí la reconoce. Véase C.T. Sealander, *Standing Behind Governemnt Subsidized Bipartisanship*, 60 Geo. Wash. L. Rev. 1580, 1602–1615 (1992).

gún tipo de ventaja competitiva sobre aquellos candidatos que no participaron. (Traducción nuestra.) *Fulani v. League of Women Voters Educ. Fund.*, supra, pág. 626.

Claramente en este caso *Fulani v. League of Women Voters Educ. Fund.* el tribunal federal reconoce un daño en la ventaja competitiva que es distinguible e independiente de su efecto real en la contienda electoral. En *In re United States Catholic Conference*, supra, se sostuvo que la doctrina del Tribunal Supremo federal que ha concedido *standing* a competidores económicos para impugnar beneficios gubernamentales concedidos a sus rivales comerciales, es aplicable también a la contienda política. *In re United States Catholic Conference*, supra, pág. 1030. Sin embargo, no se le concedió legitimación al demandante por no estar éste en verdadera posición de competencia con respecto del demandado. La opinión disidente del Juez Newman aboga por una visión aún más amplia en el contexto de partes competidoras. A estos efectos expresó:

> Una doctrina de legitimación activa se encuentra dentro de los límites manejables o permisibles cuando reconoce la competencia entre organizaciones que están sujetas a las mismas restricciones estatutarias y permite que partes competidoras que acatan dichas restricciones cuestionen la acción gubernamental que permite que una organización viole las referidas restricciones en detrimento de las otras. (Traducción nuestra.) *In re United States Catholic Conference*, supra, pág. 1033.

En *Fulani v. Hogsett*, supra, esta vez en el Séptimo Circuito federal, se le concedió *standing* a un partido minoritario para impugnar una ley que le colocaba en desventaja competitiva con respecto de los demás partidos. Íd., pág. 1030.

La doctrina federal anteriormente expuesta, la cual reconoce la legitimación activa de partidos políticos cuando se ve lesionada su capacidad de competir en igualdad de condiciones, es perfectamente compatible con nuestra normativa. En el caso particular de Puerto Rico, el reclamo de igualdad entre los partidos políticos no se basa en la

igual protección de las leyes ni en la Primera Enmienda. En nuestro ordenamiento, se ha reconocido expresamente el axioma de igualdad electoral inmerso en nuestra Constitución.

La alegación de que el derecho a la igualdad electoral de los demandantes, en su aspecto de paridad económica, ha sido lesionado por las campañas publicitarias desplegadas por el gobierno central y por el Municipio de Carolina, no es abstracta ni especulativa. No es especulativo, por ejemplo, el planteamiento de que una campaña millonaria dirigida a resaltar los logros del Gobierno, coloca en desventaja competitiva a los partidos de oposición. Aun sin tener que determinar el efecto real que la campaña del Gobierno haya tenido en el electorado, la alegación de que el fondo público se ha utilizado para adelantar la causa partidista del P.N.P., cumple cabalmente con el requisito de daño real exigido por nuestra doctrina de legitimación activa.

Es precisamente el derecho a la paridad de fondos lo que le faculta, como partido, para cuestionar el uso de fondos públicos para fines político-partidistas. El daño real, claro y palpable acontece dentro de la zona de interés del P.P.D. protegida constitucionalmente y reconocida legislativamente. El daño real se configura específicamente con la situación de desventaja competitiva en que la campaña coloca al P.P.D.

La opinión de este Tribunal no está reconociendo al P.P.D. capacidad legal para cuestionar el uso de fondos como un daño generalizado al país. Un partido político no tendría legitimación, como tampoco la tendría el resto de la ciudadanía, para cuestionar la sabiduría del gasto público. Sin embargo, el P.P.D. no basa su alegación en la vindicación del "interés público" general, como fue el caso de los legisladores en *Hernández Torres v. Gobernador*, supra. El partido demandante en los casos de autos invoca un interés particularizado, claro y legalmente reconocido en nuestro ordenamiento constitucional a los partidos políticos: la

paridad económica de los partidos que deriva del axioma de la igualdad electoral.

Además, de la transcripción de la evidencia de este caso se desprende que el P.P.D. alegó y probó que sufrió un daño a su capacidad competitiva con la campaña publicitaria. Específicamente, el perito del P.P.D., Merced Reyes, declaró que la campaña del Gobierno le causó daño al P.P.D., pues lo colocó en una desventaja al comenzar el año electoral "sin la ventaja de tener algo en el '95". T.E., pág. 214. Igualmente, le causó daño porque la magnitud de la campaña le permitió al Gobierno aprovecharse de los descuentos por volumen que tienen los medios pagados para intensificar los anuncios para saturar el mercado. Como los partidos de oposición no tenían los mismos recursos, no tenían el poder de negociar para llevar a cabo una campaña análoga. Por lo tanto, estaban en desventaja frente al incumbente. Además, explicó que a su vez el P.N.P. se benefició porque no había tenido que desarrollar una campaña publicitaria para mejorar la credibilidad y percepción de los votantes sobre el incumbente, el candidato a Gobernador por el P.N.P.

De esta manera, el P.P.D. no solamente alegó que había sufrido un daño, sino que en la vista celebrada demostró la naturaleza y magnitud de éste. De la transcripción se desprende también que tanto Merced Reyes como Gaztambide Géigel explicaron que mediante esta campaña de anuncios se exaltaba la capacidad del incumbente de cumplir con los compromisos programáticos del P.N.P. en las áreas más neurálgicas para el electorado. Como el P.P.D. no tuvo la misma oportunidad de utilizar los fondos públicos para influir en las percepciones de los votantes sobre los temas de campaña y compromisos programáticos, el efecto fue colocarlo en una desventaja competitiva en el proceso electoral que se avecina.

Los mismos argumentos que hemos esbozados sobre la legitimación activa del P.P.D. son aplicables al caso del

Lcdo. Max Pérez Preston. El principio de igualdad política permea todos los ámbitos de nuestro panorama electoral. No se limita al gobierno central. Es así que el candidato del P.N.P. en el ámbito electoral municipal sufre un daño análogo al que sufre el P.P.D. en el ámbito del gobierno central. No se justifica, para efectos de la legitimación activa, distinción alguna entre ambos casos.

En conclusión, tanto el P.P.D. como el candidato Max Pérez Preston, cumplen con el estándar mínimo exigido jurisprudencialmente para que se les reconozca legitimación activa. Por ende, la opinión del Tribunal correctamente concluyó que tanto el P.P.D. como Pérez Preston tenían legitimación activa para incoar esta acción y evitar que el Poder Ejecutivo y el Municipio de Carolina menoscaben sus intereses legalmente reconocidos de competir en igualdad de condiciones en el proceso electoral.

## IV

Superada la controversia de legitimación activa, debemos evaluar la controversia medular de estos casos. Al examinarlos, partimos de la premisa de que es innegable el interés del Estado en comunicar y orientar a las personas en torno al funcionamiento de los servicios públicos y el desenvolvimiento de los programas gubernamentales. Sobre esos extremos coincidimos con la opinión del Tribunal de "que la expresión del gobierno de naturaleza educativa e informativa es indispensable para que el pueblo pueda juzgar su labor y exigir remedios a los agravios gubernamentales". En lo que concierne a la formulación de la política pública, anteriormente habíamos expresado que "[a]l amparo de sus poderes inherentes, el Gobernador tiene la facultad y el deber de informar sobre las medidas que ha tomado y los planes concebidos para atender los problemas del país". *Noriega v. Hernández Colón*, 126 D.P.R. 42, 56 (1990), voto concurrente. Véanse, además:

*Rotunda and Nowak, Treatise on Constitutional Law. Substance and Procedure* Sec. 20.11 (1992); M.G. Yudof, *When Government Speaks: Politics, Law and Government Expression in America* Cap. 3 (1983); S. Shiffrin, *Government Speech*, 27 UCLA L. Rev. 565 (1980).

Esta facultad gubernamental de informar al ciudadano sobre los asuntos públicos es correlativa a la consecución de un efectivo ejercicio del derecho constitucional a la libertad de expresión. Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.(³) Para que el Gobierno responda a la voluntad del pueblo es necesario garantizar la existencia de un libre intercambio de ideas donde los asuntos públicos estén sujetos a examen y crítica por parte de los ciudadanos. Este principio está encarnado en nuestra Constitución como raíz indiscutible del sistema democrático de gobierno. *Mari Bras v. Casañas*, 96 D.P.R. 15, 20–21 (1968). Sin lugar a dudas, cuando el Estado ejercita su facultad de informar en función de los principios antes señalados, la ciudadanía está en mejor posición de conocer el funcionamiento del Gobierno, evaluar la gestión pública y reclamar remedios a los agravios gubernamentales.

No obstante, el ejercicio de esta facultad no es irrestricto. En ocasiones la expresión gubernamental no persigue ninguno de los fines antes expuestos. En tales instancias, la facultad de informar se convierte en instrumento al servicio, bien de intereses personales, ideológicos o político-partidistas, ajenos al bienestar común. La importante función informativa se degenera y el Gobierno, en vez de contribuir al libre intercambio de ideas donde los asuntos públicos estén sujetos a examen y crítica por parte de los ciudadanos, fomenta la deformación de este proceso.

---

(³) La facultad de informar no es una prerrogativa del Gobierno como beneficiario del derecho a la libertad de expresión, y sí un derivado del derecho de las personas a recibir información. B. Orsoff, *Government Speech as Gobernment Censorship*, 67 S. Cal. L. Rev. 229, 245 (1993). En *P.P.D. v. Gobernador II*, 136 D.P.R. 916 (1994), dispusimos de forma expresa del argumento que pretendía reconocerle al Estado un derecho a la libertad de expresión.

Lejos de perseguir fines educativos y de orientación, los recursos estatales se dirigen a la distribución de propaganda parcializada.(4)

Consciente de este problema, la Asamblea Legislativa adoptó unas medidas cautelares para evitar el uso de fondos públicos por los incumbentes, durante el año de elecciones, para resaltar su imagen y ejercer una indebida influencia en la percepción de los votantes sobre los temas importantes de la campañas políticas. Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*. Sin embargo, como hemos adelantado, la aprobación de dicha disposición no impide que este Tribunal intervenga en casos como los de autos para evitar que se viole la Sec. 9 del Art. VI de la Constitución del E.L.A., *supra*, y proteger así a la ciudadanía de toda coacción en el libre ejercicio de la prerrogativa electoral.

En *P.P.D. v. Gobernador II*, supra, extendimos el alcance de la prohibición de la Ley Electoral de Puerto Rico a la celebración de un referéndum. Así evitamos que se utilizaran fondos públicos en campañas publicitarias gubernamentales cuyo efecto era situar en una desventaja o desigualdad económica a las campañas efectuadas por los partidos políticos de oposición sobre las enmiendas constitucionales propuestas en la consulta.

Con estos principios rectores en mente, estamos de acuerdo con la opinión del Tribunal en que las restricciones constitucionales que prohíben el uso de fondos públicos para fines político-partidistas operan en todo momento y no únicamente en el año de elecciones, como sostiene el

---

(4) En lo aquí pertinente, el vocablo "propaganda" es definido por la Real Academia Española como: "[a]cción o efecto de dar a conocer una cosa con el fin de atraer adeptos o compradores", además de los "[t]extos, trabajos y medios empleados para este fin". *Diccionario de la Lengua Española*, 20ma ed. Madrid, Ed. Espasa-Calpe, pág. 1189. Sin embargo, en términos políticos la propaganda se distingue por tener una connotación negativa. "La *propaganda* presenta la realidad en forma diferente a la que es, con el fin de ganar prosélitos." R. Garzaro, *Diccionario de Política*, 2da ed., 1987, pág. 321.

Procurador General. También coincidimos en que esta restricción no requiere una ley específica para su vigencia.

## V

Esta prohibición, por lo tanto, es aplicable a las campañas publicitarias de carácter político-partidista llevadas a cabo por el Gobierno en años no electorales. No obstante, debido a los diversos tipos de campañas publicitarias que pueden llevar a cabo las agencias gubernamentales, distinguir las campañas publicitarias legítimas de las que no lo son, es una tarea compleja.

En vista de esta dificultad, hay quienes postulan la teoría de que los tribunales deben abstenerse de entrar a adjudicar las distinciones entre un anuncio gubernamental legítimo de uno que persigue fines político-partidistas por parte del incumbente. Argumentan que aun si existe una campaña propagandística, es mejor dejar el efecto que ésta pueda tener al proceso político. No podemos refrendar esta posición. ¿Cómo abandonar la solución al ruedo del proceso político y finalmente al resultado electoral, cuando es precisamente la igualdad de condiciones entre los partidos y la pureza del proceso lo que pretende alterar y manipular la actuación gubernamental? El profesor Chemerinsky ilustra de forma diáfana esta paradoja:

> La única manera de limitar el abuso del incumbente es mediante la acción judicial. Si la rama judicial se abstiene de actuar, las prácticas inconstitucionales continuarán irrestrictas. El asunto no puede ser dejado al proceso político porque precisamente lo que se reclama es que el incumbente está subvirtiendo dicho proceso e impidiendo que sea un verdadero reflejo de la voluntad popular. Mientras más exitoso es el incumbente al utilizar los recursos gubernamentales para influenciar a los votantes, menos confiable será el proceso político. El profesor John Hart Ely explica que el "[m]al funcionamiento en el proceso político ocurre cuando el proceso no merece la confianza, cuando ... los incumbentes están obstruyendo los canales del cambio político para asegurarse que se mantendrán dentro del

círculo del poder y de que los otros se mantendrán fuera." Esto, claro está, es precisamente lo que sucede cuando se abusa de la incumbencia: los que están "dentro" utilizan el poder y los recursos gubernamentales para impedir que los opositores le sucedan en el poder. (Traducción nuestra.) E. Chemerinsky, *Protecting the Democratic Process: Voter Standing to Challenge Abuses of Incumbency*, 49 Ohio State L.J. 773, 778 (1988).

Además, igual complejidad tienen la interpretación de las otras disposiciones de la Constitución y esto no ha impedido que esta Curia adjudique controversias ante su consideración e interprete los preceptos constitucionales para impartirle vida a su contenido y asegurar su vigencia en el tiempo. Recordemos que no somos arqueólogos jurídicos excavando piezas del pasado para un museo ni albaceas que interpretan un testamento escrito en 1952. Todo lo contrario. Interpretamos una Constitución que mediante la indeterminación y generalidad de sus disposiciones contiene suficiente espacio para propiciar su evolución en "un futuro que se expande". B. Cardozo, *La Naturaleza de la Función Judicial*, Eds. Arayú, 1955, pág. 64. Véase, además, R. Canosa Usera, *Interpretación Constitucional y Fórmula Política*, Madrid, Centro de Estudios Constitucionales, 1988, pág. 111.

Esta responsabilidad constitucional exige que interpretemos los preceptos constitucionales de carácter general para concretizarlos y encontrar una solución jurídica a los conflictos ante nos, que muchas veces tienen dimensiones políticas de importancia para el país. Por eso en el caso de autos no podemos escondernos como el avestruz, y tenemos que interpretar la Sec. 9 del Art. VI, *supra*, y determinar cuándo una campaña publicitaria gubernamental viola sus preceptos.

Una campaña ha sido definida como una acción en la cual varios medios de comunicación son utilizados para lograr un propósito persuasivo o informativo sobre una población escogida. Su propósito fundamental es influir en la conducta y en las percepciones de la población. E.M. Ro-

gers y J.D. Storey, *Communication Campaigns*, en *Handbook of Communication Science*, 817–821 (Charles R. Berger y Steven H. Chafee, eds., 1987); O. Kleppner, *Advertising Procedure*, 1979, pág. 59. Entre los diversos propósitos de una campaña se encuentran: el político, el de mercadeo de productos, el de información sobre salud y seguridad pública, y el de recaudación de fondos.

En el caso particular de las campañas políticas se ha reconocido que su propósito es influir en las percepciones de los votantes sobre los candidatos a cargos electivos y sus compromisos programáticos. Aunque es difícil medir con exactitud su efecto electoral a corto plazo, la literatura ilustrada sobre la conducta electoral revela que los medios pagados se utilizan por los candidatos para mejorar su imagen pública y contrarrestar la publicidad adversa en los medios no pagados, incluyendo radio, televisión y prensa escrita. Véase, L. Sabato, *The Rise of Political Consultants*, 1981, págs. 118–120.[5]

El uso de los medios por parte de los candidatos e incumbentes de puestos electivos no cesa en años no electorales. La percepción pública sobre la labor de un incumbente depende sustancialmente de la información que se proyecte por los medios de comunicación y las campañas publicitairas. Precisamente por eso es que los incumbentes incurren en campañas como las de los casos de autos. Véanse: A. Ranney, *Channels of Power: The Impact of Television on American Politics*, 116–117 (1983); D. Graber, *Mass Media and American Politics*, 5–31 (1984); B. Bagdikian, *The Media Monopoly*, 174–192 (1987).

Aunque los recursos económicos de una campaña no

---

[5] *Véanse, e.g.*: J. Cacioppo y R. Petty, *Role of Message Repetition in Persuation*, en *Psycological Processes and Advertising Effects* 91 (L. Alwitt y A. Mitchell, eds., 1985); M. Gurevitch y J. Blumler, *Political Communication Systems and Democratic Values*, en *Democracy and the Mass Media* 269 (ed. Judith Lichtenberg 1990); R. Meadow, *Political Campaigns*, en *Public Communication Campaigns* 253–263 (R. Rice y Ch. Atkin, eds., 1989); P. Sniderman *et al.*, *Reasoning and Choice: Explorations in Political Psychology* (1991); S. L. Popkin, *The Reasoning Voter* (1991).

siempre se traducen en una victoria electoral, es indudable concluir que a mayores recursos disponibles para promulgar el mensaje político, mayores las oportunidades de influir en las percepciones de los votantes y resultar victoriosos en las contiendas electorales. Ante esa realidad, en Puerto Rico la Asamblea Legislativa limitó el gasto de los partidos políticos en los medios de difusión, estableciendo un tope en el año de elecciones. Art. 3.010 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3110. La intención fue sin duda evitar un desbalance desmedido en las campañas publicitarias de los partidos.

En el caso particular de las campañas publicitarias del Gobierno, su validez depende de que cumplan con los parámetros constitucionales de la Sec. 9 del Art. VI, Const. E.L.A., *supra*. Como correctamente concluye la opinión del Tribunal, esta decisión requiere "determinar su propósito y evaluar su contenido" para adjudicar si cumple con los preceptos constitucionales. La determinación del propósito de las campañas es decisiva, dado que la prohibición constitucional del Art. VI, Sec. 9, *supra*, está concebida a base de fines o propósitos: "Sólo se dispondrá de las propiedades y fondos públicos *para fines públicos* y para el sostenimiento y funcionamiento de las instituciones del Estado ...." Art. VI, Sec. 9, Const. E.L.A., *supra*, pág. 369.

Cuando en los anuncios gubernamentales prevalece un propósito partidista, se lesiona el principio de igualdad electoral, lo cual constituye una violación del imperativo constitucional de la Sec. 9 del Art. VI de nuestra Constitución, *supra*. *P.P.D. v. Gobernador II*, supra. Conscientes de este principio rector en nuestro ordenamiento, coincidimos con la opinión mayoritaria en que el axioma constitucional de igualdad no tolera una campaña de anuncios que, vistos en su totalidad, muestren un propósito manifiesto o subyacente de naturaleza político-partidista.

Para poder determinar su propósito es indispensable examinar el contenido de la campaña y evaluar si ésta

tiene un propósito político partidista. A tales efectos, debemos examinar, entre otros, los criterios siguientes:

1. Si la expresión contiene ataques directos a los partidos o candidatos de oposición.

2. Si vista la campaña en su totalidad, el valor informativo y el beneficio para el ciudadano es mínimo y está subordinado a la exaltación de la figura u obra del incumbente.

3. Si la expresión contiene mensajes, frases, insignias, logos, colores o figuras identificadas con el partido político en el poder.

4. Si existe un vínculo entre el plan, diseño y desarrollo de una campaña gubernamental con la campaña del partido político en el poder. Cualquier designio o plan común entre las campañas del Gobierno y las de cualquier partido resulta inadmisible en nuestro orden constitucional.

Aunque la cantidad de fondos utilizados en la campaña del Gobierno no es un elemento decisivo, sin duda es un factor a considerarse en la determinación de fin público. Dicho gasto debe ser visto en el contexto de un país como el nuestro, con fondos limitados y con muchas necesidades primordiales carentes de ayuda gubernamental.

A la luz de estos criterios, sin pretender ser exhaustivos, estimamos permisibles los anuncios informativos con avisos y notificaciones relacionados a actividades gubernamentales. En muchos de esos casos se trata de una publicación o difusión exigida por el propio ordenamiento legal.

Igualmente son aceptables en años no electorales las campañas educativas del Estado dirigidas a orientar a la ciudadanía sobre los servicios, beneficios o productos ofrecidos por el Estado o sus instrumentalidades. También son legítimos los anuncios con información de interés público o los que tienen el propósito de orientar a la ciudadanía en situaciones de emergencia o cuando exista algún peligro para la salud o la seguridad pública.

De igual manera, otro tipo de campaña en el cual existe un claro fin público es la de aquellos anuncios que buscan promover el desarrollo de los recursos naturales, el turismo, la agricultura, el comercio y la industria o los que tienen el propósito de atraer inversiones a nuestro país. Este tipo de comunicación no lesiona el axioma de igualdad electoral y redunda en beneficio directo al ciudadano.

Por otro lado, nuestros pronunciamientos no impiden que los funcionarios electos celebren conferencias de prensa, pronuncien discursos o mensajes al país, escriban columnas o artículos, o concedan entrevistas a los medios de comunicación para exponer sus posiciones particulares sobre asuntos de interés público.

Lo que sí significa es que si estos funcionarios quieren llevar a cabo campañas publicitarias para enaltecer su imagen o atacar a sus oponentes, deben sufragarlas de su propio peculio o con fondos de sus respectivos partidos políticos.

## VI

Aclarado el marco normativo aplicable a la controversia del caso de autos, procede pronunciarnos sobre los dictámenes recurridos emitidos por las distintas salas del Tribunal de Primera Instancia. A la luz del análisis vertido, concurrimos con la opinión del Tribunal en que tanto la campaña gubernamental impugnada, como la campaña municipal, representan una violación de la Sec. 9 del Art. VI de la Constitución del E.L.A., *supra*, y del axioma de igualdad electoral.

En el caso *P.P.D. v. Rosselló*, Caso Civil Núm. AP-95-7, la campaña de anuncios impugnada presentaba el contraste entre el número de tarjetas de salud repartidas por el Gobierno y el hecho de que el Alcalde Héctor Luis Acevedo no había repartido ninguna. Aunque por la naturaleza de la controversia pública entre el Municipio y el go-

bierno estatal, el Departamento de Salud podía informar al país sobre las razones por las cuales no se había extendido el programa de las tarjetas de salud a los residentes de la ciudad de San Juan —*Noriega v. Hernández Colón*, supra, voto de conformidad— el ataque directo al Alcalde Acevedo y a su gestión municipal es ilegal. No podemos ignorar que el Alcalde Acevedo es el Presidente del P.P.D., uno de los partidos de oposición del actual Gobierno y candidato a la gobernación en las próximas elecciones generales por esa colectividad. Si la intención gubernamental era puramente informativa, en nada se justifica la referencia en forma de ataque directo a la gestión del Alcalde Acevedo. A la luz de los criterios esbozados, es impermisible constitucionalmente este tipo de ataque directo, sufragado con fondos públicos, en contra de un candidato de un partido opositor.

En el caso *Max Pérez Preston v. Aponte*, Caso Civil Núm. AP-95-9, se impugnó la difusión de la campaña del Municipio de Carolina cuyo mensaje central se encapsulaba en la frase "UNA DÉCADA DE SUPERACIÓN". Este mensaje fue desplegado en propiedad del gobierno municipal mediante el uso de pegatinas y rótulos, y fue difundido en los medios de comunicación mediante anuncios publicados en periódicos. En su logo central, la campaña contenía como elemento común un número diez (10) y el color rojo. Dicha campaña hace clara referencia a los diez (10) años de incumbencia del Alcalde Aponte electo bajo la insignia del P.P.D., caracterizando su obra como una de logros y de superación.

En consonancia con nuestra discusión sobre legitimación activa, concurrimos con la opinión mayoritaria en que el demandante Pérez Preston alegó y demostró un daño real, claro y palpable, provocado por la desventaja competitiva en que le coloca la campaña del gobierno municipal. También coincidimos con la opinión del Tribunal de que esta campaña "pretende enaltecer los logros de la presente administración y de su alcalde en anticipo a las elecciones

del 1996, en las cuales éste figura como candidato a la reelección". Examinada la campaña publicitaria del Municipio en su totalidad, es evidente que el valor informativo y el beneficio para el ciudadano es mínimo. Su propósito primario es exaltar la figura y la obra del incumbente.

Finalmente, en el caso *P.P.D. v. P.N.P.*, Caso Núm. CT-95-10, la prueba claramente demostró que la campaña publicitaria de las agencias del Poder Ejecutivo con el lema unitario de "compromiso cumplido" tiene una conexión directa con la campaña simultáneamente llevada a cabo por el P.N.P. bajo el lema de "prometimos y cumplimos". Según lo demostró el testimonio del Dr. José R. Gaztambide Géigel, la campaña del Gobierno responde a un diseño unitario y tiene el propósito principal, utilizando fondos públicos para ello, de enaltecer la imagen del incumbente paralelamente con la campaña que llevaba a cabo el P.N.P. de destacar la capacidad del incumbente de cumplir con sus compromisos programáticos:

P Por favor, explíquenos cómo se relaciona, [el letrero que hay en el edificio de los cuarteles generales del P.N.P de Prometimos y Cumplimos], si se relaciona de alguna manera, [con la campaña publicitaria del gobierno], según su opinión?

R Sí, para m[í] todo político hace sus promesas, hace sus compromisos cuando está corriendo para un puesto en una campaña. Entonces en el caso de la campaña del '92 yo creo que una de las cosas que la caracterizó fue que el Dr. Rosselló hizo unos ofrecimientos muy concretos sobre unos planes muy particulares que él quería llevar a cabo. Entonces, cuando entonces hoy vemos a la misma vez que el Partido Nuevo Progresista utiliza como lema en su sede central, que es muy notable, dicho sea de paso por su localización física, al lado del expreso, de manera que cumple una función de dar, de comunicárselo a mucha gente, verdad, muchas personas, al igual que por su importancia política, establecen la conexión que ellos quieren que la gente haga, en términos de "miren, nosotros dijimos que íbamos a hacer unas cosas y nosotros las cumplimos".

Entonces yo entiendo que la campaña ésta que estamos viendo de las agencias del gobierno, lo que hacen es darle cuerpo a este lema, a este slogan de "Prometimos y cumplimos", aunque no aparece el Partido Nuevo Progresista como haciendo

la campaña, sino agencias particulares, de agencias específicas, debo decir, del Gobierno.

Para mi la conexión es clara en términos de como le dije, de el lema, en términos de los colores utilizados y en términos además de que todas tienen un carácter auto—- Bueno, no todas, casi todas, tienden a tener un carácter auto-congratulatorio, de hablar de lo bien que le fue, de las cosas que hizo esa agencia y no un carácter informativo, como en ocasiones entiendo que son los anuncios del gobierno. T.E., págs. 102–107.

La prueba presentada también demostró que los anuncios de la campaña del Gobierno contienen unos elementos comunes que hacen referencia al partido de gobierno y su candidato a la gobernación, Dr. Pedro Rosselló. Entre los que resaltan encontramos repetidamente el uso de la palma, símbolo del P.N.P.; el color azul, color que identifica a dicho partido, y el lema unificador de toda la campaña, "compromiso cumplido":

P Como experto, puede usted indicarnos a nosotros si en su opinión esos partes de prensa establece algún tipo de relación entre la obra de gobierno con la persona o grupo político que en el '92 hizo una promesa?

R Yo entiendo que sí, yo creo que establece una relación clara, muy bien hecho, dicho sea de paso. Realmente es una campaña muy sofisticada, que trata de, creo yo, llevar el crédito por la obra de gobierno a otras personas que no son necesariamente la agencia misma, sino que al hacer uso de el color azul y del compromiso cumplido, yo creo que hace referencia realmente a otros entes políticos y a otras personas, otros personajes políticos.

P Sabe usted qué ente político hace referencia entonces?

R Yo entiendo que se refiere al Partido Nuevo Progresista.

P Y a qué personas particular?

R Al Gobernador, Sr. Pedro Rosselló.

No se trata de que un anuncio en particular no pueda mostrar una palma o que de ahora en adelante no se pueda utilizar el color azul en anuncios gubernamentales. Lo que sí repudiamos es el despliegue repetido y continuo de dichos símbolos en una campaña dirigida a resaltar la imagen del incumbente y del partido que representa.

De los datos ofrecidos por Publish Records Service se

desprende que en esta campaña se gastaron millones de dólares en pocos meses. De esta manera se compró suficiente espacio en los medios pagados para saturar todo el mercado desde la radio y televisión hasta los comerciales en los cines. Esta intensidad en la difusión de los anuncios, de ordinario, rebasa los límites de una campaña informativa.

La prueba también reveló que la campaña se originó en La Fortaleza y que tenía unos elementos unitarios que indicaban que había una dirección central.

Este no es el tipo de campaña publicitaria que se despliega en función de la legítima facultad gubernamental de informar a la ciudadanía. Todo lo contrario. Esta es una campaña coherente y unificada que consiste de diferentes anuncios que destacan que el doctor Rosselló González ha cumplido con las promesas políticas. Vista en su totalidad, en la campaña predomina un propósito político-partidista que choca abiertamente con nuestro orden constitucional. Los fondos públicos no pueden ser utilizados para sufragar una campaña concertada y diseñada para adelantar la causa electoral de partido político alguno.

Por tales razones, el criterio de la mayoría es acertado al reconocer la legitimación activa del P.P.D., endosar las conclusiones del ilustrado Tribunal de Primera Instancia, dictar el *injunction* preliminar y devolver el caso al foro de instancia para la continuación de los procedimientos.

Por todo lo anterior, estamos conformes con la opinión emitida por este Tribunal.

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri.

Power tends to increase power, the power machine tends ceaselessly to extend itself .... Those who specialize in the affairs of

the whole, have a propensity to take themselves for the whole
....
 ... the State tends to ascribe to itself a peculiar common good
—its own preservation and growth— distinct both from the public order and welfare which are its immediate end, and from the common good which is its final end.

 All these are but instances of ... excess or abuse. ...the State is neither a whole nor a subject of right, or a person. It is a part of the body politic, and, as such, inferior to the body politic as a whole, subordinate to it, and at the service of its common good
....
 The people are above the State, the people are not for the State, the State is for the people.

Jacques Maritain,
*Man And The State*

I

 En cualquier sociedad verdaderamente democrática, donde el pueblo mismo es la fuente del poder público y donde el orden político está subordinado a los derechos y al bienestar general de la gente, el Gobierno está compelido a actuar siempre como servidor de la colectividad, que es su poderdante.

 En tal sistema democrático, el pueblo es el dueño de la cosa pública. Los fondos y la propiedad que manejan los gobernantes pertenecen al pueblo y sólo para el estricto beneficio del pueblo pueden utilizarse. El Gobierno administra la propiedad y los fondos públicos como una *fiducia*, de lo cual se desprende la obligación de usarlos con el mayor escrúpulo, conforme a la naturaleza y los fines de tales bienes.

 Ese deber que siempre tienen todos los que ejercen la autoridad del Estado, de utilizar los fondos públicos con la mayor pulcritud y sólo en beneficio de la gente, es particularmente apremiante en sociedades como la de Puerto Rico. Nuestro país, que dista mucho de ser afluente, cuenta con un enorme grupo poblacional que no logra conseguir empleo y que sobrevive, esencialmente, a base de la asis-

tencia económica que le provee el Estado. La honda dependencia en la beneficencia pública, de casi la mitad de la población, le impone al gobierno de la isla el urgente deber de usar los fondos públicos con especial rigurosidad para promover el desarrollo económico y prestar servicios de calidad para aquellos puertorriqueños que se han visto obligados a hacer de tal dependencia, su forma de vida. Destinar dichos fondos a menesteres de cuestionable validez constituye un agravio contra los indigentes del país.

Existe otra realidad conocida en Puerto Rico, que converge también para exigir la mayor austeridad en el uso de los fondos públicos: Los dineros que recibe el Gobierno se recaudan, en gran parte, de las contribuciones impuestas a millares de puertorriqueños que sólo reciben ingresos modestos. Una enorme porción de nuestra fuerza trabajadora consiste de empleados asalariados cuyos sueldos escasamente alcanzan para proveerles de un nivel de vida decoroso y estable. A pesar de que estos trabajadores realmente viven al filo de la pobreza, sus limitados ingresos tributan. De ese modo, las arcas gubernamentales se llenan, en parte, con estas aportaciones fiscales que constituyen un verdadero sacrificio para estos asalariados que las pagan. Por lo onerosas que resultan las contribuciones aludidas, el Gobierno está obligado a usar dichos fondos sólo para fines patentemente legítimos. El dispendio de éstos en proyectos de cuestionable utilidad pública, constituye un grave atropello contra los poderdantes que han pagado sus impuestos a costa de serias privaciones.

## II

*La limitación constitucional al uso de fondos públicos*

El preeminente deber de usar los fondos públicos sólo para fines auténticamente gubernamentales, someramente delineado en los párrafos anteriores, es parte integral de nuestro sistema de vida democrático. Su observancia, *en*

*términos generales*, depende principalmente de la integridad de los gobernantes y de la vigilancia pública y electoral continua de los gobernados. En otras palabras, dicho deber se cumple cabalmente cuando los que ocupan los cargos públicos los honran rigurosamente con su conducta de alta moralidad política o cuando la gente y los medios fiscalizan el despilfarro, y ello se toma en cuenta al momento de ponderar el reelegir a los incumbentes.

Nuestro ordenamiento constitucional, claro está, contiene un mandato de que los fondos públicos sólo pueden usarse para fines públicos; pero éste no es susceptible de aplicación estricta al grueso de las situaciones que suscitan problemas de uso imprudente de tales fondos. Al interpretar el referido mandato constitucional, ha sido necesario reconocer que ese mandato entraña un amplio ámbito de discreción legislativa y ejecutiva, por la naturaleza misma de la gestión pública. Las cambiantes condiciones sociales de la colectividad, la creciente complejidad de sus problemas y los avances científicos y tecnológicos hacen necesario otorgarle flexibilidad a los funcionarios gubernamentales en el desempeño de sus responsabilidades y, consecuentemente, en su administración de los bienes públicos. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *P.R. Telephone Co. v. Tribl. Contribuciones*, 81 D.P.R. 982 (1960). La discreción y la flexibilidad que le hemos reconocido a las ramas políticas del Gobierno, en cuanto al uso de los fondos públicos, apareja inevitablemente intersticios de derroche que *de ordinario* no pueden conjurarse judicialmente. En tales casos, ausente la voluntad de los gobernantes de no malgastar los dineros del pueblo, le toca principalmente a este último la tarea de reprobar esa falta de moral pública. La intervención de los tribunales procede sólo en casos de claro abuso de discreción gubernamental.

## III

*El principio de igualdad política*

Existen otras normas constitucionales que también inciden sobre el asunto de los desembolsos públicos. Se trata de normas especiales, relativas a fundamentales valores constitucionales, que acarrean severas limitaciones en cuanto a determinados usos del dinero del pueblo. El Gobierno, por ejemplo, no puede usar fondos públicos de modo alguno para fines sectarios. *Lemon v. Kurtzman*, 403 U.S. 602 (1971). También está estrictamente prohibido destinar fondos públicos para el sostén de instituciones educativas privadas. *Asoc. Maestros P.R. v. Srio. Educación*, 137 D.P.R. 528 (1994).

Una de estas normas, de singular pertinencia al asunto que nos concierne en los casos de autos, es la que consagra la esencial igualdad económica de los partidos políticos en cuanto a la divulgación de sus ideas y posturas en el país se refiere. *P.P.D. v. Gobernador II*, 136 D.P.R. 916 (1994); *Marrero v. Mun. de Morovis*, 115 D.P.R. 643 (1984); *P.S.P. v. Srio. de Hacienda*, 110 D.P.R. 313 (1980).

El referido principio de igualdad política constituye una fuente de derecho más accesible y más precisa, respecto del asunto que nos concierne aquí, que la del mandato que requiere que los fondos públicos se destinen sólo a fines públicos. Conforme dicho principio, el partido que ostenta el poder de gobernar al pueblo en un momento dado no puede utilizar fondos públicos para promover sus posturas políticas. El Estado y sus instrumentalidades están compelidos a mantenerse neutrales en el debate público político-partidista, por lo que no es permisible la ventaja indebida, que supondría para el partido que está en el Gobierno usar fondos públicos para divulgar sus ideas y mensajes. No puede haber, en una palabra, propaganda política gubernamental.

Por la naturaleza misma del principio constitucional en

cuestión, están vedados todos los dispendios públicos que tiendan o estén destinados a mantener al partido de gobierno ostentando el poder o a ayudarlo a prevalecer en el debate público. Cualquier ventaja que tenga el partido de gobierno, mediante la utilización de los fondos de la colectividad, constituye una *desigualdad*, por lo que está proscrita. No hay espacio aquí para distinciones de grado. Si el desembolso de fondos que pertenecen a todo el pueblo adelanta, de cualquier manera, los intereses del sector político en el poder, ello constituye una ventaja sobre los otros sectores políticos, sea ésta grande o pequeña. Lo ilícito de tal ventaja no depende de su dimensión, sino de su ínsita inequidad. Todas están prohibidas, porque todas, inherentemente, aparejan la desigualdad.

Tampoco importa la época en que ocurre la ventaja. Es de conocimiento general que la contienda política acontece incesantemente en Puerto Rico. No existe partido alguno en el país que limite su proselitismo sólo al año de elecciones; ni aspirante o incumbente que no aproveche cualquier ocasión para promover su eventual candidatura. Como en nuestra realidad, la campaña eleccionaria se desarrolla todo el tiempo; el principio de igualdad económica aplica también en todo momento.

Por razón de lo anterior, pues, cualquier desembolso de fondos públicos que tienda a aventajar al partido en el poder, debe considerarse constitucionalmente sospechoso y sujeto al más estricto escrutinio judicial. Deben aplicarse aquí las normas relativas a acciones gubernamentales que, por trato desigual, menoscaban algún derecho fundamental.

# IV

*Límites a los anuncios gubernamentales*

Para darle plena vigencia al principio constitucional de igualdad política, reseñado antes, es necesario restringir rigurosamente los anuncios gubernamentales. No basta con prohibir sólo los que son de corte *patentemente* político. Es necesario formular criterios más asépticos. Ello no sólo porque cualquier anuncio gubernamental que represente alguna ventaja política para el partido en el poder socava el principio de igualdad inmerso en nuestra Constitución, sino porque, además, para promover la requerida neutralidad gubernamental en el proceso decisional puertorriqueño, es menester evitar la seductora tentación que tienen los gobernantes de turno, ordinariamente, de manipular anuncios legítimos para obtener una ventaja política. El problema que se plantea en los casos de autos es precisamente el de anuncios políticos que se disfrazan como auténtica comunicación gubernamental. Se trata de un problema que no se puede resolver adecuadamente si no se extirpa de raíz la posibilidad misma de aprovechar políticamente el anuncio oficial. A ningún funcionario público más o menos avezado se le ocurriría usar los fondos gubernamentales para pagar anuncios crudamente políticos. Ello sería evidentemente ilegal e incluso delictivo. Lo que se hace, más bien, es aprovechar la *zona gris* de los anuncios de cariz gubernamental para insertar solapados contenidos políticos. Para conjurar esa taimada práctica —ante nos ahora— cuyo uso se ha acrecentado en los últimos años, es menester reducir tajantemente el espacio que da margen a la manipulación en los anuncios gubernamentales. Es menester limitar la facultad del Gobierno de comprar anuncios sólo a un reducido número de instancias.

A tales fines, sólo deben permitirse los anuncios guber-

namentales cuyos contenidos y diseño estén estrictamente limitados a dar información, del tipo que las personas de la comunidad necesitan para atender concretamente los asuntos públicos. Los permisibles serían anuncios tales como los que:

(1) proveen información sobre deberes particulares que tienen los miembros de la comunidad y el modo de cumplirlos;

(2) proveen información sobre derechos y opciones específicos que tienen los miembros de la comunidad y los medios para ejercerlos;

(3) proveen información sobre oportunidades y programas de servicios gubernamentales que pueden beneficiar a las personas de la comunidad y las maneras de aprovecharse de éstos, y/o

(4) proveen información sobre actividades públicas que las personas de la comunidad pueden disfrutar y los datos sobre dónde y cuándo se celebran.

Los anuncios en cuestión deben ser de *naturaleza impersonal* y no pueden tener contenidos o diseños que no sean los estrictamente necesarios para divulgar la información concreta y específica que va a comunicarse. Quedarían excluidos, por ejemplo, los *retratos* de los jefes de las agencias o instrumentalidades que publican el anuncio. Quedarían excluidos, claro está, anuncios como los que están en cuestión en todos los casos de autos.

En particular, quedarían excluidos también los anuncios sobre los logros y las promesas electorales cumplidas. Tales anuncios "oficiales" son insidiosamente políticos y, además, son realmente innecesarios. Nadie puede decir cándidamente que en Puerto Rico los incumbentes en cargos gubernamentales no tienen amplios y numerosos medios y ocasiones para divulgar sus logros si no es mediante el uso de anuncios oficiales. Los incumbentes tienen incontables oportunidades para dar a conocer sus logros particulares. Lo hacen en actos oficiales; lo hacen en las

innumerables actividades sociales, cívicas y profesionales a que se les invita; lo hacen rutinariamente a través de comunicados de prensa y en entrevistas radiales y de televisión. Los incumbentes, precisamente porque lo son, tienen ventajas naturales en la comunicación social masiva y gratuita, que sus adversarios y contrincantes no tienen. Incluso, tienen ventajas a la hora de levantar fondos para sus campañas políticas, las cuales pueden desarrollar, efectivamente, para comunicar sus logros mediante anuncios políticos pagados. En la vida pública puertorriqueña no existe problema alguno de limitaciones a los incumbentes en la divulgación de sus logros. Por el contrario, el problema es más bien la saturación y el continuo bombardeo que experimenta la comunidad de propaganda sobre los incumbentes. A esos excesos, tolerables en una democracia, no es necesario añadir los abusos de la propaganda oficial que la desmerecen.

## V

*La opinión de la mayoría y los casos de autos*

Evidentemente, la conceptualización normativa del asunto ante nos —que de modo esquemático he formulado en los párrafos anteriores— coincide, en lo principal, con los pronunciamientos detallados en la opinión del Tribunal. En general, además, estoy de acuerdo con las órdenes principales emitidas por la mayoría. Por ello, y en vista de que los casos ante nos presentan en común un importantísimo problema de la colectividad que amerita resolverse urgentemente, para colegiar, he emitido un voto de conformidad. Me pareció necesario, sin embargo, expresar unos criterios adicionales, formulados en esta opinión particular, para hacer hincapié en lo rigurosas que son las limitaciones sobre anuncios oficiales que surgen del principio de igualdad inmerso en nuestra Constitución. He formulado estos criterios adicionales confiado en que, con

ellos, en alguna oportunidad futura, de mayor serenidad, podamos fortalecer aún más la democracia puertorriqueña.

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Rebollo López.

Dados los hechos, *particulares y específicos*, de los casos ante nuestra consideración —y salvada, a nuestro juicio, la cuestión de la "legitimación activa" (*standing*) de los demandantes para radicar los distintos pleitos—([1]) estamos contestes en que las campañas publicitarias impugnadas por los distintos demandantes resultan violatorias de las disposiciones de la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, por lo que procede la expedición de un *injunction preliminar* prohibiendo las referidas campañas publicitarias.

Dicha determinación, realmente, *no* debería de sorprender a persona alguna. En *primer* lugar, la *controversia planteada* en los casos —no obstante el "cacareo" de las partes— *es una sencilla y específica*, a saber: si las campañas publicitarias de parte del gobierno central y de un municipio de nuestro País, impugnadas por los distintos demandantes en los diferentes pleitos, contienen o no propaganda de caracter político-partidista. En *segundo* lugar, y dado el mensaje, o propaganda, de tipo político-partidista *obviamente inmerso* en los anuncios impugnados en los tres (3) casos, *la conclusión no puede ser otra* en vista de las disposiciones de la Sec. 9 del Art. VI de la

---

([1]) Somos del criterio que, *a los fines de la expedición de un "injunction" preliminar*, la prueba que sobre "daño" presentaron a nivel de instancia las diferentes partes demandantes *satisface* el requisito de "daños" o "daños irreparables", que requiere nuestra jurisprudencia tanto en relación con el criterio de "legitimación activa" (*standing*) como para la expedición de un *injunction* preliminar. *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992); *P.R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200 (1975); *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903 (1975).

Constitución del Estado Libre Asociado, ante. Ello, como veremos más adelante, *independientemente del deber que tiene el Gobierno de informar a la ciudadanía en cumplimiento del derecho de ésta a estar bien informada, e independientemente de que dichos anuncios hayan sido publicados en un año no eleccionario.*

La mayoría de los integrantes del Tribunal —erróneamente, a nuestro juicio— ha querido ir, y ha ido, *mucho más lejos.* Esto es, *no* se ha conformado con *limitarse* a resolver la "cuestión específica" planteada en los casos. Haciendo uso del "mollero judicial" que recientemente ha descubierto que posee, y al que ya nos tiene acostumbrado, la Mayoría extiende —por *fíat judicial*— la "veda" contenida en el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, a años *no* eleccionarios; *estableciendo una norma que constituye una innecesaria e impermisible censura o mordaza* que limita o afecta seriamente el *deber* del Gobierno de mantener informada a la ciudadanía en cumplimiento del *derecho* de ésta a estar bien informada, expidiendo el Tribunal un *injunction* que prohíbe, prácticamente, *toda* campaña publicitaria de parte del Gobierno y los municipios.

*Por otro lado*, la errónea *norma* hoy implantada por la Mayoría *carece* totalmente de *guías objetivas adecuadas* que el gobierno central y los municipios, puedan entender y aplicar en el futuro con el propósito de poder acatar y cumplir con ella. Esta situación desembocará, en los años venideros, en la radicación de *múltiples pleitos*, por los partidos de oposición, contra el partido político de turno —cualesquiera que éstos sean— en donde los primeros, posiblemente, impugnarán *todos y cada uno* de los anuncios que las agencias gubernamentales y los municipios publiquen, inundándose así al foro judicial, único posible árbitro en esta controversia, con pleitos tanto meritorios como frívolos. Ello, desafortunadamente, *causará un caos político y judicial en nuestro País.*

Ahí las razones, en síntesis, por las cuales nos vemos *impedidos* de poder endosar la Opinión mayoritaria. *Esta situación, por otro lado, nos obliga a expresarnos por separado.*

I

El Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico establece, en lo pertinente, que:

> *Nosotros el pueblo de Puerto Rico*, a fin de organizarnos políticamente sobre una base plenamente democrática, promover el bienestar general y asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos, puesta nuestra confianza en Dios Todopoderoso, *ordenamos y establecemos esta Constitución para el Estado Libre Asociado que en el ejercicio de nuestro derecho natural ahora creamos dentro de nuestra unión con los Estados Unidos de América.* (Énfasis suplido.)

Dicho de la manera más sencilla posible, *todo nuestro esquema constitucional parte de la premisa de que el pueblo es el soberano.* Como tal, cada cuatro (4) años en las elecciones generales, el pueblo *expresa su voluntad* eligiendo, o reeligiendo, al primer ejecutivo del País y a los miembros de la Asamblea Legislativa, confiriéndole a éstos un *mandato general* de gobernar nuestra tierra *conforme* a los planes y programas que los partidos políticos, a los que éstos pertenecen, le presentaron durante la campaña eleccionaria.

Ese *derecho al sufragio*, universal, igual, directo, secreto y libre de toda coacción, *garantizado por la Sec. 2 del Art. II de nuestra Carta de Derechos*, Const. E.L.A., L.P.R.A., Tomo 1, constituye, a todos los fines prácticos, la *única herramienta* que tiene ese pueblo soberano para ejercer su *poder de fiscalización* sobre el Gobierno y sus funcionarios; constituyendo el ejercicio de dicho derecho, repetimos, la única manera de canalizar el sentir, y el mandato, de la ciudadanía para alcanzar el *norte y objetivo* de todos, cual es, el *bienestar general* de la comunidad.

Ahora bien, ese derecho al sufragio del soberano *perde-ría toda su razón de ser* si el mismo es ejercitado por una *ciudadanía mal informada e ignorante* de lo que sucede en nuestro País y, en particular y en lo pertinente, *ignorante* de las gestiones y obras realizadas por los funcionarios que eligió. *Esto es, el pueblo tiene el derecho a saber si los funcionarios que eligió cumplieron, o no, con su mandato.*

· Ese *derecho a estar bien informado,* en consecuencia, es uno *consustancial* al derecho constitucional del ciudadano al sufragio. *El uno no puede existir sin el otro.* En palabras del compañero Juez Asociado Señor Negrón García,[2] "es preciso que el *derecho al sufragio* se ejerza conforme al uso más elevado de las facultades individuales de cada ciudadano. *Una democracia no puede apuntalarse en un ejercicio irresponsable, inconsciente o ignorante,* sino sobre los fundamentos más esmerados de la razón, inteligencia y voluntad". (Énfasis suplido.)

Por otro lado, y como consecuencia lógica e inescapable del *derecho de la ciudadanía* a estar bien informada, surge el *deber del Gobierno de informar al pueblo* de las gestiones y obras realizadas en cumplimiento, *precisamente,* del mandato que le fuera concedido por ella. Como certeramente expresara el compañero Juez Asociado Señor Hernández Denton, hace escasamente unos años,[3] el Gobierno "tiene la *facultad y el deber de informar* sobre las *medidas que ha tomado y los planes concebidos* para atender los problemas del país. ... [E]n asuntos públicos, *en la democracia resulta más saludable el deber de informar que la obligación de callar".* (Énfasis suplido.)

*Y es que ello no puede ser de otra manera.*

Si es que se pretende que cada uno de los ciudadanos de este País ejerza, cada cuatro (4) años, su derecho al voto *de*

---

[2] *Granados v. Rodríguez Estrada I,* 124 D.P.R. 1, 284 (1989), opinión disidente del Juez Asociado Señor Negrón García.

[3] *Noriega v. Hernández Colón,* 126 D.P.R. 42 (1990), opinión concurrente del Juez Asociado Señor Hernández Denton.

*la manera más informada e inteligente posible* cuando esté presto a elegir, o reelegir, a los funcionarios que van a tener en sus manos el destino y bienestar de todos por los próximos cuatro (4) años, *cada uno de esos ciudadanos —repetimos— tiene el derecho a estar bien informado sobre el hecho de si los que solicitan ser reelectos cumplieron, o no, con el mandato que les fue confiado por el pueblo.* Ello, precisamente, se logra permitiendo que la administración de gobierno en el poder informe al pueblo —*en forma no partidista*— sobre las medidas que ha tomado para lidiar con los problemas que aquejan a la ciudadanía, los logros y metas alcanzados, y los planes para el futuro.

De ello no permitirse, podría darse la *situación desgraciada* de que no reeligiéramos a unos funcionarios que han trabajado y cumplido bien con el mandato del pueblo y, por el contrario y en su lugar, elijamos a unos incompetentes que van a deshacer, y echar a perder, todo lo bien hecho, *o, peor aún,* que reelijamos a unos incompetentes y corruptos que no han realizado labor alguna en beneficio de la ciudadanía y rechacemos, y no le brindemos la oportunidad, a unos que podrían realizar una labor de excelencia en el Gobierno.

## II

Ahora bien, ese *deber del Gobierno* de informar al pueblo sobre las medidas que ha tomado, de los planes que ha trazado y los logros alcanzados, *está necesariamente limitado por, o tiene que ser realizado dentro de, los parámetros que establece la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado,* ante, ed. 1982, pág. 369, la cual establece que:

Sólo se dispondrá *de las propiedades y fondos públicos para fines públicos* y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley. (Énfasis suplido.)

Lo que constituye un "fin público" ha sido objeto de controversia ante los tribunales. Este Tribunal ha aplicado dicho concepto en *forma pragmática*; posición que encuentra apoyo en la *deferencia y prudencia* que el foro judicial está *obligado* a ejercer respecto a las determinaciones del foro legislativo referente a las asignaciones de fondos destinados a la consecución de fines públicos.

En un caso, *previo a la vigencia de nuestra Constitución*, interpretamos el alcance del concepto de "fin público" expresando que:

> La Legislatura tiene amplia discreción para determinar qué es lo que constituye un fin público y para tomar aquellas medidas que a su juicio promuevan el bienestar de la comunidad. No es función de los tribunales la de expresar opinión sobre la sabiduría o conveniencia de la mediada legislativa. Si ésta contiene elementos de beneficio público y el propósito que se trata de realizar es de carácter público, la cuestión en cuanto al beneficio que haya de recibir el público debe ser resuelta por la legislatura y no por los tribunales. *McCormick v. Marrero, Juez*, 64 D.P.R. 260, 267 (1944).

Posteriormente expresamos, en *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 598–599 (1978), que el debate habido en la Asamblea Constituyente, contrario a reducir la función revisora de los tribunales, concedió *amplias facultades* de interpretación de la mencionada disposición, aún más amplias que las simplemente derivables de nuestro sistema de separación de poderes.

En *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 611–612 (1988), sin embargo, *limitamos* estas expresiones y, a tales efectos, determinamos que: "los tribunales *debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del sistema constitucional y aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos.* ... Cuando los tribunales determinen entrar a fondo en la consideración de un fin público ya estimado por los otros poderes, deben reconocer que dicho concepto tiene que ceñirse a las cambiantes con-

diciones sociales de una comunidad específica y los problemas peculiares que éstas crean *y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad democrática altamente compleja.*" (Énfasis suplido.)

Ante este marco conceptual, bajo el cual el Poder Judicial le otorga deferencia al Poder Legislativo para que sea éste, en primer término, el que determine lo que constituye un "fin público", la Asamblea Legislativa de Puerto Rico, *por primera vez en Puerto Rico y en un acto de genuina y honesta preocupación por el bienestar de nuestro País*, aprobó en el año 1974 la llamada "veda electoral" sobre gastos de difusión pública del Gobierno, la cual hoy encontramos establecida en el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*,([4]) el cual establece que:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública *con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes.* Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.
>
> Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuáles sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. (Énfasis suplido.)

Esto es, y dicho de la manera más sencilla posible, los representantes directamente electos por el pueblo han entendido desde 1974 —y, actualmente, todavía entienden— *de forma unánime* que: el principio de igualdad electoral,

---

([4]) En 1974, por primera vez, bajo la administración del Partido Popular Democrático, la cual dominaba tanto la Rama Ejecutiva como la Legislativa, se aprobó la Ley Núm. 1 de 13 de febrero de 1974, conocida como el "Código Electoral de Puerto Rico", donde se prohibió mediante el Art. 3.014 (16 L.P.R.A. sec. 3108f) el uso de fondos públicos *exclusivamente en años de elecciones a las agencias del Gobierno* con el propósito de exponer sus programas, proyectos, logros, realizaciones, etc.

inmerso en nuestra Constitución,(5) entre los partidos políticos queda *amplia y plenamente* protegido prohibiéndole a la administración de gobierno en el poder el gastar fondos públicos, *durante el año en que se celebren las elecciones generales*, "con el propósito de exponen sus programas, proyectos, logros, realizaciones, proyecciones o planes".

Así lo hemos reconocido al resolver que el citado Art. 8.001 plenamente "salvaguarda el concepto de igualdad económica con relación a la distribución de fondos públicos, evitando de ésta manera que el partido que se encuentre en el poder utilice [durante año eleccionario] fondos públicos para promover su plataforma política, adquiriendo de ésta forma una desventaja indebida sobre los partidos de minorías durante años eleccionarios". Véase *P.P.D. v. Gobernador II*, 136 D.P.R. 916, 926 (1994).(6)

Resulta, *en consecuencia*, mandatoria la conclusión de que la Asamblea Legislativa de Puerto Rico, al prohibir lo anterior *únicamente* en años de elecciones generales, *claramente estableció la política pública de que el hacerlo, durante los años no eleccionarios, resulta ser perfectamente legítimo y razonable por cuanto ello constituye un fin público; determinación legislativa que merece nuestra deferencia.*

Los anuncios así publicados por el Gobierno en cumplimiento de su deber de mantener debidamente informado al pueblo, durante años *no* eleccionarios, *no* podrán ser utilizados, *naturalmente*, por la administración de gobierno en el poder con fines político-partidistas mediante la inserción, en los mismos, de logos, insignias, colores, frases, que

---

(5) En *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 646 (1984), este Tribunal señaló que, actualmente, "en materia electoral no se cuestiona seriamente el postulado de igualdad inmerso en nuestra Constitución".

(6) En *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 398 (1984), señalamos que la Legislatura, al aprobar el Art. 8.001 (16 L.P.R.A. sec. 3351), "consintió expresa y explícitamente a ser fiscalizada por la Comisión Estatal de Elecciones —y, en última instancia, por los tribunales— en cuanto a la utilización de fondos públicos durante año de elecciones generales en lo referente a la difusión de sus programas, proyectos, logros, realizaciones, proyecciones o planes". (Énfasis suprimido.)

obviamente conllevan un mensaje o propaganda político-partidista o para atacar a los contrarios políticos. Ello está, *total y continuamente*, prohibido por las disposiciones de la antes citada Sec. 9 del Art. VI de la Constitución del E.L.A.

Aceptamos que se puede argumentar que un anuncio de Gobierno en años *no* eleccionarios, mediante el cual se le informa a la ciudadanía de sus planes, proyecciones o logros —*lo cual, a nuestro juicio, es perfectamente legítimo*— siempre tiende a favorecer al gobierno de turno que lo publica, aun cuando el referido anuncio esté totalmente libre de toda propaganda político-partidista.

Dicha situación, sin embargo, *no* tiene la consecuencia de hacer de dicho anuncio uno ilegal o improcedente bajo las disposiciones de la antes citada Sec. 9 del Art. VI de nuestra Constitución. *Así ello es unánimemente reconocido.* De hecho, la propia opinión mayoritaria cita, *con aprobación*, opiniones del Secretario de Justicia a esos efectos. Véase, en adición, a esos mismos efectos, *P.R. Telephone Co. v. Tribl. Contribuciones*, 81 D.P.R. 982, 1006 (1960).

## III

Los casos de epígrafe presentan una problemática en común, cual es, la alegación de las distintas partes demandantes de que, tanto el Estado como el Municipio de Carolina, han utilizado fondos públicos en violación de las disposiciones de la antes transcrita Sec. 9 del Art. VI de la Constitución del E.L.A., ante, mediante la publicación de anuncios que constituyen clara propaganda político-partidista.(7)

---

(7) En *P.P.D. v. Rosselló,* Caso Civil Núm. AP-95-7, el anuncio que se estaba impugnando era el de la tarjeta de salud, en el que se cuestionaba sobre cuántas tarjetas de salud había distribuido el Alcalde de San Juan, Hon. Héctor Luis Acevedo, en comparación con las tarjetas distribuidas por el Gobierno de Puerto Rico en la Isla. Dicho anuncio fue pautado y pagado por el Departamento de Salud de Puerto Rico.

En *Pérez Preston v. Aponte,* Caso Civil Núm. AP-95-9, se impugnó la campaña llevada a cabo por el Municipio de Carolina bajo la frase de 'UNA DECADA DE

La mayoría de los integrantes del Tribunal —en una forma y manera posiblemente nunca antes vista[8]— concluyen que todos los anuncios impugnados adolecen del mismo defecto; esto es, contienen propaganda política, consistente la misma en logos, insignias, colores, frases o ataques a contrincantes políticos, lo cual hace ilegal dichos anuncios. *No tenemos problema alguno con esa determinación.* Es por ello que *concurrimos* con el *resultado*; esto es, con la expedición del *injunction* preliminar.

Nuestra *vehemente objeción* va dirigida, o se refiere, a otro aspecto de la opinión mayoritaria. Somos del criterio que una lectura, juiciosa, objetiva y desapasionada de la misma —y, en específico, de algunos de los "votos de conformidad" y concurrencia— *demuestra que una mayoría de los integrantes del Tribunal entiende y sostiene que,* aun en años *no* eleccionarios y aun cuando los anuncios publicados por el Gobierno o los municipios no contengan *slogans,* símbolos, emblemas, etc., de índole político—partidista, *el anuncio no puede ser publicado y/o no resulta procedente el mismo a menos que éste cumpla con unos criterios que la Mayoría "se ha sacado de la manga" y los cuales son claramente subjetivos*;[9] razón por la cual resultará sumamente difícil, por no decir imposible, que el gobierno central y los

SUPERACIÓN' y los logos alusivos a la misma; se alegó que dicha campaña es alusiva al período en el cual el demandado se ha desempeñado como Alcalde de Carolina, siendo la misma una político—partidista sufragada por fondos municipales.

En *P.P.D. v. P.N.P.,* Caso Civil Núm. CT-95-10, se impugnó una serie de anuncios publicados y difundidos por varias agencias gubernamentales, alegándose que los mismos constituían una campaña concertada y en común acuerdo con el Partido Nuevo Progresista con el fin de realzar la imagen y la administración del Gobernador, Hon. Pedro Rosselló González.

[8] Una lectura cuidadosa de las opiniones "de conformidad" suscritas por los Jueces Asociados que endosan la opinión mayoritaria —Señores Hernández Denton y Fuster Berlingeri— *demuestra que todos y cada uno de ellos entienden y sostienen una cosa distinta.* Esto es, suscriben la misma por fundamentos diferentes, razón por la cual la Opinión mayoritaria realmente *no* cuenta con el apoyo, y voto de conformidad, de cuatro (4) Jueces como es exigido.

[9] Dichos criterios, conforme el Tribunal, son:

"1. Redunda en beneficio de la salud, la seguridad, la moral y el bienestar general de todos los ciudadanos.

"2. Está destinado a una actividad de carácter público o semipúblico.

municipios puedan saber, de antemano, si sus anuncios cumplen, o no, con los referidos criterios. Ello tendrá la consecuencia, como expresáramos al principio de la ponencia, de inundar al foro judicial —único posible árbitro de esta controversia([10])— con pleitos en los cuales se cuestionará la procedencia, o no, de cada uno de dichos anuncios.

Estamos conformes, *repetimos*, con que, durante año de elecciones y por *disposición expresa* de la Ley Electoral de Puerto Rico, el Gobierno o los municipios *no* pueden publicar anuncios "con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes". *En adición*, endosamos totalmente la posición de que la Constitución *expresamente prohíbe* —mediante las disposiciones de la citada Sec. 9 del Art. VI— que el Gobierno o los municipios, *durante cualquier año*, publiquen anuncios que contengan logos, emblemas, insignias, frases, etc., de corte político-partidista, *utilizando para ello fondos públicos.*

Con lo que *no* podemos estar de acuerdo, *nunca*, es con la posición de que el Gobierno o los municipios están impedidos de publicar anuncios, *en años no eleccionarios*, con el propósito de *informar* a la ciudadanía sobre sus planes, proyecciones o logros aun cuando los mismos carezcan totalmente de la propaganda político-partidista antes mencionada.

---

"3. Promueve los intereses y objetivos de la entidad gubernamental, en consonancia con sus deberes y funciones o la política pública establecida.

"4. Promueve programas, servicios, oportunidades y derechos, o adelanta causas sociales, cívicas, culturales, económicas o deportivas.

"5. Promueve el establecimiento, modificación o cambio de una política gubernamental." Opinión mayoritaria, pág. 691.

([10]) Como es sabido, bajo el Art. 8.001 de la Ley Electoral de Puerto Rico, ante, el cual establece la "veda" sobre anuncios en año eleccionario, se crea la posición de "oficial examinador", que opera dentro de la Comisión Estatal de Elecciones, y quien es, en primera instancia, quien resuelve sobre la procedencia, o no, de un anuncio del Gobierno durante año eleccionario.

Al extender la mayoría de los integrantes del Tribunal, por *fiat judicial*, la referida "veda" a años no eleccionarios, *obligatoriamente* tendrán que ser los tribunales los llamados a decidir, *caso a caso y anuncio por anuncio*, la procedencia de los mismos.

Se ha reconocido que el Gobierno tiene el deber y la facultad de informar al pueblo sobre la marcha de la cosa pública. Esta facultad le permite informar, explicar y persuadir al pueblo; *aspectos cruciales de toda sociedad democrática.* Véase Emerson, *The System of Freedom of Expresion*, Ed. Vintage, 1970, pág. 698. *Este deber gubernamental está íntimamente unido al derecho a la libre expresión.* Como hemos señalado en varias ocasiones, "existe una *estrecha correspondencia* entre el derecho a la libre expresión y la libertad de información. La premisa es sencilla. *Sin conocimiento de hechos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada cuatro (4) años".* (Énfasis suplido.) *Soto v. Srio. de Justicia,* 112 D.P.R. 477, 485 (1982). Véase, en adición: *Santiago v. Bobb y El Mundo, Inc.,* 117 D.P.R. 153, 159 (1986).

Es debido a ello que, realmente, *no* alcanzamos a comprender cómo alguien, "con cara seria", puede sostener que la presente administración de gobierno no tiene *el deber de informarle a la ciudadanía* sobre la implantación de un sistema de salud, mediante el uso de una tarjeta, *a la cual, inclusive, el ciudadano tiene que solicitar y suscribirse.* En relación con esta situación en particular, somos del criterio que los anuncios pueden ser publicados, *inclusive,* en el año de veda electoral. *Tampoco* podemos entender cómo se puede argumentar que la presente administración de gobierno no puede informarle a la ciudadanía de la implantación del plan de "escuelas de la comunidad", el cual representa un *cambio sustancial* en el sistema de instrucción pública del País.

Decimos, con tristeza, lo anterior *por cuanto resulta innegable e indiscutible que ambos programas constituyen claramente política pública de la actual administración de gobierno.* ¿Cómo es posible, entonces, que este Tribunal pueda resolver que la actual administración no puede ha-

cer promoción respecto a la implantación de los programas referentes al concepto de la "escuela de la comunidad" y al de la "tarjeta de salud"? *Esto es*, ¿acaso no tiene el pueblo el *derecho* a saber qué está haciendo el Gobierno y hacia dónde éste pretende llevarlo en el futuro? *Prohibirlo resulta un absurdo jurídico y un claro e impermisible acto de censura o mordaza judicial a la Rama Ejecutiva de nuestro Gobierno.*

Ahora bien, y no obstante lo antes expresado, a lo que *no* tiene derecho la actual administración de gobierno *ni* el Municipio de Carolina —como *tampoco* ninguna otra administración *ni* ningún otro municipio— es a hacer propaganda político-partidista, a través de dichos anuncios y con fondos públicos, mediante el uso de frases, *slogans*, símbolos, emblemas, etc., de corte político-partidista.

En los casos hoy ante nuestra consideración, tanto el gobierno central como el Municipio de Carolina *efectivamente* incurrieron, a través de los anuncios publicados, en actos de propaganda de índole político-partidista al utilizar insignias, frases, etc., lo cual resulta *ilegal* a la luz de las disposiciones de la antes citada Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado. Entendemos procedente, *en consecuencia*, la expedición a esos efectos de un *injunction preliminar* tanto contra el Estado como contra el Municipio de Carolina.[11]

Es por ello, *y únicamente por ello*, que coincidimos con la determinación de la Mayoría de que procede decretar la paralización —a nuestro juicio, de manera preliminar y, *exclusivamente*, por razón de contener las mismas logos, insignias, frases, etc., de corte político-partidista— de las

---

[11] *No* tenemos duda alguna sobre el hecho de que atendidos los términos de nuestra Resolución de 1ro de diciembre de 1995, el *injunction* preliminar que dictó el juez de instancia, Hon. Arnaldo López, en el Caso Civil Núm. CT-95-10, fue uno emitido *sin* autoridad alguna para ello o en forma *ultra vires*.

Ello no obstante, *y en vista de la determinación y conclusión a la que llegamos*, somos del criterio que dicho asunto *no* amerita ulterior consideración *ni* acción.

campañas publicitarias impugnadas en los tres casos ante nuestra consideración; *disentimos* de todo lo demás.

— o —

Opinión concurrente y disidente del Juez Asociado Señor Corrada Del Río.

Los tres (3) casos de epígrafe plantean cuestiones similares sobre el uso de fondos públicos por agencias del Gobierno de Puerto Rico para la compra de anuncios con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes; y si tales anuncios están comprendidos dentro de la facultad y el deber de un gobierno de informar a la ciudadanía o si éstos constituyen propaganda político-partidista. En el caso del Municipio de Carolina se trata del uso de fondos públicos para promover una campaña sobre diez (10) años de alegada superación en dicho Municipio.

Es necesario que examinemos la normativa establecida por este Tribunal sobre "legitimación activa", "academicidad" y "cuestión política", y su aplicación a los hechos de estos casos. Debemos, a su vez, examinar la aplicación a estos casos de la Sec. 9 del Art. VI de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, que exige el uso de fondos públicos para un "fin público"; la Sec. 2 del Art. II de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, que establece que las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral, y la Sec. 4 del Art. VI de la Constitución de Puerto Rico, *supra*, que ordena que se dispondrá por ley todo lo concerniente al proceso electoral, así como lo relativo a los partidos políticos y las candidaturas.

I

A pesar de que nuestra resolución de 1ro de diciembre de 1995 expresa claramente que la consolidación de los casos aquí en controversia se haría con el "único propósito de la vista oral", la mayoría de este Tribunal ha resuelto en forma conjunta las controversias planteadas en dichos casos, lo que nos obliga a discutir los hechos relevantes de cada uno en forma separada.

## A. *P.P.D. v. Rosselló, Caso Civil Núm. AP-95-7*

En este caso, el Partido Popular Democrático presentó una demanda el 20 de abril de 1995 sobre entredicho provisional y permanente contra el Gobernador de Puerto Rico, Hon. Pedro Rosselló González;[1] la Secretaria de Salud, Hon. Carmen Feliciano de Melecio, y el Departamento de Salud del Estado Libre Asociado de Puerto Rico.

En el presente caso surge de los autos que los anuncios publicados por el Departamento de Salud se produjeron luego que el Alcalde de San Juan, Hon. Héctor Luis Acevedo, los días 10 y 12 de marzo de 1995, hiciera publicar unos anuncios *pagados con fondos públicos* del Municipio de San Juan, es decir, un mes antes de ser publicados los del Departamento de Salud estatal, y en los cuales el Municipio de San Juan hace, entre otras, las aseveraciones siguientes:

"POR QUE SAN JUAN NECESITA *SU PROPIO* SEGURO MEDICO"
"Porque los ciudadanos de San Juan se merecen tener *más y mejores servicios de salud.* Merecen un seguro médico *con una cubierta mayor* y que responda a sus necesidades particulares."

---

[1] En la vista oral celebrada el pasado 8 de diciembre, y a consecuencia de varias preguntas realizadas por la Juez Asociada Señora Naveira de Rodón, la parte demandante —Partido Popular Democrático— accedió a que en el presente caso procedía la desestimación de la demanda en contra del Gobernador de Puerto Rico, Hon. Pedro Rosselló González, ya que no se incluyeron alegaciones en su contra que justificaran la concesión de un remedio.

*El gobierno de Puerto Rico* se *ha negado* a implantar *su plan de salud* en San Juan en las mismas condiciones que lo ha hecho en otros municipios."

... especialistas en administración de salud, formularon el nuevo modelo de salud MAS que ofrece una cubierta de servicios *más amplia que la del Gobierno de Puerto Rico.*"

Para mejorar estos servicios hay que asignar recursos adicionales. Para ello hay dos formas de hacerlo: una es tomando un préstamo *como lo ha hecho el Gobierno de Puerto Rico* con su tarjeta cuyo principal comienza a pagar *luego de las próximas elecciones* y la otra, que entendemos es *la más responsable,* es ajustar las contribuciones de la propiedad en San Juan. (Énfasis suplido.) Ver Solicitud de Apelación, Apéndices, págs. 27 y 28.

Por otro lado, el anuncio publicado por el Departamento de Salud expresa que:

¿Después de 7 años, cuántas tarjetas de salud ha distribuido el Alcalde Acevedo en San Juan?

0

¿Después de 2 años, cuántas tarjetas de salud ha distribuido el Gobierno de Puerto Rico en el resto de la Isla?

315,000

En sólo dos años, más de 315,000 puertorriqueños están disfrutando de la reforma de salud y de la Tarjeta de Seguro de Salud del Gobierno de P.R. La misma que el Alcalde Acevedo rechazó para el municipio de San Juan, en momentos en que el sistema de salud de este municipio atraviesa su peor crisis.

Ahora después de 7 años prometiendo un plan de salud para San Juan, el Alcalde anuncia una tarjeta que no existe. Por otro lado, cientos de miles de puertorriqueños están disfrutando del poder de la salud con la tarjeta probada del Gobierno de Puerto Rico.

Por el bienestar de la salud de nuestro pueblo es importante que conozcas la verdad.

En síntesis, en su demanda el P.P.D. solicitó que se declarara inconstitucional el alegado uso de fondos públicos, por parte del Departamento de Salud y los otros codemandados, en "anuncios político-partidistas" sin un fin público, y que se les ordenara abstenerse de continuar utilizando fondos públicos en el diseño, producción y publicación de

tales anuncios, así como que se le ordenara tanto al Gobernador como a la Secretaria de Salud el reembolso al erario de lo gastado en los anuncios en cuestión.

El Tribunal de Primera Instancia, Sala Superior de San Juan (Hon. Carmen R. Vélez Borrás, Juez), denegó la solicitud de entredicho provisional, declarando sin lugar la demanda en todas sus partes. Es de esta determinación que acude ante nos el P.P.D., alegando que "[e]rró el Tribunal de Primera Instancia al decidir que se pueden costear con fondos públicos los anuncios en controversia por no encontrarnos en el período electoral según contemplado en el Artículo 8.001 de la Ley Electoral de Puerto Rico".

Evidentemente, los anuncios del Departamento de Salud cuestionados por el P.P.D. no se dan en el vacío, sino en respuesta a los anuncios financiados con fondos públicos del Municipio de San Juan sobre el tema de la tarjeta de salud un mes antes.

B. *Pérez Preston v. Aponte, Caso Civil Núm. AP-95-9*

El 23 de mayo de 1995 los demandantes apelantes presentaron un recurso de entredicho provisional, *injunction* preliminar y permanente, sentencia declaratoria y daños y perjuicios en el Tribunal de Primera Instancia, Sala Superior de Carolina. Alegaron, en síntesis, que las acciones de los demandados apelados de financiar la campaña publicitaria de los diez (10) años de superación y la publicación y diseminación del logo representativo de dicha campaña, así como la frase "UNA DÉCADA DE SUPERACIÓN", en propiedad municipal, a lo largo y ancho de dicha municipalidad, representaba una acción ilegal que contraviene el Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, *supra*; el Art. 2.001 de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, 21 L.P.R.A. sec. 4051(k) y (o), y la Sec. 15(a) de la Ley de la Guardia Municipal, 21 L.P.R.A. sec. 1075(a).

Los demandantes apelantes son el Lcdo. Max Pérez Preston, residente del Municipio de Carolina, Presidente del Comité Local de Partido Nuevo Progresista (P.N.P.) en Carolina, aspirante a la Alcaldía de dicho municipio en las próximas elecciones y candidato oficial a ésta por el P.N.P.;([2]) el Senador Roger Iglesias y los Representantes de Distrito Iván Figueroa y Epifanio Jiménez, todos legisladores por el P.N.P. por el Distrito de Carolina y miembros *bona fide* de dicho partido, y los ciudadanos, electores y residentes del Municipio de Carolina, miembros del P.N.P. y usuarios de los servicios públicos que provee ese municipio.

Previa moción de desestimación presentada a tales efectos por la parte demandada, el Tribunal de Primera Instancia, Sala Superior de Carolina (Hon. Julio Soto Ríos, Juez), desestimó la demanda por entender que los demandantes carecían de legitimación activa y, además, porque la controversia presentada no era justiciable.

Así las cosas, acudieron ante nos los demandantes del presente caso mediante un recurso de apelación. Éste fue denegado el 3 de noviembre de 1995 por entender este Tribunal que los demandantes no tenían legitimación activa y que la controversia planteada no presentaba una cuestión constitucional sustancial. Luego de que este Tribunal decidiera acoger unos días después la apelación presentada por el P.P.D.,([3]) donde se cuestionó el uso de fondos públicos por parte del Departamento de Salud para publicar unos anuncios en contra del programa de salud del Municipio de San Juan, y previa moción de reconsideración, acogimos el presente recurso([4]) como una apelación.

---

([2]) Refiérase al Apéndice de la Apelación, pág. 12, a la Petición de *Injunction*, págs. 20–33, avalada bajo juramento, del Apéndice, al igual que la Petición Enmendada, págs. 37–44.

([3]) Recurso *P.P.D. v. Rosselló*, Caso Civil Núm. AP-95-7.

([4]) Recurso *Pérez Preston v. Aponte*, Caso Civil Núm. AP-95-9.

## C. *P.P.D.* v. *P.N.P., Caso Civil Núm. CT-95-10*

El 30 de noviembre de 1995 se presentó ante nuestra consideración una Solicitud de Auto de Certificación Intrajurisdiccional y/o Petición de *Certiorari* por el Partido Popular Democrático, *P.P.D.* v. *P.N.P.*, Caso Civil Núm. CT-95-10, en la cual se nos pide que certifiquemos el caso *P.P.D. y otros* v. *P.N.P. y otros*, Caso Civil Núm. KLC95-00962, pendiente ante el Tribunal de Circuito de Apelaciones. En esos momentos se encontraba pendiente ante el Tribunal de Circuito de Apelaciones una resolución emitida por la Sala Superior de San Juan del Tribunal de Primera Instancia (Hon. Arnaldo López Rodríguez, Juez), fechada 28 de noviembre de 1995, mediante la cual dicho tribunal determinó que el P.P.D. tenía legitimación activa para instar la acción de *injunction* y daños presentada.

Además, se planteó en dicho caso que debía revocarse la Resolución de 28 de noviembre de 1995 emitida por el tribunal de instancia, quien resolvió que no era necesario emplazar en su capacidad personal a los funcionarios de gobierno que ya habían sido emplazados en su capacidad oficial, ya que se presumía que tenían conocimiento de la pendencia del litigio, sometiéndose así a la jurisdicción del tribunal. El tribunal de instancia, mediante la referida resolución, señaló la vista de *injunction* preliminar para el 30 de noviembre de 1995, luego de la cual se determinaría si procedía el *injunction* preliminar solicitado y ordenar a los demandados abstenerse de continuar utilizando fondos públicos en el diseño, producción y publicación de los anuncios a los cuales se refiere la demanda y cualesquiera otros similares.

El 29 de noviembre de 1995 los demandados presentaron una petición de *certiorari* ante el Tribunal de Circuito de Apelaciones, Caso Civil Núm. KLC95-0962, impugnando la determinación por el tribunal de instancia de la legitimación activa de los demandantes, así como la validez de la jurisdicción del tribunal sobre los funcionarios

públicos en su carácter personal. El Tribunal de Circuito de Apelaciones, en esa misma fecha, emitió una orden que paralizaba los procedimientos en instancia y le concedía un término a la parte recurrida, demandantes en el tribunal de instancia, para exponer su posición.

Mediante Resolución de 1ro de diciembre de 1995, en relación con el recurso de certificación presentado el 30 de noviembre ante nos por el P.P.D., ordenamos lo siguiente:

> Luego de analizar el recurso presentado y a la luz de lo antes expuesto, concluimos que el caso *P.P.D. y otros v. P.N.P. y otros*, que se encuentra ante el Tribunal de Circuito de Apelaciones y el Tribunal de Primera Instancia, plantea cuestiones similares a las que se discutirán en los casos de *Lcdo. Max Pérez Preston y otros v. Hon. José E. Aponte y otros*, AP-95-9 y *P.P.D. y otros v. Hon. Pedro Rosselló González y otros*, AP-95-7 y que en base al Artículo 3.002(j)(2) y (3) de la Ley de la Judicatura de Puerto Rico de 1994, cualifica para ser certificado a este Tribunal. Ahora bien, tomando en consideración que el caso *P.P.D. y otros v. P.N.P. y otros*, se encuentra, parte ante el Tribunal de Circuito de Apelaciones y parte ante el Tribunal de Primera Instancia, concedemos la certificación solicitada en cuanto al caso *P.P.D. y otros v. P.N.P. y otros*, KLC95-00962, que se encuentra ante el Tribunal de Circuito de Apelaciones y *motu proprio* ordenamos la certificación del caso *P.P.D. y otros v. P.N.P. y otros*, KPE95-0720, que se encuentra ante la Sala Superior de San Juan del Tribunal de Primera Instancia.
>
> Con relación al caso *P.P.D. y otros v. P.N.P. y otros*, KPE95-0720 que se encuentra ante el Tribunal de Primera Instancia, Sala Superior de San Juan, a tenor con lo dispuesto en las Reglas 26(b) y 54 del Reglamento del Tribunal Supremo, se ordena al Tribunal de Instancia, Sala Superior de San Juan a celebrar una vista evidenciaria relacionada con el injunction preliminar el lunes, 4 de diciembre y luego de la cual hará las determinaciones de hechos pertinentes al injunction y nos las someterá el miércoles, 6 de diciembre antes del medio día. Las partes deberán ser notificadas por teléfono para que puedan recogerlas. Las partes tendrán hasta el jueves, 7 de diciembre antes del medio día para presentar sus alegatos.
>
> Las partes deberán discutir en sus alegatos, además de los planteamientos constitucionales, los aspectos de legitimación activa a la luz de la narrativa establecida previamente por este Tribunal, los aspectos de academicidad y si estamos o no frente a una cuestión política. Para los únicos propósitos de la vista

oral se consolida el caso de *P.P.D. y otros v. P.N.P. y otros*, con los casos de *P.P.D. y otros v. Hon. Pedro Rosselló González y otros*, AP-95-7 y *Lcdo. Max Pérez Preston y otros v. Hon. José E. Aponte y otros*, AP-95-9.

Así las cosas, el 6 de diciembre de 1995 el tribunal de instancia, una vez celebrada el 4 de diciembre de 1995 la vista evidenciaria que ordenamos, emitió una Orden de *Injunction* Preliminar en el Caso Civil Núm. KPE95-0720 en la cual, luego de hacer ciertas determinaciones de hechos,[5] procedió a formular conclusiones de derecho[6] y finalmente declaró "inconstitucional el uso de fondos públicos para sufragar los gastos de publicidad objeto de esta acción" y libró un "auto de injunction preliminar ordenando a los demandados y sucesores en su cargo la detención inmediata, en lo que resta del presente año, la campaña publicitaria del gobierno en la forma y manera en que está diseñada o sea, con el emblema del P.N.P. y con la frase de 'Compromiso Cumplido' ", disponiendo además, que la prohibición no comprende aquellos anuncios autorizados por ley y los de emergencia.[7]

Las partes demandadas recurridas en los casos de certificación pendientes ante nos, a saber, el Gobernador Hon. Pedro Rosselló González y un número de funcionarios de gobierno en su carácter oficial, el Gobernador y los mismos funcionarios de gobierno en su carácter personal y el P.N.P., presentaron separadamente unas mociones en auxilio de jurisdicción el 6 de diciembre de 1995 en las cuales plantean que el tribunal de instancia incumplió el mandato que le diéramos conforme a la Regla 26(b)(1) del Reglamento de este Tribunal, 4 L.P.R.A. Ap. XXI, al no cir-

---

[5] Véase Orden de *Injunction* Preliminar de 6 de diciembre de 1995, págs. 15–26.

[6] Íd., págs. 7–14 y 26–35.

[7] Se expidió, además, un *injunction* permanente que ordenaba al codemandado Luis Maldonado Rodríguez, Representante, a remover, inmediatamente, la propaganda política que exhibe en su vehículo oficial.

cunscribirse únicamente a las determinaciones de hecho, emitiendo una orden de *injunction* preliminar en el caso.

Como expresáramos anteriormente, a tenor con lo dispuesto por la Regla 26(b) de nuestro Reglamento, 4 L.P.R.A. Ap. XXI, ordenamos al tribunal de instancia "a celebrar una vista evidenciaria relacionada con el injunction preliminar el lunes, 4 de diciembre y luego de la cual hará las determinaciones de hechos pertinentes al injunction y nos las someterá el miércoles, 6 de diciembre, antes del medio día". Siendo ello así, no procedía que el tribunal de instancia dictase el *injunction* preliminar, excediéndose de nuestra encomienda y actuando sin jurisdicción.

El 8 de diciembre de 1995 celebramos una vista oral. Según surge de nuestra Resolución de 1ro de diciembre de 1995, antes transcrita, le advertimos a las partes que discutieran en sus alegatos, además de los planteamientos constitucionales, los aspectos de legitimación activa a la luz de la normativa establecida previamente por este Tribunal, los aspectos de academicidad y si estamos o no frente a una cuestión política.

A los fines de examinar las cuestiones planteadas en el caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, es pertinente que resumamos los hechos tomando en consideración las determinaciones del tribunal de instancia en su Orden de *Injunction* Preliminar, así como las estipulaciones de las partes.[8]

Los anuncios impugnados no están en disputa por haber sido estipulados. Tampoco está en disputa que todos los anuncios de las agencias del Gobierno fueron pagados con fondos públicos.

Los demandantes presentaron, además, como prueba pericial el testimonio del Dr. Rubén Gaztambide Géigel, Catedrático de la Universidad de Puerto Rico, quien posee,

---

[8] Solamente consideramos las determinaciones de hechos y no las conclusiones de derecho ni la parte dispositiva de la Orden de Interdicto Provisional de 6 de diciembre de 1995.

entre otros títulos, un Doctorado en Comunicaciones de la Universidad de Stanford, y al Sr. Josué Merced Reyes, experto en estrategia publicitaria.

El tribunal de instancia encontró probados los hechos que reseña en su Orden de *Injunction* Preliminar.[9]

En resumen, el tribunal de instancia encontró que varios anuncios de la *Oficina de Gerencia y Presupuesto del Gobierno (O.G.P.)* contenían un listado de logros de dicha agencia; que aun cuando los anuncios destacan la labor realizada, el tribunal no ve cómo estos anuncios pueden adelantar los propósitos para los cuales esta oficina fue creada; sin embargo, no puede concluir que carezcan de cualquier fin público, pero reconoce que la frase "compromiso cumplido" identifica los logros de la O.G.P. con los del partido en el poder; aunque no pasa juicio sobre la sabiduría de los gastos en que se incurrió en publicidad, el tribunal de instancia emite el parecer de que los anuncios que sólo destacan logros de las distintas agencias y carecen de información que pueda beneficiar al ciudadano, deben ser regulados.

En cuanto a los anuncios de la *Administración de Seguros de Salud (A.S.E.S.) y del Departamento de Salud*, el tribunal a quo determinó que proveen información sobre la ampliación de la tarjeta de salud a diversos pueblos del país enumerando los pueblos cubiertos; otros proveen información general sobre los beneficios y servicios de la tarjeta de salud, tales como un examen físico anual, un tratamiento de cáncer, algunas cirugías y otros; concluye que para que A.S.E.S. pueda realizar sus funciones es necesario informar los lugares en que está disponible la tarjeta de salud y los beneficios y servicios que ésta ofrece; señala que la información que proveen los anuncios es de gran utilidad para la ciudadanía, pues le permite enterarse de los beneficios disponibles; sin embargo, expresa que nueva-

---

[9] Las determinaciones de hecho del tribunal de instancia están recogidas en las págs. 15–23 de dicha Orden y discutidas en las págs. 23–26 de ésta.

mente nos encontramos con la frase "compromiso cumplido."

En relación con los anuncios del *Departamento de la Familia*, el tribunal de instancia determinó que uno de los anuncios presenta un listado de los servicios que provee el programa PAN y Trabajo, incluso adiestramiento en áreas técnicas, educación básica y remedial, mejoramiento en las destrezas del inglés y ayuda en la búsqueda de empleo; los otros dos (2) anuncios incluyen un listado de los servicios que ofrece el Proyecto Oportunidad para adiestrar a los jefes(as) de familia para alcanzar autosuficiencia económica; concluye que los anuncios proveen información de gran utilidad para la comunidad; sin embargo, todos incluyen la frase "compromiso cumplido".

Sobre los anuncios del *Departamento del Trabajo y Recursos Humanos*, el tribunal de instancia determina que proveen información relacionada al proyecto de readiestramiento para trabajadores desplazados en la Central Mercedita, se menciona que los obreros recibirán varios incentivos y los informa; expresa que, al examinar algunos de los anuncios, puede concluir que contienen información muy beneficiosa para la ciudadanía que está desempleada; sin embargo, todos contienen la frase "compromiso cumplido."

Varios anuncios del *Departamento de Salud* informan, según el tribunal de instancia, que el compromiso de salud que hizo el P.N.P. —incluye la frase hicimos— hace dos años y medio (2½) se está cumpliendo y eso tiene a nuestro pueblo tranquilo; estos anuncios también incluyen la frase "compromiso cumplido"; el tribunal a quo determinó que estos anuncios carecían de información que beneficie a la comunidad y desconoce qué fin público o valor informativo pueda tener una página que lo único que muestra son tarjetas de salud.

Respecto al anuncio del *Departamento de Desarrollo Económico y Comercio de Puerto Rico*, el tribunal de ins-

tancia determinó que informa que se han creado setenta y cinco mil (75,000) nuevos empleos en dos años y medio (2½) y que el Gobierno y la empresa privada están trabajando juntos; el anuncio destaca los logros de dicho departamento; el juez de instancia concluye que aunque el anunciarse no es necesario para realizar su misión, el referido departamento le informa a la comunidad la labor que ha realizado; se incluye, sin embargo, la frase "compromiso cumplido".

El anuncio de la *Oficina del Comisionado de Asuntos Municipales (O.C.A.M.)* provee información sobre el nuevo modelo económico para los municipios y los logros de la oficina; destaca la creación de un fondo de contingencia; la distribución de varios millones de dólares en fondos federales asignados por el Gobernador Rosselló, y el compromiso de O.C.A.M. con la autonomía municipal. A pesar de que dicho anuncio señala los logros alcanzados, el juez de instancia dice desconocer su propósito, pues esta agencia tiene como finalidad asesorar los municipios y no brinda servicios directos al público. Destaca, además, que se incluye la frase "compromiso cumplido".

El aviso del *Departamento de Educación*, según el tribunal a quo, va dirigido a las escuelas que tienen programas de cuidado diurno para que administren los servicios de alimentación como una autoridad escolar independiente; hace alusión a los compromisos de campaña del Dr. Pedro Rosselló; concluye que el anuncio provee información sobre los servicios de alimentación, pero incluye un recuadro en el que se expresa que se ha cumplido con el compromiso del Dr. Pedro Rosselló de continuar ofreciendo una sana nutrición a los niños, y señala que más bien parece beneficiar, exclusivamente, al Dr. Pedro Rosselló.

En cuanto a otros anuncios del *Departamento de Educación*, el tribunal a quo determina que algunos presentan logros de dicho departamento y otros brindan información sobre programas de alfabetización y educación tecnológica;

empero, incluyen la frase "compromiso cumplido" o hacen referencia a compromisos del Dr. Pedro Rosselló.

En lo que concierne a los anuncios del *Departamento de Transportación y Obras Públicas* y de la *Autoridad de Carreteras*, indica el tribunal a quo que uno de ellos ilustra, a través de un mapa, el primer tramo del desvío sur de Ponce; además, incluye la foto del Gobernador y algunos jefes de agencias en la actividad de inauguración; dos de los anuncios destacan los logros de ambas agencias y hacen una relación de las carreteras terminadas y las que están en construcción; concluye que el propósito de estos anuncios es informar a la ciudadanía no solamente los logros del departamento, sino qué carreteras están ya terminadas y que esta información es de gran utilidad para la comunidad; expresa, sin embargo, que los anuncios incluyen la frase "compromiso cumplido".

Examina luego el tribunal de instancia una invitación a subasta del *Departamento de Educación*, para el mantenimiento de las escuelas, en la cual se indica donde estarán disponibles las propuestas y la fecha de entrega; se incluye un recuadro en el que se indica que la realización de obras de mejoramiento confirma el compromiso contraído por el Dr. Pedro Rosselló; concluye que el anuncio brinda información para que las distintas compañías participen en la subasta; sin embargo, señala que la referencia a los compromisos del Gobernador no cumple ningún propósito legítimo ni educativo.

Sobre los anuncios del *Departamento de Hacienda*, expresa el tribunal de instancia que éstos proveen información sobre la reforma contributiva y destacan que con ella se paga menos; otro de ellos discute el caso de un matrimonio que, para reducir el ingreso neto tributable, combinará los ingresos y pagará menos contribuciones; concluye el tribunal a quo que aunque considera necesario que se le informe a la comunidad cómo rendir la planilla y las obligaciones y beneficios bajo la nueva ley, el anuncio pretende

explicar los beneficios de la reforma sin proveer suficiente información; contienen la frase "compromiso cumplido".

El tribunal de instancia evalúa a continuación los anuncios del *Departamento de Corrección y Rehabilitación*, en los cuales se destacan los logros del departamento bajo el lema "Tú tienes derecho a vivir tranquilo"; destacan que el departamento ha cumplido el compromiso del Gobernador Rosselló y ha creado nuevos programas de rehabilitación, más espacios carcelarios y mejoras en los salarios de los empleados; concluye que los anuncios destacan los logros del departamento en su misión de proveer mayor seguridad a la comunidad y mejores programas de rehabilitación; se incluye la frase "compromiso cumplido" y la frase "el Departamento ha cumplido con el compromiso del Gobernador Rosselló", y se pregunta el juez de instancia cuándo se hizo el compromiso y si lo hizo el Gobernador Pedro Rosselló o el candidato a la gobernación por el P.N.P.

Considera, entonces, el tribunal a quo el anuncio de la *Administración de Compensaciones por Accidentes de Automóviles (A.C.A.A.)*. El anuncio destaca los beneficios que provee la A.C.A.A. a través del nuevo servicio de farmacia mediante aprobación electrónica y menciona, además, los nuevos servicios que están disponibles para las víctimas de accidentes de automóviles; concluye que el anuncio provee información necesaria para la ciudadanía, en especial para las víctimas de accidentes de tránsito; sin embargo, incluye la frase "compromiso cumplido".

El tribunal de instancia, luego de analizar estos anuncios, concluye que la parte demandante presentó como prueba otros anuncios que carecen de mensajes político-partidistas, y se refiere a los *Exhibit* 54, 55, 56 y 57 de dicha parte.

Finalmente, el tribunal hace una evaluación del testimonio del doctor Gaztambide Géigel y del publicista Josué Merced Reyes, a los cuales confirió credibilidad. Sobre el primero señala que declaró que existe una relación con la

campaña del Gobierno y la campaña del P.N.P. de 1992 y que dicha conexión "[s]urge con la incersión [sic] en los anuncios de la frase 'Compromiso Cumplido' (que alude a las promesas de campaña del P.N.P. de 1992), los colores predominantemente azul en los anuncios, el gigantesco letrero que existe en los cuarteles generales del P.N.P. de 'Prometimos y Cumplimos' y el suplemento de naturaleza político-partidista circulado en los periódicos de circulación general del país pagado por el P.N.P. atacando la obra del P.P.D. y del Alcalde Héctor Luis Acevedo".

En relación con el testimonio del señor Merced Reyes, éste sostuvo, según el tribunal a quo, que "[l]a campaña de publicidad desarrollada por el Gobierno objeto de esta acción es una campaña originada por el P.N.P. en la campaña eleccionaria en el 1992 y que ahora está siendo contestada por las agencias del gobierno a través de los anuncios impugnados. En su opinión esos anuncios del gobierno deben estar firmados por el P.N.P.". Apunta el juez de instancia que el señor Merced Reyes expresó que "[s]i se analiza individualmente cada anuncio algunos pueden contener información o fin público pero cuando se unen todas las piezas (la frase 'Compromiso Cumplido', el color azul, las palmas, el letrero del edificio del P.N.P. 'Prometimos y Cumplimos' y la publicidad del P.N.P. atacando la obra del Alcalde Héctor Luis Acevedo) y se ven todos los anuncios en conjunto, se convierte en una campaña cuyo propósito es uno de naturaleza político-partidista para beneficiar al P.N.P.".

## II

Con el trasfondo fáctico señalado, examinemos en primer lugar si las partes demandantes han probado tener legitimación activa, frente a la defensa de los demandados que sostienen lo contrario.

Es incuestionable la capacidad legal que tienen los par-

tidos políticos, en casos apropiados, para demandar y ser demandados. *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978).

Empero, no basta que una parte tenga capacidad legal para demandar. Es necesario que la parte tenga, además, legitimación activa (*standing*) para traer la acción de que trata el litigio.

La doctrina que hemos establecido sobre legitimación activa requiere que el promovente de la acción debe cumplir con los siguientes requisitos indispensables: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no abstracto o hipotético; (3) que la causa de acción surge bajo el palio de la Constitución o de una ley, y (4) que existe una conexión entre el daño sufrido y la causa de acción ejercitada. *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387, 392 (1980); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 414 (1982); *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992); *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992); *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994).

No surge de las alegaciones ni de la prueba aportada en los respectivos casos que las partes promoventes hayan demostrado que han sufrido *un daño claro y palpable*, ni tampoco que tal daño es *real, inmediato y preciso*, y no *abstracto* o *hipotético*.

Por el contrario, nos encontramos frente a unas alegaciones generalizadas sobre un daño que a nuestro entender es más abstracto o hipotético que real y preciso; y mucho menos inmediato.

De un examen de la totalidad de la transcripción de evidencia de la vista sobre *injunction* preliminar celebrada el 4 de diciembre de 1995 ante el tribunal de instancia en el caso de *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, notamos que hay *ausencia total* de prueba que tienda a establecer la existencia de un daño claro, palpable, real, inmediato y preciso. La prueba desfilada por los demandantes meramente consistió en el testimonio de los peritos doctor

Gaztambide Géigel y del publicista Josué Merced Reyes, quienes vertieron su opinión respecto a si los anuncios del Gobierno constituían o no una campaña de naturaleza político-partidista.

Vemos, pues, que no se pasó prueba alguna sobre la existencia del alegado daño ocasionado al P.P.D., circuns-cribiéndose la parte demandante a repetir las alegaciones generales contenidas en la demanda. Sobre el particular resulta significativo lo expresado por el Tribunal Supremo de Estados Unidos en *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), citado pór este Tribunal en *Hernández Torres v. Hernández Colón et al.*, supra, págs. 602–603, en cuanto a que:

> "En vista de que éstos no son meros requisitos de una etapa preliminar del proceso sino que son parte esencial del caso de la parte demandante, *cada elemento debe sostenerse de la misma manera que se sostiene cualquier otro asunto en que el peso de la prueba recaiga sobre la parte demandante*, es decir, de la manera y con el grado de prueba requeridos en las etapas sub-siguientes del litigio." (Énfasis suplido.)

Ciertamente es puramente especulativo suponer que la campaña de publicidad del Gobierno ocasiona tales daños al P.P.D. Podría señalarse que, al criticarse dicha campaña y llevar al mercado de las ideas que se trata de un uso innecesario y exagerado de fondos públicos, el daño resul-taría mayor para el partido de gobierno que para el P.P.D. Sea como fuere, este Tribunal no debe convertirse en el árbitro de lo que esencialmente sería un daño político, donde no sabemos realmente cómo puede éste *calcularse, estimarse* o *establecerse*, ni las partes promoventes nos han puesto en condiciones para así hacerlo, siendo esto parte de su responsabilidad.

Referente a la necesidad de que el daño debe ser inme-diato, valga recordar que el Art. 8.001 de la Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, mejor cono-cida como la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, dispone lo siguiente:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro de enero del año que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus *programas, proyectos, logros, realizaciones, proyecciones o planes.* (Énfasis suplido.)

Adviértase que una rama de igual rango constitucional a la nuestra, la Rama Legislativa, al reglamentar el uso de fondos públicos para la compra de tiempo y espacio en los medios de difusión pública para exponer, entre otros, programas y logros de las agencias del Gobierno, estableció una veda, sujeta a determinadas excepciones, a partir de 1ro de enero del año electoral.

*A contrario sensu*, es obvio que la Ley Electoral de Puerto Rico permite este tipo de gasto durante años no electorales, por tratarse, como en efecto se trata, de un fin público, el cual es mantener informada a la ciudadanía sobre asuntos de interés público como la salud, la educación, la seguridad pública, las carreteras, el desarrollo económico, la administración pública y otros temas de interés general.

En la estimación de la Rama Legislativa, este tipo de anuncio sobre los programas y logros de un gobierno no pueden ocasionar, ni ocasionan, un daño inmediato cuando las elecciones generales no habrán de celebrarse sino hasta más de un (1) año después de publicados los anuncios.

Este Tribunal ha resuelto que cuando no hay eventos electorales, el Gobierno disfruta de "amplísimos poderes" sobre su expresión. *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993).

En *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 393 (1984), este Tribunal, citando la prohibición de anuncios por las agencias de gobierno durante el año electoral, la cual originalmente se adoptó por el Art. 3.014 de la

Ley Núm. 1 de 13 de febrero de 1974 (16 L.P.R.A. ant. sec. 2094), expresó sobre dicha prohibición:

> Lo citado ilustra el interés en descontinuar *durante el período eleccionario* la práctica de las agencias gubernamentales de hacer campaña política mediante la publicación de anuncios sobre sus logros y planes. (Énfasis suplido.)

La referida expresión mayoritaria de este Tribunal por voz del entonces Juez Presidente Señor Trías Monge, reconoce que los anuncios sobre logros y planes de las agencias de gobierno pueden tener determinado efecto político. Dicho efecto, en años no eleccionarios, no llega al punto en que estén prohibidos por ley, por el Art. VI, Sec. 9 de nuestra Constitución, *supra*, ni por el Art. II, Sec. 2 de la Constitución del E.L.A., *supra*.

En *Romero Barceló v. Hernández Agosto*, supra, este Tribunal le permitió al Senado de Puerto Rico, entonces controlado por una mayoría del P.P.D., *durante el año electoral de 1984* pagar *con fondos públicos* la transmisión televisiva, en vivo y a todo color, de las vistas públicas sobre el nombramiento de un Fiscal Especial Independiente en el caso del Cerro Maravilla, a pesar de que la prohibición de anuncios contenida en el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, incluye expresamente a la Rama Legislativa, a la Ejecutiva y a la Judicial.

Se resolvió allí por este Tribunal que la cláusula de inmunidad parlamentaria contenida en el Art. III, Sec. 14 de nuestra Constitución, L.P.R.A., Tomo 1, y la escueta disposición del Art. III, Sec. 17 de la Constitución del E.L.A., que dispone que "[s]e dará publicidad a los procedimientos legislativos en un diario de sesiones, en la forma en que se determine por ley" (Const. E.L.A., *supra*, pág. 344), eran suficientemente amplias como para justificar el pago con fondos públicos de las vistas legislativas transmitidas por televisión en un año electoral.

En dicho caso este Tribunal no vio ni aplicó los principios de igualdad económica o neutralidad electoral para darle protección al candidato a la gobernación por el P.N.P., Hon. Carlos Romero Barceló, frente al uso de fondos públicos para transmisiones televisivas por largas horas durante varios días. No se pretendía allí paralizar las vistas públicas del Senado o que no se llevara un registro de éstas, sino que debido a la veda de anuncios en años electorales dispuesta por el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, no se usaran fondos públicos para pagar su transmisión por televisión.

Mientras se transmitían por televisión, pagadas con fondos públicos, las vistas del Senado sobre el Cerro Maravilla, podemos tomar conocimiento judicial —y sabido es por todos en Puerto Rico— que el P.P.D. convirtió el *issue* del Cerro Maravilla en el tema central de su campaña política en 1984.

Resulta *incongruente* y hasta *chocante* que al Senado, controlado por el P.P.D., se le permitió por este Tribunal gastar fondos públicos para vistas por televisión *dentro del período de la veda de anuncios* en un año eleccionario, y en dos de los casos ante nos a la Rama Ejecutiva, controlada por el P.N.P., se le pretenda extender *fuera del año electoral* dicha veda de anuncios.

La teoría de la opinión de la mayoría para justificar el daño a los fines de la legitimación activa se ampara en el caso *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 648–649 (1984).[10] En dicho caso, al resolver que es inconstitucional el uso de vehículos oficiales para hacer, de forma patente y explícita, campaña político-partidista, expresamos:

> ¿Cómo justificar ese desembolso frente a candidatos no incumbentes? *Advertimos que mediante el uso partidista ilimitado de tales vehículos se logra directamente una ventaja económica.* De hecho, cuando aritméticamente se proyecta esa utilización en toda la extensión territorial del país, vías estata-

---

[10] Opinión mayoritaria, págs. 672–674.

les y municipales por los alcaldes y legisladores incumbentes, todos los indicadores son que el desembolso de fondos públicos es sustancial. *Como cuestión de realidad es innegable que representa un subsidio adicional para "gastos de viaje", ya previstos y autorizados bajo el Fondo Electoral.* Ese beneficio aumenta. Después de todo, para el Gobierno un galón de gasolina está exento del pago de arbitrios. No así para otros aspirantes.

En este contexto, no existe vínculo racional justificativo de trato desigual para distinguir entre incumbentes y aspirantes. Todos ellos tienen la misma necesidad de viajar y proveerse transportación para comunicar sus ideas, plataformas, programas y alternativas políticas a todos los electores del país. ¿Es que quienes no detentan el poder público no incurren en estos gastos? No es posible sostener tal proposición. ...

El concepto de igualdad económica conlleva que se aplique con todo rigor la noción de equivalencia aritmética. De prevalecer el Art. 3.011 estaríamos perpetuando una disimilitud monetaria que derrotaría el propósito constitucional. *Concederíamos precisamente unos subsidios gubernamentales superiores y cuantiosos a unos candidatos, dando ventaja sobre otros. Esa disparidad económica y trato desigual es constitucionalmente impermisible.* Véase *P.S.P.* v. *Srio. de Hacienda,* 110 D.P.R. 313 (1980). (Énfasis suplido.)

Adviértase que en el citado caso se trataba de una carta blanca que se le ofrecía al funcionario público de colocar insignias políticas en un vehículo oficial e irse abiertamente de campaña política para favorecer su candidatura y/o la de otros candidatos de su partido. El "subsidiar" el uso *irrestricto* y *explícitamente político-partidista* de los *vehículos oficiales* claramente vulneraba el principio de igualdad económica entre los candidatos. Los casos de autos son *claramente distinguibles*, pues aquí no se trata de permitirle al Gobierno hacer campaña político-partidista a favor de sus candidatos ni colocar la insignia oficial del partido en su publicidad, sino anunciar los programas y logros del Gobierno en el cumplimiento de su deber de informar a la ciudadanía, como lo ha permitido en el pasado este Tribunal y como lo autoriza el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra.* No se trata, por consiguiente, de permitirle a unos candidatos lo que no se les permite a otros, sino de reconocer el deber y la facultad del

gobierno de informar. De ahí que no existe el daño que reclaman los demandantes.

Es obvio que los anuncios de logros y programas pueden tener un determinado efecto político, pero su fin es un fin público —mantener informado al pueblo— por lo que no incide sobre el mandato constitucional de que los fondos públicos se utilizarán para fines públicos y tampoco incide sobre la igualdad de oportunidades económicas de los partidos políticos cuando el gasto se incurre fuera del año eleccionario. Ello según lo dispuesto por la propia Ley Electoral de Puerto Rico y reconocido por este Tribunal.

En el caso *P.P.D. v. Rosselló González*, Caso Civil Núm. AP-95-7, la parte promovente tampoco probó que sufriría un daño claro y palpable, ni que el daño es real, inmediato y preciso, y no abstracto o hipotético. Por el contrario, surge de la evidencia que los anuncios impugnados por la parte promovente fueron publicados después que el Municipio de San Juan pagara, con fondos públicos, un anuncio para justificar por qué San Juan necesita *su propio* seguro médico con expresiones tales como:

"... los ciudadanos de San Juan se merecen tener *más y mejores servicios de salud* ...".

"... merecen un seguro médico *con una cubierta mayor* ...".

"*El gobierno de Puerto Rico se ha negado* a implantar su plan de salud en San Juan en las mismas condiciones que lo ha hecho en otros municipios."

"... especialistas en administración de salud, formularon el nuevo modelo de salud MAS que ofrece una cubierta de servicios *más amplia que la del Gobierno de Puerto Rico.*"

"Para mejorar estos servicios hay que asignar recursos adicionales. Para ello hay dos formas de hacerlo; una es tomando un préstamo *como lo ha hecho el gobierno de Puerto Rico* con su tarjeta cuyo principal comienza a pagar *luego de las próximas elecciones* ...". (Énfasis suplido.)

Los anuncios del Departamento de Salud que impugnan los demandantes no se dan en el vacío; surgen como respuesta a los anuncios pagados con fondos municipales que hizo publicar el Municipio de San Juan, donde cuestionan

el seguro de salud estatal y establecen una *comparación* entre ambos programas. Es, por lo tanto, *legítima* la acción del Departamento de Salud de publicar anuncios comparativos sobre dichos seguros de salud y rechazar las críticas abiertas contenidas en el anuncio del Municipio.

A preguntas nuestras en la vista oral de estos casos, la representación legal de la parte demandante sostuvo que los anuncios del Municipio de San Juan eran legales, pero no así los del Departamento de Salud. Nos parece más justa y ecuánime la contestación del Procurador General a la misma pregunta al señalar que ambos anuncios son legales y representan parte del deber del Gobierno de informar a la ciudadanía sobre asuntos de interés público, como ciertamente son los seguros de salud.

La opinión mayoritaria soslaya este asunto e ignora las circunstancias dentro de las cuales se producen estos anuncios.

En el caso de *Pérez Preston v. Aponte*, Caso Civil Núm. AP-95-9, tampoco la parte demandante probó que sufriría un daño claro y palpable, y que el daño es real, inmediato y preciso, aplicándole los mismos principios de falta de legitimación activa que hemos discutido anteriormente. No obstante, debemos enfatizar que en este caso existe un ingrediente particular que requiere nuestro análisis.

A diferencia de los anuncios de las agencias del gobierno estatal, los cuales poseen un contenido informativo sobre los programas y logros de dichas agencias, en el caso del Municipio de Carolina se alega por los demandantes que se trata del uso de un logo con el número "10"; en el número uno aparecen los años 1985–1995 y en el cero la frase "Carolina Tierra de Gigantes" y sobre éste una "cinta roja" con la frase "una década de superación". Dicho logo, sin más, ha sido desplegado por todo lo largo y todo lo ancho del Municipio de Carolina, sustituyendo el escudo oficial de dicho Municipio en vehículos de saneamiento, Obras Públicas y la Guardia Municipal, y para otros fines, según las

alegaciones de los demandantes. La teoría de los demandantes es que, careciendo dicha campaña de todo contenido informativo sobre logros específicos o programas de gobierno, tal campaña carece de un "fin público".

El problema es que, aunque el planteamiento de los demandantes pudiera ser sólido en cuanto al fin público que pueda tener un anuncio sin contenido,([11]) tal planteamiento le resta fuerza a la prueba de daños de los demandantes a los fines de cumplir con los requisitos de "legitimación activa". Ello, debido a que un anuncio sin contenido no puede producir un daño real, claro, palpable, inminente y preciso.

Por entender que las partes demandantes no han probado que han sufrido un daño claro y palpable ni que el daño es real, inmediato y preciso, y no abstracto o hipotético, concluimos que dichas partes carecen de legitimación activa en estos casos y que, en consecuencia, no procede dictarse el *injunction* preliminar solicitado.

En consecuencia, disentimos de lo resuelto por la mayoría de este Tribunal al reconocerle legitimación activa para solicitar los *injunctions* objeto de la presente controversia a los demandantes P.P.D., Pérez Preston en su carácter de candidato a Alcalde por el P.N.P. del Municipio de Carolina, y los electores de dicho Municipio. Sin embargo, concurrimos con las expresiones de la mayoría de este Tribunal que no le reconoce legitimación activa en los tres (3) casos ante nuestra consideración a los demandantes mencionados "para reclamar de los funcionarios demandados el remedio de restitución de los fondos públicos, toda vez que no existe una conexión entre este remedio y el daño sufrido por los demandantes". Por la misma razón, procede que se desestime la acción en contra del P.N.P. Asimismo, concurrimos con la determinación de la mayoría de este Tribunal

---

([11]) Sobre la legalidad y la razonabilidad de los gastos de fondos públicos en estos tres (3) casos, como en el desembolso de cualquier fondo público, la Oficina del Contralor de Puerto Rico tiene facultad para auditar.

de no reconocerles legitimación activa a los legisladores demandantes, tanto en el caso de *Pérez Preston v. Aponte*, Caso Civil Núm. AP-95-9, como en el caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, "por no haber alegado o demostrado un daño real, inmediato, claro y palpable, ni pretender vindicar las prerrogativas de sus cargos electivos, conforme a nuestra jurisprudencia".(¹²) Todo ello resulta cónsono con nuestra conclusión en torno a que las partes demandantes en los tres (3) casos ante nuestra consideración carecen de legitimación activa.

## III

La cuestión de academicidad no requiere ser discutida extensamente, ya que surge de la naturaleza de las alegaciones, de las determinaciones de hecho del tribunal de instancia y de los alegatos de las partes que dicha doctrina no es aplicable a los casos de autos, como concluye la opinión mayoritaria.

Basta con señalar que a la luz de los criterios que establecimos en *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980), así como en *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988), y *Noriega v. Hernández Colón*, supra, estos casos no son académicos.

## IV

Examinemos si la controversia planteada en estos casos es una "cuestión política".

El caso normativo sobre esta materia es el de *Baker v. Carr*, 369 U.S. 186 (1962), cuyos principios fueron adoptados por este Tribunal en *Noriega v. Hernández Colón*, supra. A la luz de estos casos existe una "cuestión política"

---

(¹²) Opinión mayoritaria, pág. 675.

no justiciable cuando están presentes las circunstancias siguientes: (1) una delegación expresa del asunto en controversia a otra rama de gobierno; (2) *ausencia de criterios o normas judiciales apropiadas para resolver la controversia*; (3) *imposibilidad de decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales*; (4) imposibilidad de tomar una decisión *sin expresar una falta de respeto hacia otra rama de gobierno*; (5) una necesidad poco usual de adherirse, sin cuestionar, a una decisión política tomada previamente, y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto.

Quede claro, como dijimos en *Noriega v. Hernández Colón*, supra, que "[e]l mero hecho de que un pleito buscara la protección de un derecho político no quería decir que el mismo presentara una cuestión política".

Tampoco significa lo anterior que el Tribunal deba renunciar a su función de interpretar la Constitución, función ésta que representa a nuestro juicio la piedra angular para hacer valer la doctrina de separación de poderes, el principio de la forma republicana de gobierno y salvaguardia para la protección de los derechos del individuo frente a los excesos de poder del Estado.

Como expresamos en *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750, 759 (1977), "[l]a función de ser intérprete final de la Constitución le corresponde exclusivamente a un solo poder, el Poder Judicial".[13]

Reconocido lo anterior, entendemos que las partes demandantes pretenden que este Tribunal se convierta en un *censor o árbitro* de lo que es un anuncio de una agencia de gobierno o de un gobierno municipal, que pueda o no constituir propaganda política, en lugar de información a la ciudadanía sobre programas, logros y planes de la agencia. No creemos que la función de la Rama Judicial deba ser la

---

[13] Véanse, además: *Santa Aponte v. Ferré Aguayo*, 105 D.P.R. 670 (1977); *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983).

de convertirse en una super junta de anuncios de la Rama Ejecutiva y de los municipios para juzgar si la multiplicidad de anuncios y avisos que generan dichas agencias o municipios durante los tres (3) años no electorales constituyen o no propaganda política.

Si la Rama Legislativa estima conveniente extender de forma igual o modificado el esquema de reglamentación a los anuncios de gobierno establecido por el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, a años no electorales, eso es asunto que le corresponde a dicha rama.

Si el Poder Judicial asume esa función y responsabilidad, estaríamos invadiendo el campo de las ramas políticas del Gobierno: el de la Rama Ejecutiva, que es la que debe determinar la forma en que ejerce su función de mantener informada a la ciudadanía sobre sus funciones, logros, programas y proyecciones, y el de la Rama Legislativa, que es la que debe reglamentar dichos anuncios, como lo ha hecho, a los fines de que éstos no tengan un impacto real, palpable e inmediato sobre las contiendas electorales ni vulneren el principio de igualdad económica.

Adviértase, además, que es a la Rama Legislativa en primera instancia a la que el pueblo, mediante la Constitución, le delega los poderes para plasmar mediante las leyes la garantía de la expresión de la voluntad del pueblo, a través del sufragio, la protección del ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral, así como también todo lo concerniente a los partidos políticos. Ello a tenor con el Art. II, Sec. 2, y el Art. VI, Sec. 4 de nuestra Constitución, *supra*.

La intervención indebida de la mayoría de este Tribunal en los casos de autos mediante la concesión de una orden de *injunction* preliminar, vulnera las normas de autolimitación judicial que nos hemos impuesto con el propósito de no intervenir para resolver "cuestiones políticas", y al así hacerlo: (1) *se elaboran criterios o normas judiciales que no existen* para resolver una controversia *esencialmente polí-*

*tica*; (2) se hace *una determinación inicial de política pública*,([14]) y (3) tal actuación constituye *una falta de respeto hacia la Rama Ejecutiva y la Rama Legislativa*, todo ello *violando los principios* de que la Rama Judicial *no debe intervenir* para resolver *"cuestiones políticas"* como las planteadas en los casos de autos. De modo que aun si las partes demandantes tuvieran legitimación activa en estos casos, no debemos intervenir por tratarse claramente de una "cuestión política".

## V

Aun en la eventualidad de que pudieran salvarse los escollos —a nuestro entender insalvables en los casos de autos— de la legitimación activa y de la "cuestión política", no procede conceder una orden de *injunction* preliminar. Veamos.

En esencia, estos casos requieren que consideremos dos (2) cláusulas de la Constitución del Estado Libre Asociado de Puerto Rico. La primera de ellas, invocada reiteradamente por las partes demandantes, es el Art. VI, Sec. 9, *supra*, pág. 369, que dispone:

> Solo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley.

Los anuncios cuestionados por el P.P.D. ofrecen información de programas y logros de las agencias de gobierno concernidas sobre temas de gran interés público como la salud, la educación, la seguridad pública, la transportación, el empleo y el desempleo, la administración pública y otros. Mantener al pueblo informado sobre estos asuntos es un deber y una facultad del Gobierno.

---

([14]) La opinión de la mayoría de este Tribunal establece cuál debe ser la norma para reglamentar los anuncios de las agencias del Gobierno sobre sus programas, logros, planes y proyecciones en años no electorales, función que le corresponde inicialmente a la Rama Legislativa.

El tribunal de instancia, en las determinaciones de hechos contenidas en su Orden de Entredicho Preliminar, en el caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, clasificó los anuncios sometidos a su consideración en la vista evidenciaria de 4 de diciembre de 1995 en catorce (14) grupos, los cuales están divididos a base de las distintas agencias de gobierno concernidas. Al evaluar el texto de los anuncios, según reseñado anteriormente en nuestra opinión, el tribunal de instancia reconoció en la gran mayoría de los anuncios que éstos proveen información de gran utilidad para la ciudadanía, informan a la comunidad la labor realizada y brindan información sobre distintos programas. Sobre algunos de los anuncios, como los de la O.G.P. y O.C.A.M., aunque no pasa juicio sobre la sabiduría de los gastos incurridos en publicidad, señala que aquellos anuncios que sólo destacan logros de agencias y no ofrecen servicios directos a los ciudadanos deben ser regulados.

Las propias determinaciones de hechos del tribunal de instancia sirven de base para concluir que los anuncios en cuestión cumplen con los requisitos de "fin público" al proveer información a los ciudadanos sobre programas y logros del Gobierno. Por otra parte, la Rama Legislativa ha reconocido un fin público a estos anuncios al prohibir en el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, este tipo de anuncio durante el año electoral y autorizarlos durante los tres años no electorales. No cabe otra interpretación a la letra clara de dicha disposición que no sea la de que fuera del año eleccionario se permite que las agencias de gobierno "incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública *con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes*". (Énfasis suplido.) Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*.

Así lo hemos reconocido en *C.E.E. v. Depto. de Estado*, supra, y en *Romero Barceló v. Hernández Agosto*, supra, pág. 393.

El planteamiento de la parte demandante, así como las determinaciones de hechos del tribunal de instancia, que cuestiona el uso de la frase "compromiso cumplido", el uso del color azul con cierta frecuencia y el que en el trasfondo de algunos anuncios aparezcan palmas de coco,([15]) no van verdaderamente a demostrar que los anuncios no tengan un fin público, sino que ello le da ventaja al partido de gobierno frente a la igualdad electoral que debe existir entre los partidos políticos. Esto nos lleva a la segunda cláusula constitucional relevante para la disposición de este caso.

Nos referimos al Art. II, Sec. 2 de nuestra Constitución, *supra*, pág. 261, que dispone:

> Las leyes garantizarán la expresión de la voluntad del pueblo *mediante el sufragio* universal, *igual*, directo y secreto, y *protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.* (Énfasis suplido.)

En *Marrero v. Municipio de Morovis,*([16]) supra, pág. 646–647, en la opinión del Tribunal emitida por el Juez Asociado Señor Negrón García, expresamos:

> Al presente, en materia electoral no se cuestiona seriamente el postulado de igualdad inmerso en nuestra Constitución. Históricamente ese ideal ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos políticos y los candidatos. ... Aunque esa aspiración *no alcanzó linaje constitucional*, posteriormente, en virtud de la Ley Núm. 110 del 30 de junio de 1957 —hoy derogada— tuvo alumbramiento estatutario. A tono con esa visión y hasta el presente, todas las leyes electorales han reconocido a los partidos el derecho a participar en un Fondo Electoral. ... El uso autorizado de esos dineros es abarcador. Incluye "gastos de viaje" para beneficio de los candidatos nomina-

---

([15]) Sabido es que la palma de coco es la insignia del P.N.P. y que el azul y blanco son los colores de dicho partido.

([16]) En dicho caso declaramos inconstitucional el Art. 3.011 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3108c, que autorizaba a los alcaldes, entre otros, a usar sus vehículos oficiales para hacer campaña política. El Alcalde de Morovis, Hon. Ángel Rosario, colocó en su vehículo oficial tres (3) insignias políticas correspondientes al P.P.D.

dos y todo gasto administrativo "de campaña y propaganda política" razonablemente concebible y necesario.([17]) (Énfasis suplido.)

Surge, por consiguiente, que el principio de igualdad económica de los partidos políticos que reconocimos en *Marrero v. Mun. de Morovis, supra,* no es de linaje constitucional, sino estatutario; y que en efecto, en materia de igualdad electoral ha sido la Legislatura la que ha plasmado este principio en el ejercicio de los poderes que la Constitución expresamente le delegó, al disponer en el Art. VI, Sec. 4, pág. 367, lo siguiente:

> Se dispondrá *por ley* todo lo concerniente al proceso electoral y de inscripción de electores, *así como lo relativo a los partidos políticos y candidaturas.* (Énfasis suplido.)

Es precisamente en virtud de la delegación de poderes que el pueblo le hace a la Rama Legislativa por medio de la Constitución, tanto en virtud del Art. II, Sec. 2, *supra,* como del Art. VI, Sec. 4, *supra,* que ésta aprueba dos (2) mecanismos esenciales para el logro de la igualdad económica de los partidos políticos: (1) los Arts. 3.021a3.026 de la Ley Electoral de Puerto Rico,([18]) que establecen el Fondo Electoral y la justa distribución de fondos entre los partidos políticos, y (2) el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra,* que establece el mecanismo de la "veda electoral" de anuncios del Gobierno para promover sus logros, programas y proyecciones únicamente durante el período entre el primero (1ro) de enero y el día siguiente a las elecciones generales durante el año electoral.

Es impropio y rebasa injustificadamente los principios más elementales de autolimitación judicial (*judicial self-restraint*) que pretendamos reglamentar, por fíat judicial,

---

([17]) Adviértase que el uso de fondos públicos para fines político-partidistas está autorizado por el esquema del Fondo Electoral, por lo que no procede la impugnación del uso de dichos fondos públicos por razón de *su fin,* sino por la desigualdad en *su distribución,* si alguna hubiera.

([18]) 16 L.P.R.A. secs. 3114–3118.

los anuncios de los logros, los programas y las proyecciones de las agencias de gobierno en años no electorales cuando el Poder Legislativo no ha extendido la veda electoral a tales años, como un juicio valorativo de política pública de los cuerpos legislativos de que el principio de igualdad electoral así no lo exige. Si conviene o no que, estando a plazo de unos pocos días para que entre en vigor la veda electoral que establece el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, durante el próximo año la Legislatura reexamine dicho artículo para aplicarlo prospectivamente durante años no electorales, irrespectivamente del partido que logre la mayoría en las próximas elecciones, o si prefiere hacerlo en la Primera Sesión Legislativa de 1997, le compete a la propia Legislatura determinar el curso que se ha de seguir, si alguno.

En la opinión de la mayoría se hace referencia al hecho de que recientemente la Legislatura enmendó el Art. 3.023 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3116, mediante la Ley Núm. 169 de 11 de agosto de 1995, a los fines de aumentar la participación de los partidos políticos en el Fondo Electoral y que, "[c]onsiderando nuestro esquema electoral, resulta innegable que a través de éste se considere la existencia continua de los partidos políticos y su participación en la discusión de los asuntos de interés público no sólo durante el año eleccionario, sino durante *todo el cuatrienio*". (Énfasis en el original.)[19]

Sobre el particular debemos señalar que aunque la Legislatura aumentó el Fondo Electoral mediante la citada ley, no es nada nuevo que los partidos políticos son elegibles para recibir aportaciones del Fondo Electoral durante *todo el cuatrienio*, según lo dispuesto por el Art. 3.016 de la Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. sec. 3116), renumerado como Art. 3.023 y enmendado por la Sec. 67 de la Ley Núm. 3 de 10 de enero de 1983. Por otra parte, adviértase que cuando la Legislatura reexaminó me-

---

[19] Opinión mayoritaria, pág. 668.

diante la Ley Núm. 169, *supra*, la cuestión de ampliar las aportaciones provenientes del Fondo Electoral a los partidos políticos durante todo el cuatrienio, *no enmendó* el esquema de veda electoral de anuncios que aplica únicamente *durante el año electoral*, por lo que no podemos inferir que se pretendiera extender dicha veda a los tres (3) años no electorales.

En *P.P.D. v. Gobernador II*, 136 D.P.R. 916 (1994), entramos en consideraciones adicionales sobre el principio de igualdad económica y política. De entrada, debemos señalar que allí no creamos un nuevo remedio por vía judicial, sino que extendimos al referéndum celebrado el 6 de noviembre de 1994,[20] las disposiciones del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, como derecho supletorio, por disponerlo así la Ley Núm. 49 aprobada el 2 de agosto de 1994, la cual autorizó la celebración de dicho evento electoral.

En *P.P.D. v. Gobernador II*, supra, reiteramos el principio de igualdad económica *frente a la inminencia de eventos electorales* —un referéndum— y no más allá de la proximidad de tales eventos, sosteniendo el esquema legislativo sobre la veda electoral, aplicable a dicho evento al amparo de nuestra interpretación del Art. 5 de la Ley Núm. 49, *supra*.

En el citado caso expresamos que

> ... bajo el principio constitucional de igualdad económica *que permea todo sufragio* —que el Estado viene llamado a garantizar, y que este Tribunal tiene que proteger al amparo de la Sec. 2 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*— procede que extendamos la prohibición que contiene el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, y la apliquemos a este caso para evitar que el Estado, mediante anuncios gubernamentales, pueda tener una influencia en la libre expresión de los ciudadanos en la votación, con el

---

[20] Dicho referéndum le planteó al pueblo la deseabilidad de enmendar la Constitución para reglamentar el derecho a la fianza y la conveniencia de establecer en nueve (9) el número de Jueces de esta Curia.

poder económico que éste tiene mediante la utilización de fondos públicos. (Énfasis suplido.) *P.P.D. v. Gobernador II*, supra, págs. 926–927.

En la opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton, éste expresó:

*Es necesario enfatizar*, por ende, que esta decisión *no avala una veda total* a los anuncios gubernamentales, sino que provee un procedimiento de evaluación para garantizar el respeto al derecho constitucional aquí reseñado; evitando la emisión o publicación de anuncios diseñados para influir sutil e indebidamente en el pensamiento popular. Además, se protege el principio *de igualdad económica durante un sufragio*. (Énfasis suplido.) *P.P.D. v. Gobernador II*, supra, págs. 932–933.

En estos casos no estamos aplicando un mecanismo de evaluación ya avalado por la Legislatura —el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*— sino que estamos formulando unas guías generales que inmiscuirán a la Rama Judicial innecesariamente en cuestiones esencialmente políticas sobre dónde fijar la línea entre un anuncio informativo y uno de propaganda electoral. Además, lo estaremos haciendo fuera del período de veda electoral sin que nos encontremos frente a un evento electoral inminente, por lo que invocar el caso *P.P.D. v. Gobernador II*, supra, en apoyo de nuestra acción es un grave error.

Es importante resaltar que aunque el Gobierno no tiene un derecho de expresión garantizado por el Art. II, Sec. 4 de la Constitución de Puerto Rico, *supra*, y por la Primera Enmienda de la Constitución de Estados Unidos —ello porque la libertad de expresión allí garantizada es una protección que se le brinda a los individuos— frente al Estado, y no al Estado frente a los individuos, ello no significa que el Gobierno no tenga la facultad y, más aún, *el deber* de mantener informado al pueblo sobre temas de interés público, incluso sus logros, programas, planes y proyecciones.

En *Noriega v. Hernández Colón*, 126 D.P.R. 42 (1990), este Tribunal desestimó un recurso en el cual un miembro de la Cámara de Representantes demandó al entonces Go-

bernador de Puerto Rico, Hon. Rafael Hernández Colón, e instó un recurso de *injunction* para detener la campaña publicitaria del poder ejecutivo dirigida a promover la venta de la Telefónica.

En el voto concurrente emitido por el Juez Asociado Señor Hernández Denton en dicho caso, éste, correctamente a nuestro entender, expresó lo siguiente:

> Al amparo de sus poderes inherentes, el Gobernador *tiene la facultad y el deber* de informar sobre las medidas que ha tomado y los planes concebidos para atender los problemas del país. Es inconcebible que en esta etapa de nuestra historia política un miembro del Poder Legislativo en un sistema republicano de gobierno *pretenda imponerle al Gobernador de Puerto Rico una mordaza para impedir que explique sobre su obra gubernamental.* En asuntos públicos, en la democracia resulta más saludable el deber de informar que la obligación de callar. (Énfasis suplido.) *Noriega v. Hernández Colón,* supra, pág. 56.

En el referido caso, el Juez Asociado Señor Rebollo López expresó en su voto concurrente:

> La sabiduría y propiedad de las gestiones realizadas por el Ejecutivo en relación con la referida campaña publicitaria necesariamente tendrán que ser juzgados *en otro foro que no sea el judicial.* (Énfasis suplido.) *Noriega v. Hernández Colón,* supra, pág. 51.

Ciertamente este Tribunal *no vio* en el caso de marras que la campaña publicitaria masiva del Gobierno sobre la venta de la Telefónica vulnerara la disposición del Art. VI, Sec. 9 de la Constitución del E.L.A., *supra*; es decir, dio por bueno el uso de fondos públicos para fines publicitarios y reconoció la facultad y el deber del Gobierno para expresarse.[21]

En su obra *The System of Freedom of Expression,*[22] el

---

[21] Todavía recordamos claramente a la Vaca Fortunata, producto publicitario creado con fondos públicos que fueron aportados al Gobierno por miles de contribuyentes, muchos de los cuales no estaban de acuerdo con la venta de la Telefónica.

[22] T.I. Emerson, *The System of Freedom of Expression,* Random House, 1970.

eminente Prof. Thomas I. Emerson, de la Facultad de Derecho de la Universidad de Yale, expresa:

> Participation by the government in the system of freedom of expression *is an essential feature* of *any democratic society*. It enables the government to *inform, explain and persuade* - measures especially crucial in a society that attempts to govern itself with a minimum use of force. Government participation also greatly enriches the system; it provides the facts, ideas, and expertise not available from other sources. In short, *government expression is a necessary and healthy part of the system.* (Énfasis suplido.) Íd., pág. 698.

El Gobierno, por otro lado, no puede pretender monopolizar o controlar la expresión de manera que ésta quede ahogada en el libre mercado de las ideas. Este problema lo examina cuidadosamente el profesor Emerson al señalar:

> On the other hand it is very easy to visualize situations in which the government's voice may overwhelm or displace all others and thus seriously distort the system of free expression. This occurs mainly *when the government has a monopoly or near-monopoly over the media or institutions of communications.* ... (Énfasis suplido.) Emerson, *op. cit.*, pág. 712.

Podemos tomar conocimiento judicial de que en Puerto Rico tenemos una prensa activa, vigorosa, dinámica e independiente, y que no existe un monopolio o cuasimonopolio del Gobierno sobre los medios de comunicación o las instituciones de comunicación. En Puerto Rico existe amplia libertad de prensa. Con gran frecuencia cuando el Gobernador o jefes de agencia del Gobierno de turno convocan conferencias de prensa para anunciar programas o logros del Gobierno, los periodistas que cubren tales eventos para los medios de comunicación aprovechan la ocasión para preguntar sobre una diversidad de temas que nada o poco tienen que ver con el asunto tratado. Los medios de prensa, radio y televisión en Puerto Rico no están ni obligados ni limitados en forma alguna a darle más prominencia a lo que el gobierno quiere que se diga, que a lo que los perio-

distas consideran importante desde el punto de vista noticioso. Esto es parte esencial de la libertad de prensa en una democracia.

En vista de lo anterior, es totalmente absurdo afirmar que en Puerto Rico el Gobierno tenga la capacidad de ahogar la libertad de expresión con estos anuncios. El Gobierno aquí no controla la prensa ni controla la gran cantidad de voces políticas, cívicas, religiosas, sindicales, empresariales, culturales, ambientales e individuales que constantemente se expresan en los medios de comunicación sobre los temas principales de interés público.([23])

El Prof. Mark G. Yudof ha realizado, igualmente, un abarcador estudio sobre este tema.([24]) Su libro contiene una expresión cautelar dirigida a la Rama Judicial:

> ... Judicial reshaping of the communications network to limit the impact of government speech may prove wide of the mark and perhaps disable government from implementing policy objectives that require communications with the public. ... Yudof, *op. cit.*, pág. 259.

Más adelante, en su obra, el profesor Yudof expresa lo siguiente:

> ... My preferred technique for judicial resolution of government-speech issues is a variation of the 'legislative remand.' When grave issues of government expression and the First Amendment are involved, a court should be especially concerned that *legislative bodies authorize the communication activity*. This *essentially statutory approach* allows the courts *to police government expression, while denying the judiciary the ultimate power to silence executive officers*. ... (Énfasis suplido.) Yudof, *op. cit.*, pág. 301.

Precisamente la situación que plantean los casos de autos es que la Legislatura de Puerto Rico, en virtud del poder que le confiere el Art. VI, Sec. 4 de la Constitución del

---

([23]) Algunos se refieren a estos grupos como "las fuerzas vivas".

([24]) M.G. Yudof, *When Government Speaks, Politics, Law and Government Expression in America*, University of California Press, 1983.

E.L.A., *supra,* para reglamentar el proceso electoral, así como lo relativo a los partidos políticos y candidaturas, ha restringido la expresión del Gobierno (*government speech*) sobre anuncios de programas, logros y proyecciones durante el año electoral, sin establecer dicha limitación en los tres (3) años que no son electorales. Por consiguiente, es impropio que este Tribunal pretenda aplicar limitaciones al deber y a la facultad del Gobierno de expresarse sobre asuntos de interés público, como son sus logros y programas, durante el período fuera de la veda electoral de anuncios.

Tanto Yudof como Emerson reconocen que anuncios del Gobierno para promover directamente, de forma explícita y patente, un candidato a un puesto político no representa una expresión legítima de gobierno.[25]

Si, por ejemplo, el Gobierno desarrolla una campaña directamente a favor de un candidato a un puesto público o usa las insignias o emblemas oficiales de un partido político en sus anuncios, esto podría ser prohibido por la Rama Judicial. Precisamente, el caso *Marrero v. Mun. de Morovis,* supra, planteó esa situación al colocarse en el vehículo oficial de un alcalde tres (3) insignias políticas del P.P.D.[26]

Si los casos de autos trataran de anuncios que promuevan directamente la candidatura de un funcionario de gobierno o se usara el emblema oficial del P.N.P., o del P.P.D. en el caso de Municipio de Carolina, siendo entonces los anuncios explícitos y patentemente ofensivos en términos político-partidistas, podría dictarse un remedio para eliminar únicamente tales efectos. Un remedio para paralizar en año no electoral la campaña en su totalidad constituye

---

[25] Yudof señala que "cases of egregious government expression make it difficult to advocate completely closing the door to direct judicial intervention...". Yudof, *op. cit.,* pág. 259.

Emerson, por otra parte, indica que "the government would not be empowered to engage in expression *in direct support* of a particular candidate for office...". (Énfasis suplido.) Emerson, *op. cit.,* pág. 699.

[26] Sabido es que la pava es la insignia del P.P.D. y que el rojo y el blanco son los colores de dicho partido político.

*una mordaza al deber y la facultad de informar del Gobierno*, como bien señalara el Juez Asociado Señor Hernández Denton en su voto concurrente en *Noriega v. Hernández Colón*, supra.

Claramente, el caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, no trata del uso de insignias o emblemas oficiales de un partido ni de una campaña directa a favor de un candidato. Se cuestiona el uso de la frase "compromiso cumplido" y la composición de algunos de los anuncios respecto al color azul y, en otros casos, el uso de palmas de coco como elemento de trasfondo. Aunque la parte demandante sostiene que la frase "compromiso cumplido" resulta ser de contenido político-partidista, no debemos perder de perspectiva que el mandato otorgado por el pueblo en 1992 al P.N.P. convirtió su plataforma política en un compromiso de la política pública que deberá seguir el gobierno en el presente cuatrienio, convirtiéndose de esta manera dicha plataforma en un *compromiso de Gobierno*, dejando así de ser un mero compromiso del partido.

No podemos concurrir con la conclusión a la que llega la opinión de la mayoría, de que en el caso de autos los anuncios en controversia fueron preparados por los aquí demandados "en forma coordinada entre las agencias y dependencias del Gobierno y el P.N.P. ...".[27] Igualmente, erró la mayoría al concluir que en los anuncios del Gobierno ha habido un "uso repetido de lemas y estribillos de campaña, logos y símbolos del partido en el poder ...".[28]

Tales conclusiones carecen totalmente de fundamento a la luz de la prueba desfilada ante el Tribunal de Primera Instancia y la que obra en autos.

En *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 638 (1984), expresamos:

En nuestra democracia los partidos políticos son indispensa-

---

[27] Opinión mayoritaria, pág. 702.
[28] Íd.

bles para su funcionamiento. Están investidos de poderes *cuasigubernamentales.* Constituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país. Como tales, *formulan programas de administración* y promueven candidatos a puestos políticos. El subsidio a través del fondo electoral para financiar sus actividades es un ejemplo vivo de esa característica pública. (Énfasis suplido.)

Es evidente, como hemos señalado, que una vez el programa de administración presentado por un partido político al pueblo en unas elecciones recibe el mandato de este pueblo, lo que era cuasigubernamental se convierte en gubernamental, pasando a ser dicho programa de partido *el programa de gobierno.* Esta es una realidad fundamental de nuestro quehacer de pueblo democrático y principio medular de la administración pública en Puerto Rico. Este Tribunal no debe prestarse para la trivialización o el desmerecimiento de lo que en esencia constituye la obligación legal y moral de un gobierno constituido, de informarle al pueblo sobre el cumplimiento de sus obligaciones programáticas, como hasta el presente este Tribunal lo ha reconocido y como lo reconoce el Art. 8.001 de la Ley Electoral de Puerto Rico, *supra.*

Por otra parte, resulta increíble la teoría de que estos anuncios surgen de un plan concertado entre el Gobierno y el P.N.P. por el hecho de que en el techo del edificio donde ubican las oficinas centrales del P.N.P. hay un letrero con la frase "prometimos y cumplimos", y que en los anuncios pagados con fondos del P.N.P. se critica al candidato a gobernador del P.P.D. por no cumplir sus promesas.

No se necesita tener un doctorado en comunicaciones ni ser un experto en estrategia publicitaria para saber lo que *todo el mundo sabe*: que una parte sustancial de las campañas políticas va dirigida a evaluar el récord y la obra de los principales candidatos. ¿De qué podría tratar el grueso de la campaña de ambos partidos —el P.N.P. y el P.P.D.— sino del cumplimiento de las promesas de sus respectivos

candidatos y el incumplimiento del candidato del otro partido? Por consiguiente, no se trata de un designio maquiavélico ni existe evidencia ante nos de un plan deliberado y concertado para hacer coincidir ambas campañas,[29] sino de la naturaleza misma de las campañas de ambos partidos.

Por otra parte, consideramos que es sumamente peligroso y arriesgado que este o cualquier tribunal entre a considerar las interioridades de la planificación de la campaña de ningún partido político con el consabido efecto paralizante y disuasivo (*chilling effect*) que ello pudiera tener sobre el ejercicio de las prerrogativas electorales que se le reconocen ampliamente a los partidos políticos en Puerto Rico.

Sobre el efecto del letrero "prometimos y cumplimos", ¿qué prueba aportó la parte promovente sobre la exposición que tiene un letrero en una de las fachadas sobre un edificio en la Ave. Fernández Juncos en Santurce sobre tres punto seis (3.6) millones de electores puertorriqueños? Además, el hecho de que un partido reclame políticamente para sí los logros que un gobierno dirigido por dicho partido a su vez reclame, es algo a lo que tanto el P.P.D. como el P.N.P. nos tienen acostumbrados. No hay nada *inusitado* en este asunto que no sea parte de la dinámica política, lógica y natural de un pueblo que participa intensamente de la discusión de los temas públicos como la salud, la educación, la seguridad pública, el desarrollo económico, la transportación y la administración pública y que requiere información de fuentes variadas, incluso al propio Gobierno y a los partidos políticos, del acontecer en torno a estos asuntos.

Hemos examinado los criterios elaborados en la opinión de la mayoría para determinar si existe o no un fin públi-

---

[29] Un examen de la transcripción de la vista evidenciaria celebrada el 4 de diciembre de 1995 en el caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, no revela la más mínima evidencia de hechos específicos que demuestren que hubo una planificación conjunta de ambas campañas.

co[30] y, aplicándolos a los hechos en el caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, concluimos que los anuncios de las agencias del Gobierno objeto de este caso *cumplen sustancialmente* con dichos criterios.

Los anuncios en cuestión (1) redundan en beneficio de la salud, seguridad, moral y bienestar general de todos los ciudadanos; (2) están destinados a una actividad de carácter público o semipúblico; (3) promueven los intereses y objetivos de la entidad gubernamental, en consonancia con sus deberes y funciones o la política pública establecida; (4) promueven programas, servicios, oportunidades y derechos, o adelantan causas sociales, cívicas, culturales, económicas o deportivas, y (5) promueven el establecimiento, modificación o cambio de una política gubernamental.

*Todos, absolutamente todos* los anuncios impugnados por los demandantes cumplen con uno o varios de los criterios antes señalados.

Cada uno de los cinco (5) criterios elaborados en la opinión de la mayoría son ciertamente criterios válidos para justificar un "fin público" en expresiones del Gobierno. El problema es que pueden existir otros criterios adicionales, por lo que estos cinco (5) criterios no deben imponerse como un *numerus clausus*, sino en todo caso como un *numerus apertus* para no establecer camisas de fuerza a la Rama Ejecutiva y a la Rama Legislativa. Las ramas políticas, constituidas por funcionarios electos por el pueblo, tienen amplia facultad para determinar lo que constituye un "fin público" y para asignar los fondos públicos a aquellos asuntos que entiendan prioritarios.

En *P.R. Telephone Co. v. Tribl. Contribuciones*, 81 D.P.R. 982, 997 (1960), citando el caso *Carmichael v. Southern Coal Co.*, 301 U.S. 495, 514–515 (1937), expresamos:

> ... [L]os requisitos del debido procedimiento dejan "campo libre para el ejercicio de una amplia discreción legislativa al deter-

---

[30] Opinión mayoritaria, págs. 690–691.

minar qué erogaciones servirán el interés público." Esa discreción incluye, desde luego, la asignación de fondos para el "bienestar general". "Las maneras de beneficiar el interés público están peculiarmente dentro del conocimiento de la Legislatura" y "es a ésta y no a los tribunales a la que corresponde el deber y la responsabilidad de escoger entre los posibles métodos". Por consiguiente para justificar la intervención de un tribunal se requiere "un caso claro de desviación de cualquier propósito público que razonablemente pudiera concebirse", o como se dijo en *Helvering* v. *Davis*, 301 U.S. 619, 640 (1937) "un despliegue de poder arbitrario, no una demostración de juicio". Y esa autoridad judicial, se añadió en *Emerson* v. *Board of Education*, 330 U.S. 1, 6 (1947) debe ejercitarse con la "más extrema cautela".

La Legislatura de Puerto Rico, a través del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, no solamente ha autorizado el uso de fondos públicos para que las agencias de gobierno "incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes", sino que tampoco ha prohibido el uso de fondos públicos para esos fines al asignarle el presupuesto de gastos a dichas agencias. Evidentemente, el uso de fondos públicos para mantener al pueblo informado de la obra gubernamental es un "propósito público que razonablemente puede concebirse".

Por ello, solamente debiéramos prohibir los anuncios patente y explícitamente político-partidistas, o eliminar de éstos lo ofensivo y no lo informativo.

Más aún, no procede adoptar los cinco (5) criterios esbozados por la opinión de la mayoría —y mucho menos como un *numerus clausus*— porque el concepto "fin público" no es un concepto estático, sino cambiante. Así lo reconocimos en·*P.R. Telephone Co.* v. *Tribl. Contribuciones*, supra, pág. 997, donde expresamos:

... El concepto de "fin público" no es uno estático, atado de por siempre a las ideas que en un momento histórico particular definieron los poderes y responsabilidades del gobierno. Está, por el contrario, indisolublemente ligado al bienestar general y,

como éste, tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica y los problemas peculiares que éstas crean, y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad democrática altamente compleja.

Por consiguiente, en los casos de autos, no debemos definir lo que constituye un "fin público" tomando en consideración lo que dicho término, amplio, flexible y cambiante, es capaz de *incluir*, sino por aquello que dicho término claramente debe *excluir*. Así, pues, debe excluirse lo que es —tal y como hemos dicho antes— patente y explícitamente político-partidista, como lo hicimos en *Marrero v. Mun. de Morovis*, supra.

Si la sensibilidad de la mayoría de los jueces de este Tribunal los lleva a reaccionar negativamente a estos anuncios, el remedio en todo caso sería eliminar lo "controversial" y no los anuncios en su totalidad. Un remedio concebido en términos de silenciar a la Rama Ejecutiva en su facultad y deber de informar al pueblo es no solamente una falta de respeto a otra rama constitucional del Gobierno, sino *una mordaza para impedir que el Gobierno explique sobre su obra gubernamental.*([31])

En *Marrero v. Mun. de Morovis*, supra, el remedio que concedimos fue el de prohibir que el vehículo oficial del alcalde de Morovis se usara para las campañas político-partidistas y ordenar que se removieran las insignias de su partido político de dicho vehículo, *pero no le quitamos el carro*. En estos casos la mayoría se ha extralimitado al ordenar la paralización total de los anuncios y no meramente la remoción de aquellos elementos que pudieran objetar.

Este es el tipo de controversia en que no debiera involucrarse este Tribunal, recordando el principio jurisprudencial de autolimitación que requiere que nos apartemos

---

([31]) Ver *Noriega v. Hernández Colón* 126 D.P.R. 42 (1990).

de considerar una "cuestión política" que, en todo caso, corresponde a la Legislatura resolver.

No tratándose de anuncios patente y explícitamente político-partidistas, no procede la intervención de este Tribunal.

Por todas las consideraciones anteriormente expuestas, concluimos que no procede el *injunction* preliminar. En el caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10, procede dejar sin efecto la Orden de Injunction Preliminar dictada por el tribunal de instancia el 6 de diciembre de 1995, tanto por las razones discutidas en esta opinión como por razón de haber sido dictada sin jurisdicción, y desestimar la demanda; en el caso *P.P.D. v. Rosselló*, Caso Civil Núm. AP-95-7, procede revocar la sentencia dictada por el tribunal de instancia y desestimar la demanda por falta de "legitimación activa", y en el caso *Pérez Preston v. Aponte*, Caso Civil Núm. AP-95-9, procede confirmar al tribunal de instancia al determinar la ausencia de "legitimación activa" por parte de los demandantes. En lo que respecta al caso del Representante demandado, Hon. Luis Maldonado Rodríguez, al no comparecer a la vista y habérsele anotado la rebeldía, y tomando en consideración las alegaciones de la demanda, concurrimos con lo ordenado en la opinión de la mayoría.